UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DEVELOPMENT SPECIALISTS, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO.: |
| EXECUTIVE RISK INDEMNITY INC., | ) | |
| GENESIS INSURANCE COMPANY, LLOYD'S | ) | |
| & COMPANIES SYNDICATE NOS. 839, 376 | ) | |
| and 2376, WILLIAM M. HANEY, III, | ) | |
| CHRISTOPHER J. NAGEL, JOHN T. PRESTON, | ) | |
| PETER A. LEWIS, CHARLES W. SHAVER, | ) | |
| MARIE J. LANGLOIS, ETHAN JACKS, | ) | |
| EUGENE BERMAN, DAVID HOEY, F. | ) | |
| GORDON BITTER, R.W. BECK, INC., and | ) | |
| THE BLACKSTONE GROUP, LP, | ) | |
| | ) | |
| Defendants. | ) | |

**02-121 1RWZ**

## COMPLAINT

### INTRODUCTION

This action seeks damages, as well as judgment pursuant to 28 U.S.C. §§ 2201 and 2202,

declaring that Defendants must advance legal defense costs to Plaintiff Development Specialists,

Inc. ("DSI") and indemnify it against any damages or settlement amounts arising out of a certain

lawsuit filed against it, entitled MMT Recovery LLC et al. v. Haney, et al., Civil Action No.

01-10062-MLW (the "MMT Recovery Action").  For some Defendants, that duty arises under

certain Directors and Officers liability insurance policies they issued, because DSI has been sued

in the MMT Recovery Action solely on a vicarious liability theory as an alleged *de facto* officer

of Molten Metals, Inc., the corporation which purchased the insurance policies.  For other

Defendants, the obligation for contribution and indemnification arises by virtue of the fact that



they were active tortfeasors and responsible for any damages for which the plaintiffs in the MMT Recovery Action seek recovery, while DSI has been charged with, at most, vicarious and passive responsibility.

## PARTIES AND JURSIDICTION

1.      Plaintiff Development Specialists, Inc. ("DSI") is an Illinois corporation with a principal place of business in Chicago, Illinois.

2.      Defendant William M. Haney III ("Haney") is, and at all relevant times was, an individual residing in Massachusetts.

3.      Defendant Christopher J. Nagel ("Nagel") is, and at all relevant times was, an individual residing in Massachusetts.

4.      Defendant John T. Preston ("Preston") is, and at all relevant times was, an individual residing in Massachusetts.

5.      Defendant Peter A. Lewis ("Lewis") is, and at all relevant times was, an individual residing in New York.

6.      Defendant Charles W. Shaver ("Shaver") is, and at all relevant times was, an individual residing in Massachusetts.

7.      Defendant Ethan Jacks ("Jacks") is, and at all relevant times was, an individual residing in Massachusetts.

8.      Defendant Eugene Berman ("Berman") is, and at all relevant times was, an individual residing in Maryland.

9.      Defendant David Hoey ("Hoey") is, and at all relevant times was, an individual residing in Massachusetts.

2

10.     Defendant Marie Langlois ("Langlois") is, and at all relevant times was, an individual residing in Massachusetts.

11.     Defendant F. Gordon Bitter ("Bitter") is, and was at all relevant times was, an individual residing in New York.

12.     Haney, Nagel, Preston, Lewis, Shaver, Jacks, Berman, Hoey, Langlois, and Bitter (the "Officers and Directors") were at various relevant times the officers and/or directors of Molten Metal Technology, Inc. ("Molten Metal"), a corporation organized under the laws of the State of Delaware, which had its principal place of business in Waltham, Massachusetts.

13.     Upon information and belief, Defendant Executive Risk Indemnity Inc. ("Executive Risk" ) is a corporation organized under the laws of the State of Delaware, which has its principal place of business at Simsbury, Connecticut, and which, at all relevant times, conducted business in Massachusetts.

14.     Upon information and belief, Defendant Genesis Insurance Company ("Genesis") is a corporation organized under the laws of the State of Delaware, which has its principal place of business at Stamford, Connecticut, and which, at all relevant times, conducted business in Massachusetts.

15.     Upon information and belief, Defendant Lloyd's & Companies Syndicates Nos. 839, 376, and 2376 ("Lloyd's") are foreign insurance associations with their principal place of business at London, England and a principal place of business in the United States in New York, New York, and which, at all relevant times, conducted business in Massachusetts on a regular and substantial basis.  (Lloyd's, Genesis, and Executive Risk are referred to collectively as the "Insurers.")

16.     Upon information and belief, Defendant The Blackstone Group, LP

("Blackstone") is a partnership with a principal place of business in New York.  At relevant

times hereto Blackstone was a financial consultant providing services to Molten Metals in

conjunction with Molten Metal's bankruptcy and its efforts to secure post-petition financing.

17.     Defendant, R. W. Beck, Inc. ("R.W. Beck") is a corporation with a usual place of

business in Framingham, Massachusetts.  R.W. Beck is an engineering consulting firm which

provided services at relevant times hereto to Molten Metal and the post-petition lenders.

18.     Jurisdiction is based upon 28 U.S.C. § 1332, in that the amount in controversy

exceeds $75,000.00 and the controversy is between citizens of different states.

19.     Venue is proper under 28 U.S.C. § 1391(a)(2) and (3), as a substantial part of the

events or omissions giving rise to the claim occurred in this judicial district, and Defendants are

subject to personal jurisdiction in this district.

## NATURE OF THE ACTION

20.     This is an action for a declaratory judgment, breach of contract, contribution,

indemnification, attorneys' fees, and violation of G.L. c. 93A and c. 176D.

## FACTS

Molten Metal's Bankruptcy and DSI's Appointment As Financial Professional

21.     Molten Metal was a corporation which developed certain unique technologies for

the processing of hazardous waste.

22.     DSI was hired by Molten Metal to "assist management in the development of

financial models, projections and reports in order to refine ... cash needs and to develop

meaningful pro forma reports; evaluate ... financial, operational and marketing conditions and

options; assist in negotiations with creditors; analyze, from a business perspective, the various

alternatives available to ... restructure [ ] debts; and assist ... preparing for Chapter 11 filing."
At no time was DSI retained to evaluate the unique Molten Metal technology, something that
was far afield from DSI's financial tasks.

23.     Bitter signed the retention agreement as CEO of Molten Metal on or about
November 6, 1997. At the time Bitter signed the agreement, Molten Metal was insolvent, as
Bitter was aware.

24.     On December 3, 1997, Molten Metal filed a voluntary Chapter 11 bankruptcy
petition.

25.     DSI was approved by the Bankruptcy Court in Molten Metal's Chapter 11
reorganization proceedings as a professional providing solely financial assistance to the debtor-
in-possession. Specifically, on January 15, 1998, the Bankruptcy Court approved Molten
Metal's Motion for Retention of DSI to perform accounting management oversight, bankruptcy
case management, and reorganization planning. At no time was DSI retained to evaluate the
unique Molten Metal technology, something that was far afield from DSI's financial tasks. Had
DSI purported to undertake an evaluation of the Molten Metal technology, such an evaluation
would have been so far afield from its approved tasks that any efforts in that regard would have
been rejected by the Bankruptcy Court and uncompensated.

Executive Risk Policy

26.     Upon information and belief, on or about January 19, 1998, after the bankruptcy
petition and after the retention of DSI, in consideration of a premium of $350,000.00, which
Molten Metal duly paid to Executive Risk, Executive Risk entered into, issued, and delivered to
Molten Metal, in the Commonwealth of Massachusetts, a written contract of insurance entitled
"Directors and Officers Liability Insurance Policy," bearing a policy number 751-091628-98,

5

and covering the period from January 19, 1998 through January 19, 1999 (the "Executive Risk Policy"). A copy of the Executive Risk Policy is attached as Exhibit A. The Executive Risk Policy was duly renewed through January 19, 2002.

27.     Under Section I of the Executive Risk Policy, Executive Risk is obligated to pay "on behalf of the Insured Persons Loss from Claims first made during the Policy Period against the Insured Persons for Wrongful Acts, except for Loss which the Company pays to or on behalf of the Insured Persons as indemnification." The Executive Risk Policy defines "Insured Person" to include "any past, present or future director or officer of [Molten Metal]." The Policy defines "Loss" as:

> (1)     any monetary damages or settlements which an Insured Person is obligated to pay as a result of any Claim.. . including but not limited to punitive or exemplary damages where insurable under applicable law, and
>
> (2)     any Defense Expenses which an Insured Person is obligated to pay as result of any Claim.

28.     The Executive Risk Policy defines a "Claim" to include "any civil proceedings in a court of law or equity." The Executive Risk Policy defines "Wrongful Act" as:

> (1)     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an Insured Person in his or her capacity as a director or officer of the Company;
>
> (2)     any matter asserted against an Insured Person solely by reason of his or her status as a director or officer of the Company; and
>
> (3)     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an Insured Person in his or her Outside Capacity.

29.     The Executive Risk Policy also provides:

> The Underwriter will, upon written request, pay on a current basis Defense Expenses for which this Policy provides coverage. Otherwise, the Underwriter will pay Loss only on the final disposition of a Claim.

Genesis Excess Policy

30.     Upon information and belief, on or about January 19, 1997, in consideration of a

premium of $65,000.00, which Molten Metal duly paid to Genesis, Genesis entered into, issued,

and delivered to Molten Metal, in the Commonwealth of Massachusetts, a written contract of

insurance entitled "Genesis Directors and Officers Liability Insurance Policy," bearing a policy

number YXBOO1372 and covering the period from January 19, 1997 through January 19, 1998

(the "Genesis Excess Policy"). A copy of the Genesis Excess Policy is attached as Exhibit B.

Lloyd's Excess Policy

31.     Upon information and belief, on or about January 19, 1997, in consideration of a

premium of $90,000.00, which Molten Metal duly paid to Lloyd's, Lloyd's entered into, issued,

and delivered to Molten Metal, in the Commonwealth of Massachusetts, a written contract of

insurance entitled "Excess Directors and Officers and Company Reimbursement indemnity,"

bearing a policy number 542/F01230D97 and covering the period from January 19, 1997 through

January 19, 1998 (the "Lloyd's Excess Policy"). A copy of the Lloyd's Excess Policy is attached

as Exhibit C.

The MMT Recovery Action

32.     On or about December 9, 2000, MMT Recovery LLC and other plaintiffs, all

sophisticated investment funds who invest in distressed securities and bankrupt entities, filed

claims in the Suffolk County Superior Court against Haney, Nagel, Preston, Jacks, Berman and

others. See Complaint in the MMT Recovery Action, attached as Exhibit D.  On January 11,

2001, some of the defendants therein removed the MMT Recovery Action to this Court.

33.     The MMT Recovery Action brought claims against fourteen defendants asserting

eight counts. The gravamen of the MMT Recovery Action is that the officer and directors of

Molten Metals committed various malfeasances, including fraudulent misstatements and breach

of fiduciary obligations, during the course of their solicitation of post-petition financing.

34.     Specifically, the Complaint states that Nagle and Haney knew that Molten Metal's

waste treatment technology did not operate as they had represented to the post-petition lenders.

Nonetheless, Nagle, as chief technology officer, and Haney, as chief executive officer, had made

repeated knowing misstatements about the performance of that technology, according to the

Complaint.

35.     The MMT Recovery Action alleges that Nagle, in a meeting of December 10,

1997, willfully lied about the performance of Molten Metal's technology in treating hazardous

waste.  In that meeting, it is alleged, Bitter, Hoey and Berman confirmed Nagle's lies.

36.     The MMT Recovery Action further alleges that Berman and Jacks provided the

post-petition lender with written materials which contained multiple falsehoods concerning the

technology's performance.

37.     The MMT Recovery Action further alleges that Nagle wrote a presentation to the

creditors' committee containing multiple misrepresentations concerning the performance of

Molten Metal's technology, and provided it to the post-petition lenders to induce their loan.

38.     The MMT Recovery Action alleges that Haney, Nagel and Lewis knew that the

representations being made were not true.  It also alleges that R.W. Beck produced a written

independent engineer's report which itself confirmed multiple misrepresentations about the

technology, and later, did another investigation of the technology, for the post-petition lenders

themselves, but repeated its misstatements in a report to them.

39.     The MMT Recovery Action also included DSI as a defendant to a single count

alleging violation of the Massachusetts Uniform Securities Act.  Unlike the claims against the

other defendants and R.W. Beck,  the claim against DSI did not allege any active wrongdoing on the part of DSI whatsoever.  Rather, the only claim against DSI alleged that DSI was liable for the illegal and fraudulent actions of the *other* defendants, and that the reason DSI had such vicarious liability was because it was allegedly operating as a "de facto" officer of Molten Metal. The claim against DSI thus was solely status-based and the claim alleged solely passive, vicarious liability.

40.     Other entities which were not sued in the MMT Recovery Action nonetheless were actively involved in the business of Molten Metal, or the procurement of post-petition financing, and were active tortfeasors against the plaintiffs in the MMT Recovery Action.

41.     For instance, F. Gordon Bitter acted as the CEO of Molten Metal during and slightly prior to the bankruptcy.  Bitter was, on information and belief, present at the meeting with the post-petition financers at which Nagel made the alleged misstatements and he supported those misstatements.

42.     Blackstone conveyed the initial investment proposal from Molten Metal to the MMT Recovery plaintiffs.  Upon information and belief, as Molten Metals' financing adviser and the broker for the post-petition financing, Blackstone also caused the other defendants to make the various alleged misrepresentations to the MMT Recovery plaintiffs.  Upon information and belief, Blackstone was hired to review Molten Metal's financial alternatives in or about November 1997, including a potential sale of its assets, and to consult with the company regarding those alternatives.

Related Actions To The MMT Recovery Action

43.     The MMT Recovery Action is not the only litigation involving Molten Metal and its directors and officers, although it is the only one in which DSI has been sued.  In 1997

shareholders of Molten Metal commenced a class action securities fraud litigation (the "Shareholders' Litigation"), which case has now been settled. In addition, after the appointment of a Chapter 11 Trustee in Molten Metal's bankruptcy case, the Trustee commenced an action against the directors and officers entitled <u>Stephen S. Gray, Chapter 11 Trustee v. Haney, et al</u>, No- 99-1653 ("Trustee Action").

44.     After the Insurers declined coverage of the officers and directors in the Trustee Action, certain actions were filed seeking such coverage. Another former Molten Metal director and officer sought insurance coverage from Executive Risk for claims against him in the Trustee Action, in an action entitled <u>Peter A. Lewis v Executive Risk Indemnity, Inc</u>, C.A. No. 00-11093 RWZ (the "Lewis Coverage Action"). Then, the Trustee sued the Insurers seeking coverage for the Trustee Action, in a case entitled <u>Stephen S. Gray, Chapter 11 Trustee v. Executive Risk, et al</u>, No- 00-1386, (the "Trustee Coverage Action"). After they were not allowed to intervene in the Lewis Coverage Action, various other officers and directors sued the Insurers seeking coverage for the MMT Recovery Action in <u>Haney, et al v. Executive Risk, et al</u>., C.A. No. 02-10248 RWZ (the "Haney Coverage Action").

<u>Notice to Executive Risk and Declination of Coverage</u>

45.     On or about January 17, 2001, DSI timely notified Executive Risk of the claims in the MMT Recovery Action in writing by mailing a copy of the Complaint to Executive Risk. It also requested that Executive Risk advise as soon as possible regarding coverage under the Executive Risk Policy. This notice was sent within days after DSI was served with the Complaint in the MMT Recovery Action.

46.     DSI fulfilled all of the conditions that the Executive Risk Policy required.

47.   Executive Risk did not respond directly to DSI until June 27, 2002 concerning its claims for coverage.  However, on or about January 22, 2001, Executive Risk, through its counsel, sent a letter stating that Executive Risk had no obligation under the Executive Risk Policy to defend the former officers or directors of Molten Metal in connection with the MMT Recovery Action or to indemnify them for any amounts they are obligated to pay in damages or settlement in connection with that action.  Executive Risk specifically stated in that letter that DSI was not an insured under the Executive Risk Policy.  Executive Risk "reserve[d] the right to amend its coverage position if it becomes appropriate to do so based on any additional information or factual or legal developments as this matter progress." A copy of the letter is attached as Exhibit E.

48.   Executive Risk's reasons for denial of coverage to all the officers and directors was the same. Executive Risk contended that the claim raised in the MMT Recovery Action related back to the date of the Shareholder's Litigation, because it was similar to that litigation. As such, the claim was not made within the Executive Risk policy period.  Executive Risk also claimed that a certain notice to insurers concerning the "Castle Creek Claims" constituted prior notice which caused the claim to arise prior to the Executive Risk Policy period.  Executive Risk did not take a different position with respect to DSI, even though DSI was never named in the Shareholder's Litigation.

Notice to Genesis and Declination of Coverage

49.   On or about January 17, 2001, DSI timely notified Genesis of the claims in the MMT Recovery Action in writing by mailing a copy of the Complaint to Genesis. This notice was sent within days after DSI was served with the Complaint in the MMT Recovery Action.

50.   DSI fulfilled all of the conditions that the Genesis Policy required.

51.     On February 15, 2001, Genesis declined coverage.  Specifically, on or about February 15, 2001, Genesis, through its counsel, sent a letter to counsel for DSI stating that Genesis had no obligation under the Genesis Policy to defend DSI or hold it harmless in the MMT Recovery Action. A copy of the letter from Genesis is attached as Exhibit F.  Genesis noted that while a later-arising claim such as the MMT Recovery Action could relate back to the Genesis Policy period, in this case there was no such relation back since the Shareholders' Litigation and the Castle Creek Claims were substantially different from the allegations of the MMT Recovery Action.

52.     Thus, the position of Genesis regarding coverage was diametrically opposed to that of Executive Risk.

Notice of the Underlying Action to Lloyd's and No Response As To Coverage

53.     On or about January 17, 2001, DSI timely notified Lloyd's of the claims in the Underlying Action in writing by mailing a copy of the Complaint to Lloyd's.  This notice was sent within days or weeks after DSI was served with the Complaint in the MMT Recovery Action.

54.     DSI fulfilled all of the conditions that the Lloyd's Policy required.

55.     Counsel to Lloyd's, Mendes & Mount, on January 22, 2001, acknowledged receipt of DSI's January 17, 2001 letter and advised DSI to further notify the firm of Hanson & Peters, additional counsel to Lloyd's.  On January 24, 2002, counsel to DSI notified Hanson & Peters of the claims by mailing a copy of the January 17, 2002 letter, re-addressed to Hanson & Peters.

56.     Counsel to Lloyd's, Sedgwick, Detert, Maran & Arnold, in a letter of January 31, 2002, acknowledged receipt of the January 17, 2001 letter, and reserved all rights of Lloyd's,

particularly to deny coverage on the basis that DSI is not an insured under the Lloyd's Excess Policy.

57.     Notwithstanding these acknowledgments, Lloyd's never responded to the merits of DSI's demand for coverage.  On or about April 9, 2001, Lloyd's, through its counsel, sent a letter to other directors and officers of Molten Metal stating that Lloyd's had no obligation under the Lloyd's Policy to defend or indemnify them or hold them harmless in the MMT Recovery Action. A copy of the letter from Lloyd's is attached as Exhibit G.  Although the letter was not sent to DSI, it stated that "DSI is not an insured under [the Lloyd's Excess Policy]."  The letter also incorporated the position of Genesis that the Shareholders' Litigation and Castle Creek Claims were not prior litigation or prior notice bringing the MMT Recovery Action within the Lloyd's Excess Policy period.

58.     Thus, the position of Lloyd's regarding coverage was also diametrically opposed to that of Executive Risk.

This Court Makes A Ruling Supporting DSI's Claims For Coverage

59.     In the Lewis Coverage Action, this Court handed down a ruling on December 28, 2001, which supported DSI's claims for coverage from Executive Risk.

60.     Specifically, this Court ruled, inter alia, that the Shareholders' Litigation was not "pending litigation" which excluded coverage for the Trustee Action to Mr. Lewis, a former Molten Metals officer.   One basis for the decision was that Mr. Lewis had not been sued in the Shareholders' Litigation.  The same pending litigation exclusion was also a basis for refusal of coverage to DSI, but, like Mr. Lewis, DSI also was not sued in the Shareholders' Litigation.

13

61.     Thus, this Court's decision further supports DSI's claims that Executive Risk should provide coverage for the Underlying Action. A copy of the Court's decision is attached hereto as Exhibit H.

The Global Mediation

62.     The MMT Recovery Litigation was stayed shortly after its inception so that certain of the Officers and Directors could pursue insurance coverage under the claims identified above. Although that stay expired in March of 2002, the case was again delayed so that the insurers, the individual directors and officers, the bankruptcy trustees, and the other parties to the various related cases could attempt a global mediation of the various claims amongst them.

63.     On or about May 13 and 24, 2002, the parties met to attempt a global mediation. Mediation efforts continued through the rest of the summer, and although DSI had participated in the mediation efforts and had notified the Insurers of its claims, no attempt was made by the Insurers to include DSI amongst the parties they sought releases from or for in the mediation negotiations, or in the global resolution.

64.     Rather, counsel to DSI became aware that the Insurers were preparing to pay out monies from the various policies to indemnify and hold harmless the *other* alleged directors and officers, but not apparently for the benefit of DSI.

Renewed Notice to Insurers

65.     On June 3, 2002, counsel for DSI sent a renewed demand letter to the Insurers' counsel demanding that the Insurers provide coverage to DSI, particularly in light of the mediation payments and the decision in the Lewis Coverage Action. A copy of that letter is attached hereto as Exhibit I.

66.     Notwithstanding the renewed notice, Executive Risk again declined coverage to DSI.

67.     Specifically, on or about June 27, 2002, Executive Risk, through its counsel, sent a letter to DSI's counsel, declining coverage, on the basis that DSI was not an insured, and on the other bases stated in its letter of January 22, 2001 to the directors and officers. The response specifically referred to and even attached the letter of January 22, 2001, despite the fact that this Court had already eliminated at least one of the defenses therein. Executive Risk further stated that the "state of the MMT Recovery Action is in flux given the advanced state of settlement negotiations" and offered to further discuss coverage only *after* the global settlement was concluded, and policy money paid for the benefit of the other alleged officers and directors. A copy of Executive Risk's June 27, 2002 letter is attached as Exhibit J.

68.     For their part, neither Lloyd's nor Genesis responded in any way to DSI's renewed notification.

The Conflicting Positions of Executive Risk, Genesis and Lloyd's

69.     Executive Risk on the one hand, and Genesis and Lloyd's on the other hand, have taken conflicting and inconsistent positions in declining DSI and the Officers and Directors coverage under their respective policies. Accordingly, there is a dispute between the DSI and the Insurers, and various disputes among the Insurers, which must be resolved.

70.     Specifically, Executive Risk has claimed that the Shareholders' Litigation and the Castle Creek Claims are the same as the MMT Recovery Action and thus the claim arose during the Genesis and Lloyd's Excess Policy periods under the prior litigation or prior notice provisions. In other words, Executive Risk asserts that it need not provide coverage of the

Underlying Action because, among other things, Genesis and Lloyd's must provide such coverage.

71.     Genesis and Lloyd's have stated a contrary position, asserting that the MMT Recovery Action differs from the Shareholders' Action and the Castle Creek Claims, and thus arose within the Executive Risk Policy period.

72.     The various conflicting positions of Executive Risk, Genesis, and Lloyd's cannot each be correct, and DSI needs this Court to resolve the conflict between those positions.

Actual Controversy Between And Among DSI, The Insurers And The Other Defendants

73.     As an alleged officer of Molten Metals, duly appointed by the Bankruptcy Court, DSI is entitled to coverage under the Executive Risk policy for the allegations in the MMT Recovery Action.  The pending litigation and/or prior notice exclusions in the Executive Risk Policy cited by Executive Risk in its January 22, 2001 and June 27, 2002 denial of coverage letters are inapplicable to the facts at issue in the Underlying Action as to DSI.

74.     Executive Risk is obligated to defend DSI in the MMT Recovery Action, and also to indemnify it for any amounts it is obligated to pay in damages or settlement as a result of the claims.

75.     An actual controversy exists between DSI and Executive Risk regarding Executive Risk's defense and indemnification obligations.

76.     To the extent the Court agrees with Executive Risk and concludes that the allegations in the MMT Recovery Action are "the same as, or substantially similar to" the allegations in the Securities Litigation or the Castle Creek Claims, then the Court must conclude that the exclusions cited by Genesis and Lloyd's are inapplicable to the MMT Recovery Action as to DSI.

16

77.     Genesis and Lloyd's are therefore obligated to defend DSI in the MMT Recovery Action, and also to indemnify it for any amounts it is obligated to pay in damages or settlement as a result of the claims.

78.     An actual controversy exists between DSI on the one hand, and Genesis and Lloyd's, on the other, regarding defense and indemnification obligations.

79.     An actual controversy exists between DSI, on the one hand, and the Officers and Directors, R.W. Beck, and Blackstone, on the other hand, as DSI asserts that each is responsible for defense and indemnification of it as further specified below.

COUNT I
(Declaratory Judgment as to Indemnification by Executive Risk)

80.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 79.

81.     The MMT Recovery Action seeks damages against the Plaintiff as a result of its alleged "act[s], error[s],omission[s], misstatement[s], misleading statement[s] or breach[es] of duty [in its] capacity as officer[s] or director[s] of Molten Metal," and was asserted against the Plaintiff "solely by reason of [its] ... status as an officer or director" of Molten Metal.

82.     Plaintiff is, if the allegations of the MMT Recovery Action are correct, an insured under the Executive Risk Policy.

83.     Accordingly, pursuant to the express terms of the Executive Risk Policy, the Plaintiff is entitled to a declaratory judgment that Executive Risk is obligated to defend the Plaintiff in the MMT Recovery Action, and also to indemnify it for any amounts it is obligated to pay in damages or settlement as a result of the MMT Recovery Action.

## COUNT II
### (Declaratory Judgment as to Indemnification by Genesis and Lloyd's)

84.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 83.

85.     The MMT Recovery Action seeks damages against Plaintiff as a result of its alleged "negligent act[s], omission[s], error[s], negligent misstatement[s], misleading statement[s], neglect or breach[es] of duty" in "the discharge of [its] duties solely in [its] capacity as director[] or officer[]" of Molten Metal.

86.     Plaintiff is, if the allegations of the MMT Recovery Action are correct, an insured under the Genesis Excess Policy and the Lloyd's Excess Policy.

87.     Accordingly, pursuant to the express terms of the Genesis Excess Policy and the Lloyd's Excess Policy, the Plaintiff is entitled to a declaratory judgment that Genesis and Lloyd's are obligated to defend the Plaintiff in the MMT Recovery Action, and also to indemnify it for any amounts it is obligated to pay in damages or settlement as a result of the MMT Recovery Action.

## COUNT III
### (Breach of Contract by Executive Risk)

88.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 87.

89.     The Executive Risk Policy constitutes a contract between Molten Metal and Executive Risk. The Plaintiff, as an alleged officer of Molten Metal, is a named insured in that contract.

90.     By declining to defend the Plaintiff in the MMT Recovery Action and also to indemnify it for any amounts it is obligated to pay in damages or settlement as a result of the

MMT Recovery Action in accordance with the terms of the Executive Risk Policy, Executive Risk is in breach of the contract.

91.     The Plaintiff has suffered injury by reason of Executive Risk's breach and is entitled to recover attorneys' fees incurred and to be incurred in connection with the MMT Recovery Action as well as other damages in an amount to be proven at trial.

COUNT IV

(Breach of Contract by Genesis and Lloyd's)

92.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 91.

93.     The Genesis Excess Policy and the Lloyd's Excess Policy constitute contracts between Molten Metal, and Genesis and Lloyd's. The Plaintiff, as an alleged officer of Molten Metal, is a named insured in those contracts.

94.     By declining to defend the Plaintiff in the Underlying Action and also to indemnify it for any amounts it is obligated to pay in damages or settlement as a result of the MMT Recovery Action in accordance with the terms of the Genesis Excess Policy and the Lloyd's Excess Policy, Genesis and Lloyd's are in breach of their contracts.

95.     The Plaintiff has suffered injury by reason of Genesis and Lloyd's' breaches and is entitled to recover attorneys' fees incurred and to be incurred in connection with the MMT Recovery Action as well as other damages in an amount to be proven at trial.

COUNT V

(Violation of G.L. c. 176D and c. 93A by Executive Risk)

96.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 95.

19

97.     By failing to respond to a demand for coverage in a timely fashion and by wrongfully and repeatedly denying coverage for the Plaintiff under the Executive Risk Policy, Executive Risk violated its duties to defend and indemnify the Plaintiff.

98.     Executive Risk's conduct constitutes a willful, knowing, unfair and deceptive trade practice and an unfair claim settlement practice and thus a violation of G.L. c. 93A and c. 176D.

## COUNT VI
### (Violation of G.L. c. 176D and a 93A by Genesis and Lloyd's)

99.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 98.

100.    By wrongfully and repeatedly denying coverage for the Plaintiff under the Genesis Excess Policy and the Lloyd's Excess Policy, Genesis and Lloyd's violated their duties to defend and indemnify the Plaintiff.  Lloyd's also violated its policy by failing to respond in a timely fashion to a demand for coverage.

101.    The Defendants' conduct constitutes a willful, knowing, unfair and deceptive trade practice and an unfair claim settlement practice and thus a violation of G.L. c. 93A and c. 176D.

## COUNT VII
### (Contribution As To The Officers and Directors, R.W. Beck, and Blackstone)

102.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 101.

103.    If Plaintiff is liable in the MMT Recovery Action, which liability Plaintiff specifically denies, then the Directors and Officers, R.W. Beck, and Blackstone, as a result of their tortious conduct, are liable for all, a pro rata share, or other portion, of that liability.

## COUNT VIII
### (Declaratory Judgment As To Indemnification By Officers and Directors)

104.   The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 103.

105.   At all relevant times, with respect to the allegations in the MMT Recovery Action, Plaintiff was the agent of the Officers and Directors, which were Plaintiff's principals.

106.   Plaintiff faithfully and properly executed the instructions of its principals, the Officers and Directors.

107.   If Plaintiff is liable in the MMT Recovery Action, which liability Plaintiff specifically denies, then Plaintiff is entitled to indemnification from the Officers and Directors from any amount it is required to pay in damages or settlement thereof.

108.   Accordingly, Plaintiff is entitled to declaratory judgment that the Officers and Directors are obligated to defend the Plaintiff in the MMT Recovery Action, and also to indemnify it for any amounts it is obligated to pay in damages or settlement of the MMT Recovery Action.

## COUNT IX
### (Declaratory Judgment As To Indemnification By Officers and Directors, R.W. Beck, and Blackstone)

109.   The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 108.

110.   Plaintiff's alleged liability is in the nature of derivative or vicarious liability for the wrongful acts of Officers and Directors, R.W. Beck, and Blackstone, in which acts Plaintiff did not join.

111.   Accordingly, Plaintiff is entitled to declaratory judgment that Officers and Directors, R.W. Beck, and Blackstone are obligated to defend the Plaintiff in the MMT Recovery

Action, and also to indemnify it for any amounts it is obligated to pay in damages or settlement of the MMT Recovery Action.

COUNT X
(Breach Of Fiduciary Duty By Officers and Directors)

112.    The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 111.

113.    The Officers and Directors owed a fiduciary duty to the Plaintiff as of the time of Molten Metal's insolvency, including to preserve assets for the use of Molten Metal's creditors and not to engage in conduct which would exacerbate such insolvency to the detriment of the company's creditors, such as the Plaintiff.

114.    The Officers and Directors breached such duty by the actions noted above and alleged in the MMT Recovery Action.

115.    Plaintiff has been damaged by the Officers' and Directors' breach of their fiduciary duties.

WHEREFORE, the Plaintiff seeks judgment as follows:

1)      (a)     a declaration by this Court that Executive Risk is obligated under the Executive Risk Policy to defend and indemnify the Plaintiff in the MMT Recovery Action; or, in the alternative;

(b)     a declaration by this Court that Genesis is obligated under the Genesis Excess Policy to defend and indemnify the Plaintiff in the MMT Recovery Action; and

(c)     a declaration by this Court that Lloyd's is obligated under the Lloyd's Excess Policy to defend and indemnify the Plaintiff in the MMT Recovery Action;

22

2)      a declaration by this Court that the Officers and Directors, R.W. Beck, and

Blackstone are obligated to defend and indemnify Plaintiff for any liability incurred in the MMT

Recovery Action;

3)      damages for breach of contract and breach of fiduciary duty in an amount to be

determined at trial;

4)      double and/or treble damages for violation of M.G.L, c. 176D and c. 93A;

5)      all of the Plaintiffs' reasonable attorneys' fees and expenses incurred in this

action;

6)      damages in the amount of the Officers' and Directors', R.W. Beck's, and

Blackstone's combined *pro rata* or other determined share of any liability incurred by Plaintiff in

the MMT Recovery Action; and

7)      such other further relief that this Court deems just and proper.

                             Respectfully submitted,

                             DEVELOPMENT SPECIALISTS, INC.,

                             By its attorneys,

                             _____
                             Richard L. Yurko (BBO# 538300)
                             Kevin S. Murphy (BBO# 638335)
                             YURKO & SALVESEN, P.C.
                             One Washington Mall, 11th Floor
                             Boston, MA 02108-2603
                             (617) 723-6900

Dated: N ovember 5, 2002


Executive Risk Indemnity Inc.
Home Office
32 Loockerman Square, Suite L-100
Dover, Delaware 19901

*Administrative Offices/Mailing Address:*
82 Hopmeadow Street
Simsbury, Connecticut 06070-7683
(Herein referred to as Underwriter)



THIS IS A CLAIMS MADE INDEMNITY POLICY WITH EXPENSES INCLUDED
IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.

## DECLARATIONS

| POLICY NUMBER |
| 751-091628-98 |

## DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY INCLUDING COMPANY REIMBURSEMENT

NOTICE: THIS IS A CLAIMS MADE INDEMNITY POLICY WHICH APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION. THE UNDERWRITER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM." THE COVERAGE AFFORDED UNDER THIS POLICY DIFFERS IN SOME RESPECTS FROM THAT AFFORDED UNDER OTHER POLICIES. PLEASE READ THE ENTIRE POLICY CAREFULLY.

| ITEM 1. PARENT ORGANIZATION NAME & PRINCIPAL ADDRESS: MOLTEN METAL TECHNOLOGY INC 51 Sawyer Road Waltham, MA 02154 | ITEM 2.   POLICY PERIOD: (a) Inception Date: January 19, 1998 (b) Expiration Date: January 19, 1999 at 12:01 a.m. both dates at the Principal Address in Item 1. |
|---|---|

| ITEM 3. | LIMIT OF LIABILITY (Inclusive of Defense Expenses): $ 10,000,000.00    maximum aggregate limit of liability for all Claims. |
|---|---|

| ITEM 4. | PREMIUM: $350,000.00    total prepaid premium. |
|---|---|

ITEM 5.    RETENTIONS:
   (a) $0.00 each Insured Person each Claim, but only for Loss as to which indemnification by the Company is not legally permissible or is not made solely by reason of the Company's financial insolvency.
   (b) $150,000.00 each Claim, for Loss as to which indemnification by the Company is legally permissible.

| ITEM 6.    DISCOVERY PERIOD: Either one year or two years after the end of the Policy Period, at the election of the Parent Corporation. | ITEM 7.   ADDITIONAL PREMIUM FOR DISCOVERY PERIOD: (a) Additional Premium for one-year Discovery Period: $262,500.00 (b) Additional Premium for two-year Discovery Period: $525,000.00 |
|---|---|

ITEM 8.    NOTICE UNDER CONDITIONS (A)(1) AND (A)(2) MUST BE ADDRESSED TO
   Vice President of Claims
   Executive Risk Management Associates
   P. O. Box 2002
   Simsbury, CT. 06070

| ITEM 9. | ENDORSEMENTS ATTACHED AT ISSUANCE: |
|---|---|
| C21915 | D22854 |
| D21225 | D23129 |
| D21394 | D25690 |
| D21505 | QMOLTEN |
| D22028 | |
| D22083 | |

These Declarations, the signed and completed Application and the Policy with endorsements will constitute the entire agreement between the Underwriter, the Company and the Insured Persons.

EXECUTIVE RISK INDEMNITY INC. (Authorized Company Representative)
February 16, 1998

James G. Darpey
Countersigning Agent



# Directors and Officers Liability Insurance Policy Including Company Reimbursement

*Administrative Offices/Mailing Address:*
82 Hopmeadow Street
Post Office Box 2002
Simsbury, Connecticut 06070-7683
860.408.2000

Executive Risk Indemnity Inc.

THIS IS A CLAIMS MADE INDEMNITY POLICY
WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ THE ENTIRE POLICY CAREFULLY.

## EXECUTIVE RISK INDEMNITY INC.

### DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY
### INCLUDING COMPANY REIMBURSEMENT

Executive Risk Indemnity Inc. (the "Underwriter"), the Insured Persons and the Company, subject to all of the terms, conditions and limitations of and any endorsements to this Policy, agree as follows:

I.   INSURING AGREEMENTS

(A)  The Underwriter will pay on behalf of the **Insured Persons Loss** from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts**, except for **Loss** which the **Company** pays to or on behalf of the **Insured Persons** as indemnification.

(B)  The Underwriter will pay on behalf of the **Company Loss** from **Claims** first made during the **Policy Period** against the **Insured Persons** for **Wrongful Acts** which the **Company** pays to or on behalf of the **Insured Persons** as indemnification.

II.   DEFINITIONS

(A)  "**Application**" means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are on file with the Underwriter and are a part of the Policy, as if physically attached.

(B)  "**Claim**" means:

(1) any civil proceeding in a court of law or equity,

(2) any criminal proceeding in a court of law, and

(3) any administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigative order or similar document.

(C)  "**Company**" means the **Parent Corporation** and any **Subsidiary** created or acquired on or before the **Inception Date** or during the **Policy Period**.

(D)  "**Defense Expenses**" means reasonable legal fees and expenses incurred in the defense or appeal of a **Claim. Defense Expenses** will not include the **Company's** overhead expenses or any salaries, wages, fees or benefits of its directors, officers or employees.

(E)  **"Insured Person"** means any past, present or future director or officer of the Company. In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person.**

(F)  **"Loss"** means:

   (1)  any monetary damages or settlements which an **Insured Person** is obligated to pay as a result of any **Claim** as defined in DEFINITION (B) (1), including but not limited to punitive or exemplary damages where insurable under applicable law, and

   (2)  any **Defense Expenses** which an **Insured Person** is obligated to pay as a result of any **Claim;**

   provided, that the above amounts will be **Loss** only to the extent that they are in excess of any applicable retention and, further, that **Loss** will not include wages, fines, taxes or penalties, or the multiplied portion of any multiplied damage award or matters which are uninsurable under the law pursuant to which this Policy is construed.

(G)  **"Outside Capacity"** means service by an **Insured Person** as a director, officer, trustee, regent or governor of an **Outside Entity**, but only during such time that such service is at the specific written request of the **Company.**

(H)  **"Outside Entity"** means a corporation or organization other than the **Company** which is exempt from taxation under Section 501 (c) (3) of the Internal Revenue Code, as the same may be amended from time to time.

(I)  **"Parent Corporation"** means the entity named in ITEM 1 of the Declarations.

(J)  **"Policy Period"** means the period from the Inception Date to the Expiration Date in ITEM 2 of the Declarations or to any earlier cancelation date.

(K)  **"Related Claims"** means all **Claims** for **Wrongful Acts** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events.

(L)  **"Subsidiary"** means any corporation during any time in which the **Parent Corporation** owns, directly or through one or more **Subsidiaries**, more than fifty percent (50%) of the outstanding securities representing the right to vote for the election of such corporation's directors.

(M)  **"Wrongful Act"** means:

   (1)  any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an **Insured Person** in his or her capacity as a director or officer of the **Company;**

(2) any matter asserted against an **Insured Person** solely by reason of his or her status as a director or officer of the **Company**; and

(3) any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an **Insured Person** in his or her **Outside Capacity**.

## III.  EXCLUSIONS

(A) Except for **Defense Expenses** payable in accordance with and subject to CONDITION (B), the Underwriter will not pay **Loss** for **Claims** brought about or contributed to in fact:

(1) by any dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by any **Insured Person**; or

(2) by the gaining by any **Insured Person** of any profit, remuneration or advantage to which such **Insured Person** is not legally entitled.

(B) The Underwriter will not pay **Loss**, including **Defense Expenses**, for **Claims** for:

(1) any actual or alleged bodily injury, sickness, mental anguish, emotional distress, disease or death of any person, or damage to or destruction of any tangible property including loss of use thereof; or

(2) any actual, alleged or threatened exposure to, or generation, storage, transportation, discharge, emission, release, dispersal, escape, treatment, removal or disposal of, any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials (including materials which are intended to be or have been recycled, reconditioned or reclaimed) or other irritants, pollutants or contaminants, or any regulation, order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any of the foregoing, or any action taken in contemplation or anticipation of any such regulation, order, direction or request;

except that this EXCLUSION (B) will not apply to those portions of any **Claim** that (i) allege that **Wrongful Acts** resulted in any actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any state "blue sky" law, or any other federal, state or local securities law or any rule or regulation promulgated under any of the foregoing, or (ii) are a derivative action by or on behalf of, or in the name or right of, the **Company** brought by a security holder of the **Company**, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, the **Company** or any **Insured Person**.

(C) The Underwriter will not pay **Loss**, including **Defense Expenses**, for **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

(1) any fact, circumstance, situation, transaction, event or **Wrongful Act** underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding as of the Inception Date in ITEM 2 (a) of the Declarations;

(2) any fact, circumstance, situation, transaction, event or **Wrongful Act** which, before the Inception Date in ITEM 2 (a) of the Declarations, was the subject of any notice given under any other policy of directors and officers liability or other similar insurance;

(3) any actual or alleged violation of the Employee Retirement Income Security Act of 1974 or any regulations promulgated thereunder or of any similar law or regulation; or

(4) the service by any **Insured Person** as a director or officer of:

    (a) any entity other than the **Company** or an **Outside Entity**, even if directed or requested by the **Company** to serve as a director, officer or employee of such other entity, or

    (b) any entity acquired by the **Company**, whether by merger, consolidation or otherwise, at any time prior to the **Company's** acquisition of such entity.

(D) The Underwriter will not pay **Loss**, including **Defense Expenses**, for **Claims**:

(1) by or on behalf of, or in the name or right of, the **Company** or any **Insured Person**, except that this exclusion will not apply to:

    (a) any derivative action by or on behalf of, or in the name or right of, the **Company** brought by a security holder of the **Company**, and brought and maintained independently of, and without the solicitation, assistance, participation or intervention of, the **Company** or any **Insured Person**;

    (b) any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this Policy; or

    (c) any **Claim** for the actual or alleged wrongful termination of an **Insured Person**;

(2) by or on behalf of, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Capacity** with respect to such Outside Entity; or

(3) against the **Insured Persons** of any **Subsidiary** in their capacities as such for any **Wrongful Act** committed during any time in which such entity is not a **Subsidiary**.

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the above EXCLUSIONS.

## IV.  CONDITIONS

(A)  **Notice; Timing and Interrelationship of Claims:**

(1)  As a condition precedent to any right to payment in respect of any **Claim**, including any **Claim** for a **Wrongful Act** of which notice was previously given under CONDITION (A) (2), the **Company** or the **Insured Persons** must give the Underwriter written notice of such **Claim**, with full details, as soon as practicable after it is first made. A **Claim** is first made when it is commenced by the filing of a complaint, notice of charges, formal investigative order or similar document, or by the return of an indictment, against an **Insured Person**.

(2)  If, during the **Policy Period**, the Company or the **Insured Persons** first become aware of a **Wrongful Act** which may subsequently give rise to a **Claim** against the **Insured Persons**, and the **Company** or the **Insured Persons:**

(a)  give the Underwriter written notice of such **Wrongful Act**, including a description of the **Wrongful Act** in question, the identities of the potential claimants, the consequences which have resulted or may result from such **Wrongful Act**, the damages which may result from such **Wrongful Act** and the circumstances by which the **Company** or the **Insured Persons** first became aware of such **Wrongful Act**, and

(b)  request coverage under this Policy for any subsequently resulting **Claim** for such **Wrongful Act**;

then the Underwriter will treat any such subsequently resulting **Claim** as if it had been first made during the **Policy Period**.

(3)  All notices under CONDITIONS (A) (1) and (2) must be sent by certified mail to the address set forth in ITEM 8 of the Declarations.

(4)  All Related Claims will be treated as a single **Claim** made when the earliest of such **Related Claims** was first made, or when the earliest of such **Related Claims** is treated as having been made in accordance with CONDITION (A) (2), whichever is earlier.

(B)  **Defense and Settlement of Claims; Payment and Allocation of Loss:**

(1)  The Underwriter will have no duty under this Policy to defend any **Claim**. No Defense Expenses may be incurred and no settlement of any **Claim** may be made without the Underwriter's consent, such consent not to be unreasonably withheld.

(2) The Underwriter will, upon written request, pay on a current basis **Defense Expenses** for which this Policy provides coverage. Otherwise, the Underwriter will pay **Loss** only on the final disposition of a **Claim**.

(3) As a condition of any payment of **Defense Expenses** under CONDITION (B) (2), the Underwriter may require a written undertaking on terms and conditions satisfactory to the Underwriter guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured Person** if it is finally determined that **Loss** incurred by such **Insured Person** would not be covered.

(4) If some, but less than all, of the allegations in any **Claim** give rise to **Loss** for which this Policy provides coverage, the **Company**, the **Insured Persons** and the Underwriter will use their best efforts to arrive at a fair and appropriate allocation of any damages, settlements, and legal fees and expenses incurred in connection with such **Claim**.

(C) **Limit of Liability:**

(1) The amount stated in ITEM 3 of the Declarations will be the maximum aggregate limit of liability of the Underwriter under this Policy for all **Loss** from all **Claims** for which this Policy provides coverage, regardless of the time of payment by the Underwriter, and regardless of whether such **Claims** are made during the **Policy Period** or during any Discovery Period. However, if any **Claim** made against the **Insured Persons** gives rise to coverage both under this Policy and under any other policy or policies of directors and officers liability or other similar insurance issued by the Underwriter to any **Outside Entity**, the Underwriter's maximum aggregate limit of liability under all such policies for all **Loss**, including **Defense Expenses**, in respect of such **Claim** will not exceed the largest single available limit of liability under any such policy, including this Policy.

(2) **Defense Expenses** will be part of and not in addition to the Underwriter's limit of liability, and payment of **Defense Expenses** by the Underwriter will reduce its limit of liability.

(D) **Presumption of Indemnification; Applicable Retention:**

(1) The certificate of incorporation, charter, articles of association or other organizational documents of the **Parent Corporation**, each **Subsidiary** and each **Outside Entity**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Insured Persons** to the fullest extent permitted by law.

(2) Regardless of whether **Loss** in connection with any **Claim** against the **Insured Persons** (including any **Claim** against the **Insured Persons** for **Wrongful Acts** in their **Outside Capacities**) is payable under INSURING AGREEMENT (A) or (B), the retention set forth in ITEM 5 (b) of the Declarations will apply to any **Loss** as to which indemnification by the **Company** or any **Outside Entity** is legally permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Company** or such **Outside Entity** solely by reason of its financial insolvency.

(3) If different retentions are applicable to different parts of any **Loss**, the applicable retentions will be applied separately to each part of such **Loss**, and the sum of such retentions will not exceed the largest applicable retention as set forth in ITEM 5 of the Declarations.

(E) **Events Allowing the Underwriter to Amend Policy and Charge Additional Premium:**

If, during the **Policy Period**, any of the following events occurs:

(1) the **Company** acquires any assets, acquires a **Subsidiary** or acquires any entity by merger and, at the time of such transaction, the assets so acquired or the assets of the entity so acquired exceed twenty-five percent (25%) of the total assets of the **Company** as reflected in the **Company's** most recent audited consolidated financial statements, or

(2) the **Company** assumes any liabilities and, at the time of such assumption, the liabilities so assumed exceed twenty-five percent (25%) of the total liabilities of the **Company** as reflected in the **Company's** most recent audited consolidated financial statements;

the **Company** must give the Underwriter full details of such transaction or event as soon as practicable, and the Underwriter will be entitled to impose such terms, conditions and limitations of coverage and such additional premium in connection with the foregoing which the Underwriter, in its sole discretion, may require.

(F) **Conversion of Coverage Under Certain Circumstances:**

If, during the **Policy Period**, any of the following events occurs:

(1) the acquisition of the **Parent Corporation**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Parent Corporation** into or with another entity such that the **Parent Corporation** is not the surviving entity;

(2) the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to the **Parent Corporation**; or

(3) the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors of the **Parent Corporation**;

coverage under this Policy will continue in full force and effect with respect to Claims for **Wrongful Acts** committed before such event, but coverage will cease with respect to Claims for **Wrongful Acts** committed after such event. After any such event, the Policy may not be canceled, regardless of CONDITION (G) (2), and the entire premium for the Policy will be deemed fully earned.

(G) **Cancelation; No Obligation to Renew:**

    (1) The Underwriter may not cancel this Policy except for failure to pay a premium when due.

    (2) The **Parent Corporation** may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in ITEM 2 (b) of the Declarations, such cancelation will be effective. In such event, the earned premium will be computed in accordance with the customary short rate table and procedure. Premium adjustment may be made either at the time cancelation is effective or as soon as practicable after cancelation becomes effective, but payment or tender of unearned premium is not a condition of cancelation.

    (3) The Underwriter will not be required to renew this Policy upon its expiration.

(H) **Discovery Period:**

If either the Underwriter or the **Parent Corporation** refuses or declines to renew this Policy for any reason and, within ten (10) days of the end of the **Policy Period**, the **Parent Corporation** elects to purchase either of the Discovery Periods set forth in ITEM 6 of the Declarations by paying the corresponding additional premium set forth in ITEM 7 of the Declarations, then the coverage otherwise afforded by this Policy will be extended to apply to **Loss** from **Claims** first made during whichever of the Discovery Periods the **Parent Corporation** has elected to purchase, but only if such **Claims** are for **Wrongful Acts** committed before the end of the **Policy Period** or the date of any conversion of coverage under CONDITION (F), whichever is earlier.

(I) **Other Insurance; Other Indemnification:**

    (1) All **Loss** payable under this Policy will be specifically excess of and will not contribute with other insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this Policy. This Policy will not be subject to the terms of any other insurance.

    (2) All coverage for **Loss** from **Claims** against **Insured Persons** for **Wrongful Acts** in their **Outside Capacities** will be specifically excess of, and will not contribute with, any other insurance available to such **Insured Persons** by reason of their service in **Outside Capacities**, and any indemnification by any person or entity other than the **Company**, including any **Outside Entity**, available to such **Insured Persons** in connection with their service in **Outside Capacities**.

(J) **Exhaustion:**

If the Underwriter's limit of liability is exhausted by the payment of **Loss**, the premium will be fully earned  all obligations of the Underwriter under this Policy

will be completely fulfilled and exhausted, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

(K)  Cooperation; Subrogation:

The **Insured Persons** and the **Company** will provide the Underwriter with all information, assistance and cooperation that the Underwriter reasonably requests, and will do nothing that may prejudice the Underwriter's position or potential or actual rights of recovery. The Underwriter will be subrogated to the extent of any payment to all of the rights of recovery of the **Insured Persons** and the **Company**. The **Insured Persons** and the **Company** will execute all papers and do everything necessary to secure such rights, including the execution of any documents necessary to enable the Underwriter effectively to bring suit in their name. The obligations of the **Insured Persons** and the **Company** under this CONDITION (K) will survive the Policy.

(L)  Representations; Severability:

The **Insured Persons** and the **Company** represent that the particulars and statements contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy. No knowledge or information possessed by any **Insured Person** will be imputed to any other **Insured Person** except for material facts or information known to the person or persons who signed the **Application**. In the event that any of the particulars or statements in the **Application** are untrue, this Policy will be void with respect to any **Insured Person** who knew of such untruth or to whom such knowledge is imputed.

(M)  No Action Against the Underwriter:

(1)  No action may be taken against the Underwriter unless, as conditions precedent thereto, there has been full compliance with all of the terms of this Policy and the amount of the obligation of the **Insured Persons** to pay has been finally determined either by judgment against the **Insured Persons** after actual trial, or by written agreement of the **Insured Persons**, the claimant and the Underwriter.

(2)  No person or entity will have any right under this Policy to join the Underwriter as a party to any **Claim** to determine the liability of any **Insured Person**; nor may the Underwriter be impleaded by an **Insured Person** or his or her legal representative in any such **Claim**. The Underwriter will not be relieved of any of its obligations under the Policy by the bankruptcy or insolvency of any of the **Insured Persons** or their estates.

(N)  **Authorization and Notices:**

The **Parent Corporation** will act on behalf of the **Insured Persons** with respect to receiving any notices and return premiums from the Underwriter.

(O)  **Changes:**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Underwriter will not effect a waiver or change in any part of this Policy or estop the Underwriter from asserting any right under the terms, conditions and limitations of this Policy. The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement.

(P)  **Assignment:**

No assignment of interest under this Policy will bind the Underwriter without its consent.

(Q)  **Entire Agreement:**

The **Insured Persons** and the **Company** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement between them and the Underwriter or any of its agents relating to this insurance.

(R)  **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.


**In Witness Whereof, the Underwriter has caused this Policy to be executed by its authorized officers, but this Policy shall not be valid unless countersigned on the Declarations page by a duly authorized representative of the Underwriter.**

_____                    _____
Secretary                                                    Executive Vice President

ENDORSEMENT NO. 1
MASSACHUSETTS AMENDATORY ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

| | |
|---|---|
| Policy No. | 751-091628-98 |
| Issued to | MOLTEN METAL TECHNOLOGY INC |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged:

(1)     The Underwriter may non-renew this Policy, or condition its renewal upon a change in coverage, only by mailing or delivering to the entity named in ITEM 1 of the Declarations, at least forty-five (45) days before the Expiration Date set forth in ITEM 2(b) of the Declarations, a notice containing the specific reason or reasons for non-renewal or, in the case of a conditional renewal, setting forth the amount of the renewal premium and the nature of any proposed changes.

(2)     A copy of any notice required under paragraph (1) above must also be mailed to the insurance agent or broker of record on this Policy.

(3)     This endorsement will not apply if the entity named in ITEM 1 of the Declarations or an agent or broker authorized by the entity named in ITEM 1 of the Declarations or another insurer of the entity named in ITEM 1 of the Declarations has mailed written notice to the Underwriter that this Policy is replaced or is no longer desired.

(4)     If, before the Expiration Date set forth in ITEM 2(b) of the Declarations, the Underwriter mails or delivers to the entity named in ITEM 1 of the Declarations a late notice of non-renewal or conditional renewal, the entity named in ITEM 1 of the Declarations will have the right to renew this Policy for one (1) year and to cancel on a pro rata basis at the lower rates if the entity named in ITEM 1 of the Declarations exercises this right within sixty (60) days from the date notice should have been provided.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 2
SPOUSAL EXTENSION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

Policy No.    751-091628-98
Issued to     MOLTEN METAL TECHNOLOGY INC
Issued by     Executive Risk Indemnity Inc.

In consideration of the premium charged:

(1)    The coverage afforded under this Policy shall, subject to all of its terms, conditions, limitations
and exclusions, be extended to apply to Loss resulting from a Claim made against a person
who, at the time the Claim is made, is a lawful spouse of an Insured Person, but only if:

   (a)   the Claim against such spouse results from a Wrongful Act actually or allegedly
         committed by the Insured Person to whom the spouse is married; and

   (b)   such Insured Person and his or her spouse are represented by the same counsel in
         connection with such Claim.

(2)    No spouse of an Insured Person shall, by reason of this endorsement, have any greater right
to coverage under this Policy than the Insured Person to whom such spouse is married.

(3)    The Underwriter shall not be liable under this endorsement to make any payment of Loss in
connection with any Claim against the spouse of an Insured Person for any actual or alleged
act, error, omission, misstatement, misleading statement, omission or breach of duty by such
spouse.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 3
SEC SUB-RETENTION ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

Policy No.   751-091628-98
Issued to    MOLTEN METAL TECHNOLOGY INC
Issued by    Executive Risk Indemnity Inc.

In consideration of the premium charged:

(1)   With respect only to Claims made against any of the Insured Persons based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of:

   (a)   the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, any other federal law with respect to the regulation of securities, any rules or regulations of the United States Securities and Exchange Commission, or any amendment of any such law, rule or regulation; or

   (b)   any state securities or "blue sky" laws or rules or regulations, or any amendment of any such law, rule or regulation; or

   (c)   any provision of the common law imposing liability in connection with the offer, sale or purchase of securities;

   ITEM 5 of the Declarations is amended to read as follows:

   ITEM 5. Retentions:

   (a)   $0.00 each Insured Person each Claim, but only for Loss as to which indemnification by the Company is not legally permissible or is not made solely by reason of the Company's financial insolvency.

   (b)   $350,000.00 each Claim, for Loss as to which indemnification by the company is legally permissible.

(2)   With respect to all other Claims, ITEM 5 of the Declarations shall remain unchanged.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 4
NON-ENTITY EMPLOYMENT PRACTICES ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

Policy No.      751-091628-98
Issued to       MOLTEN METAL TECHNOLOGY INC
Issued by       Executive Risk Indemnity Inc.

In consideration of the premium charged:

(1)    "Employment Practices Wrongful Act" will mean any actual or alleged:

(a)    wrongful termination, whether actual or constructive, of the employment of, or demotion of, or failure or refusal to hire or promote, any person in violation of law or in breach of any agreement to commence or continue employment;

(b)    employment discrimination, including any failure or refusal to hire any person, or discharge of or other discrimination against any person with respect to his or her compensation or any of the terms, conditions or privileges of his or her employment, or any limitation, segregation or classification of employees or applicants for employment in any way which would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an employee, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy or other protected status;

(c)    sexual harassment, including unwelcome sexual advances, requests for sexual favor or other verbal or physical conduct of a sexual nature that are made a condition of employment, are used as a basis for employment decisions, or create a work environment that interferes with performance; or

(d)    retaliatory treatment against an employee of the Company on account of such employee's exercise or attempted exercise of his or her rights under law.

(2)    The term "Claim" shall include a written notice from any person or entity, including but not limited to the Equal Employment Opportunity Commission or any other state or federal agency or authority with jurisdiction over the Company's employment practices, that such person or entity intends to hold any Insured Person responsible for an Employment Practices Wrongful Act.

(3)    The term "Insured Person" shall include any past or present employee of the Company, but only if and to the extent that a Claim is made against any such employee for an Employment Practices Wrongful Act. Nothing in this endorsement is intended, nor shall it be construed, to afford coverage for Loss in connection with any Claim against an employee of the Company who is not a past or present officer or director of the Company unless, and then only to the extent that, such Claim is for an Employment Practices Wrongful Act by such employee.

(4)   The term "Wrongful Act" shall include any Employment Practices Wrongful Act by an Insured Person in the discharge of his or her duties solely in his or her capacity as an employee of the Company or as an officer or director of the Company.

(5)   Section III Exclusions (B) shall not apply to Loss, including Defense Expenses, resulting from allegations of:

   (a)   libel or slander or oral or written publication of defamatory or disparaging material, or

   (b)   mental anguish or emotional distress;

but only to the extent that such allegations are made as part of a Claim against an Insured Person for an Employment Practices Wrongful Act.

(6)   Section III Exclusions (D)(1)(c) is amended to read as follows:

   "(c)   any Claim for an Employment Practices Wrongful Act."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 5
AMEND POLLUTION EXCLUSION

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

Policy No.      751-091628-98
Issued to       MOLTEN METAL TECHNOLOGY INC
Issued by       Executive Risk Indemnity Inc.

In consideration of the premium charged:

(1)    Section III EXCLUSIONS (B) is amended by deleting subparagraph (2) thereof in its
       entirety.

(2)    Section III EXCLUSIONS is amended by adding a new subsection (E) which reads in its
       entirety as follows:

"(E)   The Underwriter will not pay Loss, including Defense Expenses, from Claims based upon,
       arising out of, directly or indirectly resulting from, in consequence of, or in any way involving
       any actual, alleged or threatened exposure to, or generation, storage, transportation,
       discharge, emission, release, dispersal, escape, treatment, removal or disposal of, any
       smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste
       materials (including materials which are intended to be or have been recycled,
       reconditioned or reclaimed) or other irritants, pollutants or contaminants, or any regulation,
       order, direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or
       neutralize any of the foregoing, or any action taken in contemplation or anticipation of any
       such regulation, order, direction or request."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 6
ALLOCATION AND SECURITIES CLAIMS ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

Policy No.      751-091628-98
Issued to       MOLTEN METAL TECHNOLOGY INC
Issued by       Executive Risk Indemnity Inc.

In consideration of the premium charged:

(1)    <u>Allocation.</u>

    (a)    <u>Allocation of All Claims.</u>  With respect to any Claim under this Policy made against Insured Persons which is also made against the Company, including but not limited to Claims for Securities Activity Wrongful Acts (as defined below), the Company, the Insured Persons and the Underwriter agree to use their best efforts to determine a fair and proper allocation, as between the Company and the Insured Persons, of all amounts, including Defense Expenses, that the Insured Persons and/or the Company become obligated to pay in connection with such Claim.  In making such determination, the parties shall take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/or settlement of the Claim by, the Insured Persons and the Company.  In the event that an allocation cannot be agreed to, then the Underwriter shall be obligated to make an interim payment of the amount of Loss, including Defense Expenses, which parties agree is not in dispute (which, with respect to any Claim for Securities Activity Wrongful Acts will be no less than the Minimum Securities Allocation Amount, as defined below) until a final amount is agreed upon or determined pursuant to the provisions of this Policy and applicable law.

    (b)    <u>Minimum Securities Allocation Amount.</u>  Notwithstanding anything to the contrary contained in subparagraph (a) above, with respect solely to Claims for Securities Activity Wrongful Acts, the portion of such Loss allocated to Insured Persons under this Policy shall in no event be less than one hundred percent (100%) (the "Minimum Securities Allocation Amount").

    (c)    <u>Company Securities Claims.</u>  In the event of a Company Securities Claim (as hereinafter defined), this Policy shall provide coverage to the Company as described in paragraph (2) below.  For the purposes of this endorsement, "Company Securities Claim" means any Claim brought or maintained against the Company, but not against any Insured Person, for a Securities Activity Wrongful Act.

(2)    <u>Entity Coverage for Company Securities Claims.</u>

    (a)    <u>Grant of Entity Coverage for Company Securities Claims.</u>  In addition to the coverage afforded pursuant to Insuring Agreements (A) and (B), but still subject to all of the terms and conditions of the Policy (except as otherwise expressly provided in this endorsement), and subject to subparagraph (b) of this paragraph (2), the Underwriter will pay on behalf of the Company Loss incurred by the Company which results from a Company Securities Claim made during the Policy Period or, if purchased, the Discovery Period for a Securities Activity Wrongful Act.

    (b)    <u>Insured Percentage for Company Securities Claims.</u>  With respect to Loss that the

Company is obligated to pay in connection with a Company Securities Claim, the Underwriter will be liable to pay one hundred percent (100%) of such Loss, excess of the Retention stated in subparagraph (c) of this paragraph (2), and not to exceed the available Limit of Liability set forth in ITEM 3 of the Declarations; it being a condition of this endorsement that the remaining zero percent (0%) of all such amounts will be carried by the Company at its own risk and uninsured.

(c)   **Retention for Company Securities Claims**.  The Company will be entitled to coverage under this paragraph (2) only for Loss in excess of $350,000.00 each Company Securities Claim, and such amount will be deemed to be the retention set forth in ITEM 5 of the Declarations with respect to each Company Securities Claim.

(3)   **Securities Activity Wrongful Act Defined**. "Securities Activity Wrongful Act" means any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by the Company or by an Insured Person in his or her capacity as a director or officer of the Company, or any matter asserted against an Insured Person solely by reason of his or her status as a director or officer of the Company, but only in connection with a purchase or sale, or an offer to purchase or sell, securities issued at any time by the Company.

(4)   **Amendment to Definition of Claim and Wrongful Act**.  Solely for the purposes of the coverage provided by this endorsement, (a) the term "Claim" will also include any Company Securities Claim; and (b) the term "Wrongful Act" will also include any Securities Activity Wrongful Act.

(5)   **Exclusions**. In addition to, and not in limitation of, the exclusions set forth in Section III Exclusions and any amendments thereto:

(a)   Except for Defense Expenses payable in accordance with and subject to Section IV Condition (B), the Underwriter will not pay Loss for Claims against the Company for any Securities Activity Wrongful Act:

   (i)   brought about or contributed to in fact by any dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by the Company; or

   (ii)  by the Company gaining any profit, remuneration or advantage to which the Company was not legally entitled;

(b)   The Underwriter will not pay Loss, including Defense Expenses, for Claims against the Company for any Securities Activity Wrongful Act based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving:

   (i)   any fact, circumstance, situation, transaction, event or Wrongful Act underlying or alleged in any prior and/or pending litigation or administrative or regulatory proceeding against the Company as of January 19, 1998, or

   (ii)  any fact, circumstance, situation, transaction, event or Wrongful Act which, before the Inception Date in ITEM 2(a) of the Declarations, was the subject of any notice given under any other policy of directors' and officers' liability or other similar insurance; or

(c)   with respect to any Subsidiary, based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving (i) any Securities Activity Wrongful Act occurring at any time during which such entity was not a Subsidiary, or (ii) any Securities Activity

Wrongful Act occurring at any time during which such entity is a Subsidiary which arises out of, is based on, relates to, or is in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events as any Securities Activity Wrongful Act occurring at any time during which such entity was not a Subsidiary.

(6)   **Policy Amended as Necessary to Effect Purposes of Endorsement**. Those provisions of this Policy stating or implying that coverage is applicable only to Loss from Claims against one or more of the Insured Persons are deemed to have been amended to the extent necessary to effect the purposes of this endorsement.

(7)   **No Duty to Defend**. The Underwriter will have no duty under this endorsement to defend any Claim for Securities Activity Wrongful Acts, including any Company Securities Claim. It shall be the duty of the Company and the Insured Persons to defend such Claims, subject to all of the other terms, conditions and limitations of the Policy.

(8)   **Entire Agreement**. Except as expressly set forth in paragraph (2) of this endorsement, nothing in this endorsement is intended, nor shall it be construed, to afford coverage for (i) Loss in connection with any Claim against the Company, or (ii) any portion of Loss allocated to the Company pursuant to Paragraph 1(a) above.

(9)   **Headings**. The captions and headings appearing in this endorsement are for convenience only and are not intended, and shall not be construed, to affect the interpretation of any provision hereof in any manner whatsoever.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 7
AMEND CONVERSION OF COVERAGE CLAUSE

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

    Policy No.  751-091628-98
    Issued to   MOLTEN METAL TECHNOLOGY INC
    Issued by   Executive Risk Indemnity Inc.

In consideration of the premium charged, Section IV Conditions (F)(2) is deleted in its entirety.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
                   Authorized Representative

_____
                  Countersigning Agent

ENDORSEMENT NO. 8
BROAD NUCLEAR EXCLUSION

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

| | |
|---|---|
| Policy No. | 751-091628-98 |
| Issued to | MOLTEN METAL TECHNOLOGY INC |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged no coverage will be available under this Policy for Loss, including Defense Expenses, for Claims based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged nuclear reaction, nuclear radiation, radioactive contamination, or radioactive substance.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 9
RETURN OF PREMIUM ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

Policy No.      751-091628-98
Issued to       MOLTEN METAL TECHNOLOGY INC
Issued by       Executive Risk Indemnity Inc.

In consideration of the premium charged, Section IV Conditions (F) is amended to read in its entirety as follows:

"(1)    If, within four months following the Inception Date of the Policy:

(a)    either of the following events occurs (each a "Run-Off Triggering Event"):

(i)    the acquisition of the Parent Corporation, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the Parent Corporation into or with another entity such that the Parent Corporation is not the surviving entity; or

(ii)    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate at least fifty percent (50%) of the directors of the Parent Corporation; and

(b)    there have been no Claims made against the Insured Persons or the Company;

the Underwriter will provide the Company with a return premium of $50,000.00 and coverage under this Policy will continue in full force and effect for three years following the date of the Run-Off Triggering Event with respect to Claims for Wrongful Acts committed before such event, but no coverage will be available for any Wrongful Acts committed or allegedly committed after such event. After any such event, any portion of the premium not returned pursuant to this paragraph (1) will be deemed fully earned.

(2)    If a Run-Off Triggering Event occurs more than four months after the Inception Date of this Policy and there are no Claims of which notice has been given to the Underwriter under Section IV Conditions (A); the Underwriter will provide the Company with a return premium of $0.00 and coverage under this Policy will continue in full force and effect for three years following the date of the Run-Off Triggering Event with respect to Claims for Wrongful Acts committed before such event, but no coverage will be available for any Wrongful Acts committed or allegedly committed after such event. After any such event, any portion of the premium not returned pursuant to this paragraph (2) will be deemed fully earned.

(3)    If no Run-Off Triggering Event occurs within the Policy Period, and no Claims of which notice has been given to the Underwriter under Section IV Conditions (A); the Underwriter will provide the Company with a return premium of $75,000.00."

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 10
AMEND NOTICE PROVISIONS

This Endorsement, effective at 12:01 a.m. on January 19, 1998, forms part of

|  |  |
|---|---|
| Policy No. | 751-091628-98 |
| Issued to | MOLTEN METAL TECHNOLOGY INC |
| Issued by | Executive Risk Indemnity Inc. |

In consideration of the premium charged, the Underwriter agrees that any Claim involving any claims, facts, circumstances and situations first reported in the Notice of Claim Pursuant to the "Notice/Claim Reporting Provisions" of National Union Policy Number 484-74-93 and policies excess thereto which are determined, by binding arbitration or final adjudication pursued in good faith by the Parent Organization, not to be covered solely by reason of failure to meet the Notice requirements under Section 7C of the National Union Policy Number 484-74-93, shall not be excluded solely on the basis of Section III Exclusions (C)(1) and (2) of this Policy.

All other terms, conditions and limitations of this Policy shall remain unchanged.

_____
Authorized Representative

_____
Countersigning Agent

ENDORSEMENT NO. 11
RUN-OFF COVERAGE ENDORSEMENT

This Endorsement, effective at 12:01 a.m. on January 19, 1999, forms part of

Policy No.     751-091628-98
Issued to      Molten Metal Technology, Inc.
Issued by      Executive Risk Indemnity Inc.

In consideration of the premium charged, effective on and as of the Expiration Date set forth in Item 2 of the Declarations, the following shall apply:

(1)   Item 2 of the Declarations is amended to read in its entirety as follows:

"ITEM 2.  POLICY PERIOD:

(a) Inception Date: January 19, 1998
(b) Expiration Date: January 19, 2002
at 12:01 a.m. both dates at the Principal Address in ITEM 1."

(2)   ITEM 6 of the Declarations Page is deleted in its entirety.

(3)   ITEM 7 of the Declarations Page is deleted in its entirety.

(4)   No coverage will be available under this Policy for Loss in connection with any Claim made against any of the Insured Persons based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any Wrongful Act committed or allegedly committed on or after January 19, 1998.

(5)   Section IV Conditions (F) is deleted in its entirety.

(6)   Section IV Conditions (G)(2) is amended to read in its entirety as follows:

"(2)   The Parent Corporation may cancel this Policy by mailing the Underwriter written notice stating when, not later than the Expiration Date set forth in Item 2(b) of the Declarations, such cancellation will be effective."

(7)   Section IV Conditions (G) is amended by adding a new clause (4) thereto as follows:

"(4)   The entire premium for this Policy shall be deemed to be fully earned as of January 19, 1998."

(8)   Section IV Conditions (H) is deleted in its entirety.  All other references in the Policy to the Discovery Period are deleted.

All other terms, conditions and limitations of this Policy shall remain unchanged.


Counter Signature

Authorized Representative



Executive Re Spe . .lty
Insurance Company

82 Hopmeadow St.
Simsbury, CT 06070
(Herein referred to as Underwriter)

## RENEWAL APPLICATION

## DIRECTORS AND OFFICERS LIABILITY INSURANCE
## INCLUDING COMPANY REIMBURSEMENT

**NOTICE: THE POLICY FOR WHICH APPLICATION IS MADE APPLIES, SUBJECT TO ITS TERMS, ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD," OR, IF PURCHASED, ANY DISCOVERY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION. THE UNDERWRITER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM." READ THE ENTIRE APPLICATION CAREFULLY BEFORE SIGNING.**

1. a) Name of Applicant: ___MOLTEN METAL TECHNOLOGY, INC.___
(Whenever used in this Application, the term "Applicant" shall mean the Parent Corporation)

   b) Name and Title of the officer of the Applicant designated as the representative to receive all notices from the Underwriter on behalf of all persons and entities proposed for this insurance:
   ___Ethan E. Jacks, Vice President & General Counsel___

2. Have the outside auditors stated there are no material weaknesses in the Applicant's system of internal controls?
Yes ☐   No ☒
If no, please provide the latest CPA letter to management and management's response. See Attachment 1

3. Has the Applicant or any Subsidiary in the past 12 months completed or agreed to, or does it contemplate within the next 12 months, any of the following, whether or not such transactions were or will be completed. If yes, please describe the essential terms of each such transaction as an attachment to this Application.

   a) Merger, acquisition or consolidation with another entity whose consolidated assets exceed 25% of the Applicant's consolidated assets?
   Yes ☐   No ☒

   b) Sale, distribution or divestiture of any assets or stock other than in the ordinary course of business in an amount exceeding 25% of the Applicant's consolidated assets?
   Yes ☐   No ☒

   c) Any registration for a public offering or private placement of securities?
   Yes ☐   No ☒

   d) In the past 12 months has there been any change in the identity or responsibility of the Applicant's top environmental officer?
   Yes ☐   No ☒
   If yes, please identify and explain by attachment.

   e) Reorganization or arrangement with creditors under federal or state law?
   Yes ☒   No ☐
   See Attachment 2

4. As part of this Application, submit a schedule of all material litigation or administrative proceedings with a brief description of each case or proceeding commenced. See Attachment 3

5. As part of this Application, submit the following documents with respect to the **Applicant**:
   a) Last proxy statement, 10-K and annual report, including audited financial statements with all notes and schedules.
   b) Latest 10-Q report filed and any 8-K or 13D reports filed with the SEC within the last 12 months.
   c) Each prospectus, offering circular or private placement memorandum within the last 12 months.
   d) If amended since last submitted, copies of all provisions of the Applicant's charter and by-laws relating to the indemnification of its directors and officers and the Applicant's written environmental policy.

THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSONS AND ENTITY(IES) PROPOSED FOR THIS INSUR-
ANCE FOR THE PURPOSE OF THIS APPLICATION DECLARES THAT TO THE BEST OF HIS/HER KNOWLEDGE,
AFTER REASONABLE INQUIRY,            STATEMENTS HEREIN ARE TRUE.         THIS APPLICATION DOES
NOT BIND THE UNDERSIGNED TO COMPLETE THE INSURANCE BUT IT IS AGREED THAT THIS APPLICATION
SHALL BE THE BASIS OF THE CONTRACT SHOULD A POLICY BE ISSUED, AND THIS APPLICATION WILL
BECOME A PART OF SUCH POLICY, IF ISSUED, AND WILL BE ATTACHED THERETO.  THE UNDERWRITER
S HEREBY AUTHORIZED TO MAKE ANY INVESTIGATION AND INQUIRY IN CONNECTION WITH THIS
APPLICATION AS IT MAY DEEM NECESSARY.

SUBMISSION OF THIS APPLICATION DOES NOT BIND THE UNDERWRITER TO ISSUE ANY COVERAGE; HOW-
EVER, IT IS AGREED THAT THIS APPLICATION AND ANY MATERIALS SUBMITTED HEREWITH, TOGETHER
WITH ALL APPLICATIONS FOR ANY POLICIES ISSUED BY THE UNDERWRITER FOR WHICH THIS POLICY IS
INTENDED TO BE A RENEWAL OR REPLACEMENT, ARE THE BASIS FOR ISSUANCE OF ANY POLICY WHICH
MAY BE ISSUED TO THE APPLICANT BY THE UNDERWRITER PURSUANT TO THIS APPLICATION.

IT IS AGREED THAT IN THE EVENT THERE IS ANY MATERIAL CHANGE IN THE ANSWERS TO THE QUESTIONS
CONTAINED HEREIN PRIOR TO THE EFFECTIVE DATE OF THE POLICY, THE APPLICANT WILL NOTIFY THE
UNDERWRITER AND, AT THE SOLE DISCRETION OF THE UNDERWRITER, ANY OUTSTANDING QUOTATIONS
MAY BE MODIFIED OR WITHDRAWN.

THE UNDERSIGNED DECLARES THAT THE INDIVIDUALS AND ENTITIES PROPOSED FOR THIS INSURANCE
UNDERSTAND:
    (A) THIS POLICY APPLIES ONLY TO "CLAIMS" FIRST MADE DURING THE "POLICY PERIOD," OR, IF PUR-
        CHASED, ANY DISCOVERY PERIOD;
    (B) THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS WILL BE REDUCED BY
        "DEFENSE EXPENSES," AND "DEFENSE EXPENSES" WILL BE APPLIED AGAINST THE RETENTION; AND
    (C) THE UNDERWRITER HAS NO DUTY UNDER THIS POLICY TO DEFEND ANY "CLAIM."

NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD
ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT
OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF
MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT
INSURANCE ACT, WHICH IS A CRIME AND SHALL ALSO BE SUBJECT TO A CIVIL PENALTY NOT TO EXCEED
FIVE THOUSAND DOLLARS AND THE STATED VALUE OF THE CLAIM FOR EACH SUCH VIOLATION.

NOTICE TO MINNESOTA AND OHIO APPLICANTS: ANY PERSON WHO, WITH INTENT TO DEFRAUD OR
KNOWING THAT HE IS FACILITATING A FRAUD AGAINST AN INSURER, SUBMITS AN APPLICATION OR FILES
A CLAIM CONTAINING A FALSE OR DECEPTIVE STATEMENT IS GUILTY OF INSURANCE FRAUD, WHICH IS
A CRIME.

NOTICE TO KENTUCKY APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY
INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY
FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING
ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT WHICH IS A CRIME.

NOTICE TO OKLAHOMA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE,
DEFRAUD OR DECEIVE ANY INSURER, MAKES ANY CLAIM FOR THE PROCEEDS OF AN INSURANCE POLICY
CONTAINING ANY FALSE, INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY.

NOTICE TO PENNSYLVANIA APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD
ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT
OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION OR CONCEALS FOR THE PURPOSE OF MIS-
LEADING INFORMATION CONCERNING ANY FACT MATERIAL THERETO COMMITS A FRAUDULENT INSUR-
ANCE ACT WHICH IS A CRIME AND SUBJECTS SUCH PERSON TO CRIMINAL AND CIVIL PENALTIES.

THE UNDERSIGNED AUTHORIZED AGENT OF THE PERSONS AND ENTITY(IES) PROPOSED FOR THIS
INSURANCE FOR THE PURPOSE OF THIS APPLICATION DECLARES THAT THE APPLICANT HAS RECEIVED
AND READ A SPECIMEN FORM OF THE INSURANCE CONTRACT FOR WHICH APPLICATION IS MADE.

| APPLICANT   MOLTEN METAL T . . OGY, INC. | | |
|---|---|---|
| BY (CHAIRMAN AND/OR PRESIDENT SIGNATURE)   Charles W. Shaver | TITLE   President, COO | DATE   January 16, 1998 |

**NOTE:** This Application must be signed by the CHAIRMAN AND/OR PRESIDENT of the Applicant acting as the authorized agent of the persons and entity(ies) proposed for this insurance.

| PRODUCED BY (Insurance Agent) | INSURANCE AGENCY |
|---|---|
| INSURANCE AGENCY TAXPAYER I.D. OR SOCIAL SECURITY NO. | |
| ADDRESS (No., Street, City, State, and Zip Code) | |

| SUBMITTED BY (Insurance Agency) | INSURANCE AGENCY TAXPAYER I.D. OR SOCIAL SECURITY NO. |
|---|---|
| ADDRESS (No., Street, City, State, and Zip Code) | |

ATTACHMENT 2

The Applicant and its subsidiaries filed for protection under Chapter 11 of the Bankruptcy Code on December 3, 1997.

The Company expects to file plan of reorganization and to emerge from Chapter 11 within 12 months.

ATTACHMENT 1

# Molten Metal
# Technology, Inc.

**Report to the Audit Committee**
**Results of 1996 Audit**

160 Federal ... ...,
Boston, MA 02110                    Telephone 617 439 4390

## Price Waterhouse LLP.



May 23, 1997

To the Members of the Audit Committee of the
Board of Directors of Molten Metal Technology, Inc.

Dear Sirs:

We have completed our audit of the consolidated financial statements of Molten Metal
Technology, Inc. for the year ended December 31, 1996 and have issued an unqualified report
dated May 23, 1997 on those financial statements. In connection with our examination, we
are pleased to submit the accompanying report which describes certain auditing, accounting
and reporting matters which we believe will be of interest to you.

This report is intended solely for the use of the members of the Board of Directors and
management of Molten Metal Technology, Inc.

We look forward to discussing the matters included in this report with you and to addressing
any other matters which you believe appropriate.

Very truly yours,

Michael A. Sommer
Engagement Partner

cc:  William M. Haney, III
     F. Gordon Bitter
     Benjamin T. Downs
     Joseph P. Grabmeier

MOLTEN METAL TECHNOLOGY, INC.
REPORT TO THE AUDIT COMMITTEE
RESULTS OF THE 1996 AUDIT

## TABLE OF CONTENTS

| | Page |
|---|---|
| EXECUTIVE OVERVIEW | |
| Results of the 1996 Audit | 1 |
| Scope of Audit | 1 |
| Significant Matters Discussed with Management | 1 |
| Significant Audit Adjustments | 1 |
| Internal Accounting Controls | 2 |
| Independence | 3 |
| Review of Annual Report and Form 10-K | 3 |
| RECOMMENDATIONS TO MANAGEMENT | 4 |
| MANAGEMENT JUDGMENTS AND ACCOUNTING ESTIMATES | |
| Transactions with M4 | 7 |
| Recoverability of Long-Lived Assets | 7 |
| Acquisition from SEG | 8 |
| Risks and Uncertainties | 9 |
| SIGNIFICANT ACCOUNTING POLICIES | |
| Stock-Based Compensation | 10 |
| Earnings Per Share | 10 |

*Price Waterhouse LLP*

| | |
|---|---|
| Results of the 1996 Audit | We have completed our audit of the consolidated financial statements of Molten Metal Technology, Inc. ("MMT" or the "Company") for the year ended December 31, 1996. Our audit was conducted in accordance with generally accepted auditing standards and, accordingly, was designed to enable us to ascertain with reasonable assurance that such financial statements are free of material misstatement. Based on the results of our audit, we have issued an unqualified opinion on the consolidated financial statements dated May 23, 1997. |
| Scope of Audit | We developed our 1996 audit plan to allocate our resources to areas of importance based upon our understanding of the business, our ongoing discussions with management and our assessment of the relative audit risk associated with the Company's operations and financial statement components. |
| | As previously discussed with the Audit Committee, our efforts were focused on the accounting for the Company's transactions with M4 Environmental L.P. ("M4") and management's assessment of the recoverability of the Company's and M4's long-lived assets. Additionally, certain accruals and costs capitalized for construction in progress involve subjective judgments by management, and, accordingly, we emphasized these areas as well. Cash, short-term investments, and stockholders' equity are less subjective in nature. However, due to the significance of these balances, these components also were emphasized in our audit work. |
| Significant Matters Discussed with Management | During the course of our audit, we discussed a variety of accounting, auditing and reporting matters with management. The most significant of these matters are addressed in this report under the headings "Management Judgments and Accounting Estimates" and "Significant Accounting Policies". |
| Significant Audit Adjustments | A number of adjustments were recorded to the financial statements presented to us by management at the commencement of our audit. Following are the more significant audit adjustments: |

- The Company reversed revenue on transactions with M4 in the aggregate amount of approximately $13 million. Of this amount, $3.1 million related to revenue recorded by the Company during the first three quarters of 1996, resulting in a restatement of the Company's financial statements for the second and third quarters of 1996. Also, the Company recorded an adjustment to the financial statements for the third quarter to write-off as bad debt expense approximately $1.5 million of disputed receivables from M4. See further discussion under the heading "Significant Judgments and Accounting Estimates-Transactions with M4".

*Price Waterhouse* LLP

1

EXECUTIVE OVERVIEW

**Significant Audit Adjustments (Continued)**

- The Company recorded an increase in accounts payable and accrued expenses of approximately $12.0 million to adjust for previously unrecorded liabilities. The majority of this amount related to purchases of fixed assets.

*b/s only*
*112.0m*

We also maintained a schedule of waived adjustments. There were no waived adjustments which were material, individually or in aggregate, to the Company's 1996 financial statements.

**Internal Accounting Controls**

In planning and executing our audit, we considered the Company's internal control structure in order to determine the nature, timing and extent of the audit procedures necessary to render our opinion on the consolidated financial statements, not to provide assurance on the internal accounting control structure.

However, we noted certain matters involving internal control and its operations that we consider to be a material weakness under standards established by the American Institute of Certified Public Accountants. A material weakness is a condition in which the design or operation of one or more of the internal control components does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions.

The material weakness that we noted is related to the controls surrounding the Company's procedures for monitoring contractual relationships, billing for services provided under such contracts, and the related accounting.

During 1996, the Company performed certain construction and research and development services for M4. Although the Company's Basic Ordering Agreement with M4 requires such services to be authorized through a written and signed task order approval process, often work was performed by the Company on the basis of verbal agreements prior to the receipt of written authorization. Performing work for customers and billing for such services without written authorization allows for the possibility of disagreements with customers regarding their obligation to pay for such services and may result in the inappropriate recognition of revenue. In this regard, because the Company did not obtain written evidence of M4's authorization to perform certain work and of M4's agreement to pay for such services, disagreements arose related to certain amounts billed by the Company to M4 during 1996. Because M4 did not pay the amounts related to the disputed balances and there was not sufficient evidence of M4's obligations, the Company recorded adjustments to reverse revenue in the aggregate amount of approximately $13 million. Additionally, the Company wrote-off accounts receivable from M4 related to the disputed amounts of approximately $1.5 million.

*Price Waterhouse LLP* 

| | |
|---|---|
| Internal Accounting Controls (Continued) | The Company should establish policies and procedures requiring that task orders are signed on a timely basis and that written documentation evidencing the customer's agreement to purchase and pay for goods and services is obtained by the Company prior to the recognition of revenue. Additionally, communications between the Company's accounting and operations personnel should be strengthened to ensure that any matters impacting the accounting for transactions with customers (both the recognition of revenue and monitoring of potential bad debts) are reflected in the Company's financial statements in the appropriate periods. |
| | Also, as a result of our audit work, we have certain other recommendations to management which are designed to improve the Company's financial policies, business practices and system of internal accounting controls. These items are discussed in this report under the heading "Recommendations to Management". |
| Independence | With respect to the Company, we are independent accountants within the meaning of Rule 101 of the Code of Professional Conduct of the American Institute of Certified Public Accountants. |
| | We are also independent accountants within the meaning of the Securities Act of 1933 and are in compliance with the applicable requirements of Rule 2.01 of Regulation S-X promulgated by the Securities and Exchange Commission relating to the qualifications of accountants. |
| Review of Annual Report and Form 10-K | We have reviewed the Company's 1996 consolidated financial statements and annual report and Form 10-K for compliance with generally accepted accounting principles and the applicable requirements of the Securities Exchange Act of 1934. In addition, we have ascertained that the other information in the Company's annual report to stockholders and Form 10-K is consistent with the financial information contained in the consolidated financial statements. |
| | The financial statements of M4 were filed with the Company's Form 10-K in accordance with the requirements of Regulation S-X. |
| | As provided for in Statement on Auditing Standards No. 8, "Other Information in Documents Containing Audited Financial Statements," our audit does not include the performance of procedures to corroborate other information in documents containing audited financial statements, including forward-looking statements, and we assume no obligation thereto. |

*Price Waterhouse LLP* 

## Organization of the Finance and Administration Department

We recommend that the Company reassess the organization and resources required by the Finance & Administration Department. As the Company continues to grow and the complexity of its business operations increases, management should ensure that the Company has sufficient resources to meet the internal and external financial reporting and internal control demands associated with effectively managing these functions.

We believe that the structure of the Finance & Administration organization should be reviewed to ensure that the corporate accounting and finance functions are staffed appropriately and that lines of authority and areas of responsibility are clearly defined. This review should consider the effects of system changes, the anticipated growth of the Company and the current needs of the organization.

## Financial Reporting

We agree with management's plan to enhance controls surrounding the monthly closing process to improve the integrity and timeliness of the reporting of interim financial information. In particular, it will be important to mitigate delays in receiving key financial information and operating reports from subsidiaries or joint venture investees in order to prevent untimely reporting and significant accounting adjustments at period-end. We understand that Management intends to take actions to ensure that reporting responsibilities and lines of communication are improved in a manner which provides for timely and accurate month-end financial information and to ensure that interim financial information is reviewed by the appropriate levels of management. We support management's plans and believe that improved communication and reporting will also enable management to identify potential operating problems on a more timely basis.

## Information Systems

We recommend that the Company consider implementing a plan to enhance the current information systems infrastructure. The Company has made a significant investment in the Oracle Financials information system. We believe that the current information systems personnel should be expanded to adequately support and maximize the benefits of the system. Increasing the current infrastructure will help the Company maximize its return on this investment by using the system to its potential and by empowering employees to operate more productively and effectively.

Additionally, immediately prior to year-end, the Company acquired SEG's wet-waste business. As of December 31, 1996, the procedures in place to track revenue and costs associated with waste processing and other wet waste services provided by the Company had not yet been integrated with the Company's Oracle Financials job costing system. As a result, information has been maintained on spreadsheets by the accounting personnel in Oak Ridge and manually entered into the Oracle system in Waltham. Such procedures are labor intensive, result in duplicate effort and increase the possibility of errors being made. We support management's plans to implement appropriate systems to allow for integration of the Company's systems to the extent possible and to evaluate the appropriateness of standardization of the Company's pricing policies. Such steps would improve the quality and timeliness of information available to management related to this business.

*Price Waterhouse* LLP 

RECOMMENDATIONS TO MANAGEMENT

**Revenue Recognition**

We recommend that the Company formalize a written revenue recognition policy. As the Company continues to expand its operations and the complexity of the business operations increases, management should formally document the Company's revenue recognition policies. Clearly defining policies and procedures related to revenue recognition and distributing this guidance to the entire organization will communicate management's expectations regarding appropriate conduct in this area and will add additional control over this critical area of the business.

**Recording of Accounts Payable and Accrued Liabilities**

The Company should strengthen the controls and processing functions surrounding the accounts payable component to ensure that proper cut-off is obtained at period end. During the current year, the volume of accounts payable transactions increased significantly, mainly as a result of increased expenditures for construction in progress, equipment and services. As a result, the number of unprocessed invoices and the need for manual accruals also has increased. Since the volume of such transactions is expected to grow, we recommend that the Company ensure that proper cut-off is obtained by reviewing supporting documentation, such as invoices received subsequent to period end, in order to prepare appropriate accrual estimates, including those related to legal and professional services, construction in progress and other significant accruals which require estimation at period end.

**Stock-Based Compensation**

During our audit, we noted several instances where, pursuant to the accounting guidance provided in APB 25, the Company should have recorded compensation expense related to certain stock option grants. Because the amounts involved were not material, no adjustments were made to the Company's financial statements. These situations resulted primarily from a lack of communication between those involved in granting the stock awards (human resources, compensation committee, etc.) and the accounting department. Accordingly, we recommend that the Company establish formal procedures for the notification of stock options and awards, including any non-standard terms, by those responsible for granting awards to the accounting department. Such procedures will ensure that stock options and other awards of stock are accounted for properly and in a timely manner.

**Intangible Assets/Intellectual Property**

Existing procedures surrounding the recording of patents, trademarks and other intellectual property should be strengthened in order to ensure that patent costs are adequately reflected in the fixed asset system. Currently, the MMT patent management team meets quarterly to review the status and recoverability of all patents. We recommend that the minutes of such meetings are directed to the controller for dissemination to the accounting department. This will allow for closer monitoring of the status of patents (both issued and unissued) and ensure that any changes are properly reflected in the fixed asset system, which is used to track capitalized patent costs.

In addition, we recommend that a periodic review be performed of the useful lives of capitalized patents to ensure that amortization periods are appropriate. Given the nature of the Company's business and rapidly changing technology, useful lives shorter than the legal lives may be appropriate for certain of the Company's patents. A periodic review will ensure that useful lives and amortization expense are properly reflected in the accounting records.

*Price Waterhouse LLP* 

## RECOMMENDATIONS TO MANAGEMENT

### Property, Plant and Equipment

We recommend that the Company enhance its procedures surrounding the disposal of fixed assets. Currently, there are no formal procedures for the disposal of assets. Rather, when an asset is sold, scrapped or otherwise disposed of, the person disposing of the asset notifies the accounting department that an asset has been disposed of. In order to avoid the misappropriation of assets, we recommend that a formal policy be established, including appropriate authorization, before an asset is to be disposed. This would include documentation to be completed and forwarded to the accounting department upon disposal.

### Debt

We recommend that the Company monitor its compliance with debt covenants required by its various loan agreements on a monthly basis and obtain debt waivers, as necessary, in the event of non-compliance. Such procedures will ensure that the appropriate trustee is notified promptly of any non-compliance and avoid potential default of the loan agreements.

*Price Waterhouse* LLP 

We consult with management on an ongoing basis regarding significant transactions, as well as important accounting, tax and financial reporting developments affecting MMT. During 1996, there were a number of matters which received particular emphasis in our ongoing communications with management. Set forth below is a brief discussion of the more significant matters that we discussed with management during the year and in connection with our audit.

| | |
|---|---|
| Transactions with M4 | As described above and as previously discussed with the Audit Committee, during 1996, the Company performed certain construction and research and development services for M4 for which M4 disputed the related billings. Because M4 did not pay the amounts related to the disputed invoices and there was not sufficient evidence of M4's obligations, the Company recorded adjustments to reverse revenue on these transactions in the aggregate amount of approximately $13 million and to write-off as bad debt expense approximately $1.5 million of disputed receivables from M4. Note 17 to the financial statements includes a table summarizing the restated results of operations for the second and third quarters of 1996. |
| Recoverability of Long-Lived Assets | Financial Accounting Standards No. 121, "Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to be Disposed Of" ("FAS 121") was adopted by the Company in 1996. FAS 121 requires that long-lived assets be reviewed for impairment whenever events or changes in circumstances indicate the carrying amount of the asset may not be recoverable. The Company's long-lived assets include fixed assets and intangible assets (primarily patents, licenses and permits and goodwill). |

As a result of certain changes in the Company's business (which are described in Note 4 to the financial statements) and the Company's significant loss for the quarter ended December 31, 1996, management performed an assessment of the recoverability of all of the Company's long-lived assets as of December 31, 1996.

The methodology and assumptions used by the Company in performing this assessment are described in detail in Note 4 to the financial statements. The Company retained independent valuation experts to assist with this process. For each grouping of long-lived assets, the sum of the weighted average forecasted cash flows from management's models exceeded the carrying amount of the Company's long-lived assets. Accordingly, the Company has not recorded any adjustments to the carrying amount of these assets.

*Price Waterhouse LLP*    

| | |
|---|---|
| Recoverability of Long-Lived Assets (Continued) | With respect to M4, due to the proposed restructuring of the Partnership with Lockheed Martin Corporation ("LMC"), pursuant to which the Company would become the owner of M4's Technology Center and LMC would be transferred the Retech division of M4, and the imbalance evident in the relative book values of the assets transferred to the partners, management performed an assessment of the recoverability of the net book value of M4's Technology Center and intangible assets as of December 31, 1996. This analysis indicated that these assets were impaired. An independent appraisal was obtained to determine the estimated fair value of these assets and an impairment charge of $60.9 million was recorded on M4's books, one-half of which was absorbed by the Company through equity loss from affiliate. |

We worked with management and the independent experts to obtain an understanding of the valuation methodology and assumptions and performed certain audit tests of the relevant data. Based upon the procedures performed, we believe that the conclusions reached by management and the independent experts with regard to both the Company and M4 are reasonable.

| | |
|---|---|
| Acquisition from SEG | In 1994, the Company entered into an agreement with Scientific Ecology Group, Inc. ("SEG") to engineer, construct and operate a CEP plant at SEG's Oak Ridge, Tennessee facility to process low-level radioactive waste from nuclear power plants (the "Q-CEP facility"). Under the terms of the agreement, MMT and SEG each were responsible for the design, procurement, construction and start-up of specific components of the full-scale plant and would own the respective components. |

During December 1996, the Company signed a series of agreements to become the full owner of the Q-CEP facility and to acquire certain assets used for handling and processing low-level radioactive waste known as the "wet waste" business. The purchase price for these assets was approximately $31 million in cash. The acquisition was accounted for as a purchase in accordance with APB Opinion No. 16, "Business Combinations" ("APB 16") and, accordingly, operating results of this business subsequent to the date of acquisition are included in the Company's consolidated financial statements. In accordance with APB 16, the purchase price was allocated to the assets acquired and liabilities assumed based upon their fair values at the date of acquisition. The excess of the purchase price over the fair value of the net assets acquired was approximately $6.7 million and was recorded as goodwill.

*Price Waterhouse* LLP



MANAGEMENT JUDGMENTS
AND ACCOUNTING ESTIMATES

| | |
|---|---|
| Acquisition from SEG (Continued) | The Company obtained an opinion from independent experts which concluded that the allocation of the purchase price and the useful lives assigned to the assets acquired by the Company were reasonable. We worked with management and the independent experts to obtain an understanding of the methodology and assumptions used in making the purchase price allocation and performed certain audit tests of the relevant data. Based on the procedures performed, we believe that the conclusions reached by management and the independent experts are reasonable. |
| Risks and Uncertainties | Statement of Position (SOP) 94-6, "Disclosure of Certain Significant Risks and Uncertainties" requires disclosure regarding the nature of operations and the use of estimates in the preparation of financial statements. In addition, it requires entities to make disclosures regarding amounts reported in the financial statements or in the notes that are particularly sensitive to change in the near term. |

The Company's 1996 financial statements include such disclosures. In particular, Note 1 of the financial statements describes the more significant risks and uncertainties associated with the nature and status of MMT's operations. These factors include the uncertainty of market acceptance and sustained commercial operations of CEP technology, limited revenue from unaffiliated third parties, and the uncertainty of future profitability.

Additionally, disclosure has been included throughout the financial statements regarding certain estimates made by management for which it is reasonably possible that the factors considered in the estimate could change in the near term and the effect of such a change would be material to MMT's financial statements. Such estimates include future cash flows from the Company's long-lived assets, useful lives of fixed and intangible assets, and estimated losses on lease obligations for the Company's Totten Pond Road facilities.

*Price Waterhouse LLP*



**Molten Metal Technology**

Molten Metal Technology, Inc. • 400-2 Totten Pond Road • Waltham, MA 02154 U.S.A. • Tel: 617-487-9700 • Fax: 617-487-7870 • http://www.mmt.com

October 3, 1997

Mr. Michael A. Sommer
Price Waterhouse LLP
160 Federal Street
Boston, MA 02110

Dear Mike,

Your report to the members of the Audit Committee regarding the 1996 Financial Statements for Molten Metal Technology included specific recommendations to management for improving internal control. I would like to respond to these recommendations.

Your report noted a material weakness in internal controls regarding the Company's procedures for monitoring contractual relationships and specifically the invoicing for services and related accounting. The concern stemmed from the Company's business arrangements with M4 which, as you know, have been terminated. Suffice it to note that other contractual relationships will be carefully reviewed and there will be no revenue recognition without a signed document.

<u>Organization - Finance & Administration</u>

Regarding your recommendation to re-assess the organization and resources required by the Finance & Administration Department, a new CFO, Gordon Bitter, joined the Company in mid-September, and he has begun such an assessment. His preliminary position is that the Controller's staff needs to be bolstered by two mid-level managers with expertise in external reporting (SEC/tax compliance) and the Oracle software package. Recruitment for these two critical accounting positions has been authorized despite the overall downsizing of the Company.

<u>Financial Reporting</u>

The specific problems noted refer to unique issues with M4 which are now moot; however, reporting responsibilities and lines of communication will be more clearly delineated as the Company moves to establish distinct profit centers, each with a general manager and supporting financial executive.

Mr. Michael A. Sommer
Price Waterhouse LLP
Page 2
October 3, 1997

## Information Systems

I agree that the Company could benefit from additional investment in its Oracle financial information systems; however, as noted above, the incremental cost must be weighed against other demands of the organization and budgetary constraints.

Your second recommendation concerning information systems, namely the integration of the accounting systems of the recently acquired SEG business with the Company's Oracle system, is a bit wide of the mark. SEG's accounting is, in fact, integrated with the Oracle system. The recognition of revenue at the prior SEG facility, however, is not automated because of the inherent complexity of the waste treatment process which necessitates a substantial "manual intervention" to determine appropriate revenues. All data entry, however, will be done in Oak Ridge by the end of this year to minimize errors and improve the timeliness of reporting.

## Revenue Recognition

Although the Company has a number of informal directives concerning revenue recognition, a formal policy will be issued to document management's expectations.

## Accounts Payable/Accrued Liabilities

Although the number of transactions for construction in progress, equipment purchases and engineering services is actually expected to decline, management will insure that appropriate accruals are made at the month-end for outstanding invoices.

## Stock-Based Compensation

There are formal procedures in place for the issuance of stock options; however, there is a need to formalize procedures concerning the change of existing grants. This new policy and procedure will be developed with the Compensation Committee.

Mr. Michael A. Sommer
Price Waterhouse LLP
Page 3
October 3, 1997

## Intangible Assets/Intellectual Property

The Controller's office will work closely with the Intellectual Property Department to ensure that patent costs and useful lives are adequately reflected in the fixed asset system and that procedures for the ongoing monitoring of patents are enhanced.

## Property, Plant & Equipment Disposal

A formal policy and procedure concerning the authorization and disposition of fixed assets will be issued.

## Debt Compliance

The Company will strengthen and formalize its monitoring of compliance with debt covenants of its various loan agreements.

The year 1996 was an extremely difficult one for the Company, but out of it has come significant technological progress and a renewed sense of direction. We appreciate the advice and counsel which Price Waterhouse has extended to us over this difficult period and look forward to your continued contributions to the successful commercialization of our core technology.

Sincerely,

William M. Haney, III
President and CEO

WMH/jac

cc:  Marie J. Langlois (Phoenix Investment Management Co.)
     Peter A. Lewis (Lazard Frères & Co. LLC)
     F. Gordon Bitter
     Charles W. Shaver

# GENESIS    GENESIS INSURANCE COMPANY

(herein called the INSURER)

DIRECTORS AND OFFICERS LIABILITY INSURANCE POLICY

## THIS IS A CLAIMS MADE POLICY, PLEASE READ IT CAREFULLY

In consideration of the payment of the premium and in reliance upon all statements made and information furnished to Genesis Insuranc Company, including the statements made in the Declarations and Application and subject to all terms, conditions and limitations of thi Policy, the INSURER agrees:

## SECTION I. INSURING AGREEMENTS

A. With the DIRECTORS and OFFICERS of the COMPANY that if, during the POLICY PERIOD or the DISCOVERY PERIOD, an CLAIM is first made against the DIRECTORS or OFFICERS, individually or collectively, for a WRONGFUL ACT, the INSURE will pay on behalf of the DIRECTORS or OFFICERS, all LOSS in excess of the applicable Retention amount stated in Item 4 of th Declarations, which the DIRECTORS or OFFICERS shall be legally obligated to pay, except for such LOSS which the COMPANY actually pays as indemnification.

B. With the COMPANY, that if during the POLICY PERIOD or the DISCOVERY PERIOD, any CLAIM is first made against the DIRECTORS or OFFICERS, individually or collectively, for a WRONGFUL ACT, the INSURER will reimburse the COMPANY for all LOSS in excess of the applicable Retention amount stated in Item 4 of the Declarations which the COMPANY is required to indemnify, or for which the COMPANY has to the extent permitted by law indemnified the DIRECTORS or OFFICERS.

## TION II. DEFINITIONS

A. "COMPANY" shall mean the entity named in Item 1 of the Declarations and any SUBSIDIARY as defined in Section II B which i legally constituted at the inception date of this Policy.

B. "SUBSIDIARY" shall mean:

(1) Any entity more than 50% of whose outstanding securities representing the present right to vote for the election of Directors ar owned by the entity named in Item 1 of the Declarations and/or one or more of its Subsidiaries at the inception date of this Policy or of any Policy issued by the INSURER of which this Policy is a renewal thereof; or

(2) Any entity which is acquired or created subsequent to the effective date of this Policy in which more than 50% of whose outstanding securities representing the present right to vote for the election of Directors are owned by the entity named in Item 1 of the Declarations and/or one or more of its Subsidiaries, subject, however, to the provisions of Section VIII(E).

The term "SUBSIDIARY" shall include any Subsidiary of any Subsidiary.

C. "DIRECTORS" and "OFFICERS" shall mean all persons who were, now are, or shall be duly elected Directors or duly elected o appointed Officers of the COMPANY, including their estates, heirs, legal representatives or assigns in the event of their death incapacity or bankruptcy.

D. "WRONGFUL ACT" shall mean any actual or alleged negligent act, omission or error, including but not limited to, any negligen misstatement, misleading statement, neglect or breach of duty by the DIRECTORS or OFFICERS in the discharge of their duties solel in their capacity as DIRECTORS or OFFICERS of the COMPANY, individually or collectively.

E. "INTERRELATED WRONGFUL ACTS" shall mean WRONGFUL ACTS which have as a common nexus any fact, circumstance situation, event, transaction or series of facts, circumstances, situations, events or transactions.

H 3618

F.  "LOSS" shall mean any amount which the DIRECTORS or OFFICERS are legally obligated to pay or for which the COMPANY required to indemnify the DIRECTORS or OFFICERS, or for which the COMPANY has, to the extent permitted by law, indemnified the DIRECTORS or OFFICERS, for a CLAIM or CLAIMS made against the DIRECTORS or OFFICERS for WRONGFUL ACT and shall include damages, judgements, settlements, and COST OF DEFENSE, provided always, however, LOSS shall not include criminal or civil fines or penalties imposed by law, punitive or exemplary damages or any multiplied portion of a damage award excess of actual damages, taxes, or any matter which may be deemed uninsurable under the law pursuant to which this Policy sh be construed.

G.  "COST OF DEFENSE" shall mean reasonable and necessary legal fees and expenses incurred in the investigation and/or defense any CLAIM and appeals therefrom, and cost of attachment or similar bonds; provided, however, COST OF DEFENSE shall not include salaries, wages, overhead or benefit expenses associated with DIRECTORS, OFFICERS or employees of the COMPANY.

H.  "POLICY YEAR" shall mean the period of one year following the effective date and hour of this Policy or the period of one year following any anniversary date thereof falling within the POLICY PERIOD; or if the time between the effective date or any anniversary date and the termination of this Policy is less than one year, such lesser period.  If the DISCOVERY PERIOD is exercised accordance with Section III, then such period shall be deemed part of and not in addition to the last POLICY YEAR.

I.  "POLICY PERIOD" shall mean the period from the inception date of this Policy to the Policy expiration date stated in Item 2 of t Declarations, or its earlier termination, if any.

J.  "CLAIM" shall mean any civil proceeding initiated against a DIRECTOR or OFFICER before any governmental body which is legal authorized to render an enforceable judgment or order for money damages or other relief against such DIRECTOR or OFFICER a shall include any appeal from such proceeding.

## SECTION III. DISCOVERY PERIOD

A.  If the INSURER cancels this Policy pursuant to Section VIII A (2), or in the event the INSURER refuses to renew this Policy, for an reason other than the COMPANY'S non-payment of premium or non-compliance with the terms and conditions of this Policy, the the entity named in Item 1 of the Declarations on behalf of the DIRECTORS and OFFICERS shall have the right, upon payment of an additional premium calculated as provided in Item 6 of the Declarations to an extension of the coverage granted by this Policy with respect to any CLAIM first made against the DIRECTORS or OFFICERS during the period of ninety (90) days after the effective date of such cancellation or, in the event of such refusal to renew, after the date upon which the POLICY PERIOD ends, but only with respect to WRONGFUL ACT committed before such date and otherwise covered by this Policy.  This ninety (90) day period shall be referred to in this Policy as the DISCOVERY PERIOD.

B.  A renewal quotation by the INSURER incorporating different terms, conditions and/or premium with respect to the coverage afforded by this Policy shall not be deemed to constitute a cancellation or refusal to renew by the INSURER for the purpose of determining th right to purchase the DISCOVERY PERIOD.

C.  In the event of renewal on terms and conditions different from those in effect during the POLICY PERIOD, the COMPANY shall have the right, upon payment of an additional premium to be determined by the INSURER, to an extension of the original terms and conditions with respect to any CLAIM first made against any DIRECTOR or OFFICER during the period of ninety (90) days after the effective date of renewal, but only with respect to any WRONGFUL ACT committed prior to the effective date of the renewal.  This right of extension shall terminate unless written notice of such election is received by the INSURER within ten (10) days after the effective date of renewal.

D.  As a condition precedent to the right to purchase the DISCOVERY PERIOD, the total premium for this Policy must have been paid The right to purchase the DISCOVERY PERIOD shall terminate unless a written request for the DISCOVERY PERIOD is given to the INSURER within ten (10) days after the effective date of cancellation, or, in the event of a refusal to renew, within ten (10) days after the POLICY PERIOD ends, together with payment of the appropriate premium for the DISCOVERY PERIOD.  In the event that such written request and premium paid is not so given to the INSURER, there shall be no right to purchase the DISCOVERY PERIOD at any later date.

E.  The fact that this Policy may be extended by virtue of the purchase of the DISCOVERY PERIOD shall not in any way increase the Limit of Liability stated in Item 3 of the Declarations.  For purposes of the Limit of Liability, the DISCOVERY PERIOD is considered to be part of and not in addition to the last POLICY YEAR.

H 3619

F.    The DISCOVERY PERIOD shall only apply to CLAIMS first made against the DIRECTORS or OFFICERS during said DISCOVER'
PERIOD.

G.    In the event of the purchase of the DISCOVERY PERIOD, the entire premium therefore shall be deemed earned at its commencement
If the DISCOVERY PERIOD is terminated before its full term for any reason the INSURER shall not be liable to return any portio
of the premium paid for the DISCOVERY PERIOD. Notwithstanding the foregoing, if the DISCOVERY PERIOD is terminated befor
completion of its full term pursuant to Section III H, the INSURER shall return the pro rate unearned premium to the INSURED.

H.    If the DISCOVERY PERIOD is purchased, it shall terminate immediately on the effective date of any contract of insurance o
indemnity which replaces the coverage afforded by this Policy through the DISCOVERY PERIOD either in whole or in part.

SECTION IV. EXCLUSIONS

The INSURER shall not be liable to make any payment for LOSS in connection with any CLAIM made against the DIRECTORS o
OFFICERS:

A.    Alleging, arising out of, based·upon or attributable to any attempt, whether successful or unsuccessful, by any person or entity to
acquire securities of the COMPANY against the opposition of the Board of Directors of the COMPANY ("BOARD"), or any action
whether successful or unsuccessful, by the COMPANY or the BOARD to resist such attempts; however, this exclusion shall not apply
if, before taking any such resistive action, the COMPANY or the BOARD has obtained written opinion (1) from independent lega
counsel that such resistive action is a lawful exercise of the BOARD'S business judgement and (2) from an independent investmen
banking firm that the offer for the securities of the COMPANY is inadequate, and that any financial transaction approved by the
BOARD which is resistive of such acquisition is fair to the COMPANY and its shareholders;

B.    Based upon or attributable to the DIRECTORS or OFFICERS gaining in fact any profit or advantage to which they were not legally
entitled;

        For return by the DIRECTORS or OFFICERS of any remuneration paid to the DIRECTORS or OFFICERS without the previous
approval of the governing bodies of the COMPANY, which payment, without such previous approval, shall be held to be in violation
of law;

D.    Brought about or contributed to by the fraudulent, dishonest or criminal acts of the DIRECTORS or OFFICERS;

E.    Which is insured in whole or in part by another valid policy or policies, regardless of whether or not any LOSS in connection with
such CLAIM is collectible or recoverable under such other policy or policies, provided, however, this Exclusion E shall not apply
with respect to any excess beyond the amount or amounts of coverage under such other policy or policies whether such other policy
or policies are stated to be primary, contributory, excess or otherwise, where such CLAIM is otherwise covered by the terms and
provisions of this Policy;

F.    Arising out of or in any way involving (1) any WRONGFUL ACT, or any fact, circumstance or situation which has been the subject
of any notice given prior to the effective date of this Policy under any insurance policy providing protection for the DIRECTORS or
OFFICERS, including any matter in any way related thereto; or (2) any other WRONGFUL ACT which, together with a WRONGFUL
ACT which has been subject of such notice described in the preceding clause, would constitute INTERRELATED WRONGFUL ACTS;

G.    Arising out of or in any way involving actual or alleged: (1) bodily injury, sickness, disease, or death of any person, assault, battery,
mental anguish, emotional distress, loss of consortium, or ethnic, sexual, racial, religious, disability, age  or other discrimination or
harassment; or (2) damage to or destruction of any tangible property including loss of use thereof; or (3) invasion of privacy, wrongful
entry, eviction, false arrest, false imprisonment,·malicious prosecution, defamation or false light, libel or slander;

H.    Arising out of or in any way involving any pension, profit sharing or employee benefit program established in whole or in part for the
benefit of any of the DIRECTORS, OFFICERS or employees of the COMPANY, or based upon, arising out of or in any way involving
the Employee Retirement Income Security Act of 1974 (or any regulations promulgated thereunder) or similar provisions of any federal,
state or local statutory law or common law;

H 3620

3

I.  For any actual or alleged WRONGFUL ACT in the discharge of their duties as a Director or Officer of any entity other than th COMPANY, even if directed or requested to serve as a Director or Officer of such other entity, except where this Policy has bee specifically endorsed providing such extension of coverage;

J.  Based upon, arising out of, attributable to or in any way involving, directly or indirectly:

   (1)  the actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of pollutants, or

   (2)  any direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize pollutants or to pay for or contribute to the costs of undertaking such actions including claims alleging damage to the COMPANY or it shareholders.

   Pollutants includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, organisms or other hazardous substances, and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

K.  By or at the behest of the COMPANY, or any affiliate of the COMPANY or any DIRECTOR or OFFICER, or by any security holder of the COMPANY, whether directly or derivatively, unless such CLAIM is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any DIRECTOR or OFFICER or the COMPANY or any affiliate of the COMPANY; provided, however, this exclusion shall not apply to wrongful termination of employment claims brought by a former employee other than a former employee who is or was a DIRECTOR of the COMPANY;

L.  For an accounting of profits in fact made from the purchase and sale or sale and purchase by the DIRECTORS or OFFICERS of securities of the COMPANY within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law or common law;

M.  Arising out of or in any way involving any actual or alleged failure to effect or maintain any policy of insurance;

N.  Of any SUBSIDIARY arising out of or in any way involving, (1) any WRONGFUL ACT occurring prior to the date such entity became a SUBSIDIARY, or (2) any WRONGFUL ACT occurring subsequent to the date such entity became a SUBSIDIARY which, together with a WRONGFUL ACT occurring prior to the date such entity became a SUBSIDIARY, constitute INTERRELATED WRONGFUL ACTS.

NOTE: THE WRONGFUL ACT OF ANY DIRECTOR OR OFFICER SHALL NOT BE IMPUTED TO ANY OTHER DIRECTORS OR OFFICERS FOR THE PURPOSE OF DETERMINING THE APPLICABILITY OF EXCLUSION B, C AND D.

SECTION V. LIMIT OF LIABILITY

A.  The INSURER shall be liable to pay one hundred percent (100%) of LOSS in excess of the applicable Retention amount stated in Item 4 of the Declarations up to the Limit of Liability stated in Item 3 of the Declarations.

B.  CLAIMS based upon or arising out of the same WRONGFUL ACT or fact, circumstance or situation, or any INTERRELATED WRONGFUL ACT, or fact, circumstance or situation, or one or more series of any similar, repeated or continuous WRONGFUL ACTS, of one or more of the DIRECTORS or OFFICERS, shall be considered a single CLAIM and only one Retention and Limit of Liability shall be applicable to such single CLAIM; provided, however, that each such single CLAIM shall be deemed to fall within the POLICY YEAR in which the earliest CLAIM arising out of such WRONGFUL ACT or fact, circumstance or situation, or one or more series of any similar, repeated or continuous WRONGFUL ACTS is first made, or within the POLICY YEAR in which notice pursuant to Section VII A is given, whichever occurs first. In the event that more than one DIRECTOR or OFFICER is included in the same CLAIM, the total amount of such CLAIM and the Retention shall be apportioned pro-rata among the DIRECTORS and OFFICERS in proportion to their respective LOSS unless otherwise mutually agreed upon by the DIRECTORS and OFFICERS and the INSURER.

C.  One Retention amount shall apply to each and every CLAIM. In the event a single CLAIM is covered under more than one Insuring Agreement, the Retention stated in Item 4 of the Declarations shall be applied separately to the part of the CLAIM covered by each Insuring Agreement and the sum of the Retentions so applied shall constitute the Retention for each single CLAIM, provided however, he total Retention as finally determined shall in no event exceed the largest of the applicable Retentions. Notwithstandi ; the

4

H 3621

aforementioned, for the purposes of the application of the Retention, any LOSS applicable to the Company Reimbursement, Insurir Agreement Section I B, includes that for which indemnification by the COMPANY is legally permissible whether or not actu indemnification is granted and the COMPANY shall be presumed to have in effect in its By-Laws the broadest possible indemnificatic provisions permitted under the applicable laws.

D.   COSTS OF DEFENSE shall be part of and not in addition to the Limit of Liability stated in Item 3 of the Declarations, and suc COSTS OF DEFENSE shall reduce the Limit of Liability stated in Item 3 of the Declarations and shall also be applied against tl Retention.

E.   Subject to the foregoing, the INSURER'S liability for all LOSS including COSTS OF DEFENSE shall be the amount shown in Ite 3 of the Declarations, and shall be the maximum aggregate Limit of Liability of the INSURER in the POLICY YEAR for all CLAIM made against the DIRECTORS and OFFICERS, regardless of the time of payment by the INSURER.

## SECTION VI. COSTS OF DEFENSE AND SETTLEMENTS

A.   The DIRECTORS or OFFICERS shall not admit liability for, or settle, any CLAIM or incur COSTS OF DEFENSE, in connectic with any CLAIM, without the INSURER'S prior written consent, which consent shall not be unreasonably withheld. The INSURE shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent. Any COSTS O DEFENSE incurred, and/or settlements agreed to prior the INSURER'S consent thereto shall not be covered hereunder. In the ever of such consent being given, and subject to all other terms and provisions of this Policy, including but not limited to Section V D c this Policy, the INSURER shall reimburse COSTS OF DEFENSE only upon the final disposition of any CLAIM made against tl DIRECTORS or OFFICERS.

B.   Notwithstanding the provisions of Paragraph A hereinabove, the INSURER at its sole option and discretion may advance COSTS O DEFENSE on behalf of the DIRECTORS and OFFICERS, incurred by the DIRECTORS and OFFICERS in connection with an CLAIM made against them, prior to the final disposition of any such CLAIMS. Any agreement by the INSURER to advance COST OF DEFENSE shall be on the condition that:

(1)   The DIRECTORS and OFFICERS provide a written undertaking satisfactory to the INSURER providing that in the event it i finally established that the INSURER has no liability under the Policy to the DIRECTORS and OFFICERS, or any of them, fo such CLAIM, such DIRECTORS and OFFICERS agree to repay to the INSURER upon demand all COSTS OF DEFENS! advanced on their behalf by virtue of this provision;

(2)   The DIRECTORS and OFFICERS provide security for such written undertaking satisfactory to the INSURER; and

(3)   Any COSTS OF DEFENSE advanced by the INSURER shall reduce the Limit of Liability for such CLAIM to the extent that the are not in fact repaid to the INSURER in accordance with (1) hereinabove.

C.   It shall be the duty of the DIRECTORS and OFFICERS and not the duty of the INSURER to defend CLAIMS, provided that th DIRECTORS or OFFICERS shall only retain counsel as is mutually agreed upon with the INSURER.

The INSURER shall at all times have the right, but not the duty, to associate with the DIRECTORS or OFFICERS in the investigation defense or settlement of any CLAIM to which this Policy may apply. The COMPANY and the DIRECTORS and OFFICERS shal provide the INSURER with such information, assistance and cooperation as the INSURER may reasonably request.

## SECTION VII. NOTICE OF CLAIM

A.   The DIRECTORS or OFFICERS shall, as a condition precedent to their rights under this Policy, give the INSURER notice in writing as soon as practicable of any CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or DISCOVERY PERIOD, but in no event later than thirty (30) days after such CLAIM is made, and shall give the INSURER such information an cooperation as the INSURER may reasonably require.

B.   If prior to the effective date of the cancellation of this Policy in the event of its cancellation by the INSURER pursuant to the provision of Section VIII (A) (2), or if prior to the expiration date of this Policy stated in Item 2 of the Declarations in the event of its non renewal by the INSURER pursuant to the provisions of Section VIII (A) (4) and prior to the inception of the DISCOVERY PERIOD the DIRECTORS or OFFICERS of the COMPANY first become aware of any circumstances which may subsequently give rise to

H 3622

CLAIM being made against the INSURED, and the DIRECTORS or OFFICERS as soon as practicable, but in no event later than thir (30) days from the date of such first awareness, give written and specific notice to the INSURER of the circumstances and the reason for anticipating a CLAIM, then any CLAIM subsequently made against the DIRECTORS or OFFICERS arising directly out of suc circumstances as specifically noticed shall be deemed for the purposes of this Policy to have been made during the POLICY YEA in which such notice was given; provided, however, that as a condition precedent for any coverage to arise hereunder:

(1)  Such notice must be received by the INSURER prior to the effective date of the cancellation of the Policy, or in the case of non renewal by the INSURER, prior to the expiration date of this Policy stated in Item 2 of the Declarations; and

(2)  Such notice must be specific and contain full particulars as to the circumstances potentially giving rise to the CLAIM, includin a narrative setting forth dates, names of the potential plaintiffs and affected DIRECTORS or OFFICERS, names of other person involved, the nature and scope of the anticipated CLAIM, and all reasons why such a CLAIM is reasonably to be anticipated

C.  In addition to furnishing the notice as provided in Section VII A and VII B, the DIRECTORS or OFFICERS shall, as soon a practicable, furnish the INSURER with copies of reports, investigations, pleadings and all information requested by the INSURER i connection therewith.

D.  The INSURER shall have the right but not the obligation to make any investigation it deems expedient and with the consent of th INSURED against whom the CLAIM has been made or the COMPANY on behalf of the INSURED, make settlement within th available Limit of Liability (whether above or below the applicable Retention). If the INSURED, or the COMPANY on behalf of th INSURED, shall refuse to consent to any settlement recommended by the INSURER and shall act to contest or continue any action or proceedings in connection with such CLAIM, then, subject to the available Limit of Liability and the applicable Retention, th INSURER'S liability for all LOSS in connection with such CLAIM shall not exceed the amount for which the CLAIM could have bee settled, plus the reasonable COST OF DEFENSE incurred with the INSURER'S consent up to the date of refusal to consent by th INSURED and/or the COMPANY.

E.  Notice to the INSURER as provided in Section VII A and VII B, and any information furnished to the INSURER as provided in Sectior VII C shall be given to GENESIS INSURANCE COMPANY, CLAIMS DEPARTMENT, 25550 CHAGRIN BLVD. SUITE 300 BEACHWOOD, OHIO 44122.

## SECTION VIII. GENERAL CONDITIONS

## A. CANCELLATION OR NON-RENEWAL

(1)  By acceptance of this Policy, the COMPANY and the DIRECTORS and OFFICERS hereby confer the exclusive power an authority to cancel this Policy on their behalf to the entity named in Item 1 of the DECLARATIONS. Such entity may cance this Policy by surrender thereof to the INSURER, or by mailing to the INSURER written notice stating when thereafter suc cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the POLICY PERIOD. Delivery of such written notice shall be equivalent to mailing.

(2)  This Policy may be canceled by the INSURER by mailing to the entity named in Item 1 of the DECLARATIONS written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the POLICY PERIOD. Delivery of such written notice by the INSURER shall be equivalent to mailing.

(3)  If this Policy shall be cancelled by the entity named in Item 1 of the DECLARATIONS, the INSURER shall retain the customary short rate portion of the premium. If this Policy shall be cancelled by or on behalf of the INSURER, the INSURER shall retain the pro-rata portion of the premium. Payment or tender of any unearned premium by the INSURER shall not be a conditior precedent to the effectiveness of cancellations, but such payment shall be made as soon as practicable.

(4)  If the INSURER elects not to renew this Policy, the INSURER shall provide the entity named in Item 1 of the DECLARATIONS with no less than thirty (30) days advance notice thereof.

(5)  If the period of limitation relating to the giving of notice as provided for in Section VIII A (2) or VIII A (4) is prohibited or made void by any law controlling the construction thereof, such period shall be amended so as to be equal to the minimum period o limitation permitted by such law.

H 3623

## B. TERMINATION

This Policy shall be deemed terminated immediately upon the happening of any of the following events:

(1)   The acquisition of the entity named in Item 1 of the Declarations by another entity, or the merger of the entity named in Item of the Declarations into another entity such that the entity named in Item 1 of the Declarations is not the surviving entity, or consolidation of the entity named in Item 1 of the Declarations with another entity, or the acquisition of substantially all of assets of the entity named in Item 1 of the Declarations by another entity, or

(2)   The appointment of a receiver, conservator, trustee, liquidator, or rehabilitator, or any similar official for or with respect to entity named in Item 1 of the Declarations.

If this Policy shall be terminated, the INSURER shall retain the pro rata portion of the premium.  Payment or tender of any unearn premium by the INSURER shall not be a condition precedent to the effectiveness of terminations, but such payment shall be made as so as practicable.

## C. WARRANTY

It is agreed and warranted that the particulars and statements contained in the application for this Policy or contained in any Application any Policy issued by the INSURER of which this Policy is a renewal thereof (any such Applications collectively referred to as "APPLICATION"), a copy of which is attached hereto, and any material submitted therewith (which shall be on file with the INSURE and be deemed attached hereto, as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy.

By acceptance of this Policy the DIRECTORS and OFFICERS and the COMPANY agree:

(1)   That the statements in the Application or in any materials submitted therewith are their representations, that they shall be deeme material to the acceptance of the risk or hazard assumed by the INSURER under this Policy, and that this Policy is issued reliance upon the truth of such representations;

(2)   That in the event that the Application, including materials submitted therewith, contains misrepresentations made with the actu intent to deceive, or contain misrepresentations which materially affect either the acceptance of the risk or the hazard assume by the INSURER under this Policy, this Policy in its entirety shall be void and of no effect whatsoever; and provided, howeve that except for material facts or circumstances known to the person(s) who signed the Application, any misstatement or omissio in such Application or materials submitted therewith in respect of a specific WRONGFUL ACT by a particular DIRECTOR OFFICER or his cognizance of any matter which he has reason to suppose might afford grounds for a future claim against hir shall not be imputed to any other DIRECTOR or OFFICER for purposes of determining the validity of this Policy as to such othe DIRECTOR or OFFICER; and

(3)   That this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individu contracts of insurance with each of the DIRECTORS and OFFICERS.

## D. ACTION AGAINST THE INSURER

(1)   No action shall be taken against the INSURER unless, as a condition precedent thereto, there shall have been full compliance wit all the terms of this Policy, and until the DIRECTORS' or OFFICERS' obligation to pay shall have been finally determined, eithe by an adjudication against the DIRECTORS or OFFICERS or by written agreement of the DIRECTORS or OFFICERS, claimar and the INSURER.

(2)   No person or organization shall have any right under this Policy to join the INSURER as a party to any CLAIM against th DIRECTORS or OFFICERS nor shall the INSURER be impleaded by the DIRECTORS or OFFICERS or their leg: representative in any such CLAIM.

H  3624

E. ACQUISITIONS, MERGERS AND SUBSIDIARIES

(1)   In the event the COMPANY acquires another entity or acquires substantially all of the assets of another entity, or merges with another entity such that said COMPANY is the surviving entity, or creates or acquires a SUBSIDIARY, after the inception of this Policy, no coverage shall be afforded under this Policy for any LOSS in any way involving the assets or entity acquired or the assets, liabilities, Directors, Officers or employees of the entity acquired or merged with, or such SUBSIDIARY unless an until:

   (a)   The entity named in Item 1 of the Declarations provides written notice of such transaction or event to the INSURER thirty (30) days prior to the effective date of such transaction or event;

   (b)   The entity named in Item 1 of the Declarations provides the INSURER with such information in connection therewith as the INSURER may deem necessary;

   (c)   The entity named in Item 1 of the Declarations accepts any special terms, conditions, exclusions or additional premium charge required by the INSURER; and

   (d)   The INSURER, at its sole discretion, specifically agrees in writing to provide such coverage.

(2)   In the event that all of the conditions stated in Paragraph (1) hereinabove are met, such coverage as may be afforded under this Policy for an LOSS in any way involving the assets or entity acquired or the assets, liabilities, Directors or Officers of the entity merged with or of such SUBSIDIARY shall not apply to any CLAIM based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

   (a)   Any WRONGFUL ACT or any fact, circumstance or situation committed or allegedly committed prior to the effective date of such acquisition, merger or creation; or

   (b)   Any other WRONGFUL ACT which, together with a WRONGFUL ACT committed or allegedly committed prior to the effective date of such acquisition, merger or creation, constitute INTERRELATED WRONGFUL ACTS.

(3)   In the event of sale or dissolution of any SUBSIDIARY after the inception date of this Policy or of any Policy issued the INSURER of which this Policy is a renewal thereof, this Policy, subject to its terms, shall continue to apply to all persons who were DIRECTORS or OFFICERS of such SUBSIDIARY with respect to CLAIMS first made during the POLICY PERIOD or the DISCOVERY PERIOD against such DIRECTORS or OFFICERS for WRONGFUL ACTS committed or allegedly committed prior to the time of sale or dissolution.   In the event of sale, there shall be no coverage for CLAIMS made against the DIRECTORS or OFFICERS of such SUBSIDIARY based on WRONGFUL ACTS committed or allegedly committed subsequent to the sale.

F. SUBROGATION

   In the event of any payment under this Policy, the INSURER shall be subrogated to all of the DIRECTORS' or OFFICERS' and the COMPANY'S rights to recovery thereof, and the DIRECTORS or OFFICERS and the COMPANY shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the INSURER to effectively bring suit in the name of any DIRECTOR or OFFICER or the COMPANY.

G. ASSIGNMENT

   Assignment of interest under this Policy shall not bind the INSURER until its consent is endorsed hereon.

H. CONFORMITY TO STATUTE

   Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, are hereby amended to conform to such laws.

H 3625

## I. ENTIRE AGREEMENT

By acceptance of this Policy, the DIRECTORS, OFFICERS and the INSURER agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached thereto constitute the entire agreement between the parties.

## J. AUTHORIZATION

By acceptance of this Policy, the entity named in Item 1 of the Declarations shall act on behalf of the COMPANY and all the DIRECTORS and OFFICERS for all purposes including, but not limited to, giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

## K. CHANGES

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the INSURER shall not effect a waiver or a change in any part of this Policy or stop the INSURER from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed, except by written endorsement or rider issued to form a part of this Policy.

## L. CONSTRUCTION OF POLICY

The terms of this Policy are to be construed in an evenhanded fashion as between the DIRECTORS, OFFICERS or COMPANY and the INSURER in accordance with the laws of the jurisdiction in which the situation forming the basis for this controversy arose. Where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of the Policy without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the DIRECTORS, OFFICERS or COMPANY or the INSURER.

## M. FINANCIAL REPORTING

It is hereby understood and agreed that the COMPANY shall submit to Genesis Insurance Company, 25550 Chagrin Blvd. Suite 300, Beachwood, Ohio 44122 as such becomes available, copies of each Annual Report, Form 10-K, Interim Financial Report or any press release which the COMPANY issues, along with any proxy material or other information that may be requested by the INSURER depicting either the financial condition, the organizational structure or the management of the COMPANY.

FORM GIC-7418 (8/93)                                                    GENESIS INSURANCE COMPANY

H 3626

# GENESIS   GENESIS INSURANCE COMPANY

## DECLARATIONS PAGE FOR FOLLOW FORM ENDORSEMENT

Policy Number YXB001372

It is understood and agreed that Item 1-12 of the Declarations is hereby amended to read as follows:

DECLARATIONS:

Item 1. Name of Insured (herein Insured):   Molten Metal Technology, Inc.

Principal Address:   400-2 Totten Pond Road, Waltham, MA   02154--

Item 2. Policy Period from 12:01 a.m. on 01/19/1997 (inception date) to 12:01 a.m. on 01/19/1998 (expiration date), standard time at the Principal Address as to each of said dates.

IMPORTANT:   THIS POLICY DEFINITELY EXPIRES ON THE DATE STATED ABOVE WITHOUT FURTHER NOTICE BY OR ON BEHALF OF THE UNDERWRITERS.

Item 3. Aggregate Limit of Liability: $ 5,000,000.

Item 4. Underlying Primary Limit(s):   $15,000,000.

Item 5. Premium: $65,000 1 year prepaid premium

Item 6. Premium for DISCOVERY PERIOD:

75% of the Premium in Item 5 above, as provided in Section III, to be paid only if the eligibility requirements are met and the DISCOVERY PERIOD option is properly exercised.

Item 7. Endorsements:

This Policy is subject to the terms of the following endorsements attached hereto and incorporated herein by reference at the effective date of this Policy and to all other endorsements attached hereto after the effective date of this Policy:

Item 8. Notices:

All Notices required to be given to the INSURER under this Policy shall be addressed to Genesis D&O Insurance Company, 25550 Chagrin Boulevard, Suite 300, Beachwood, Ohio 44122.

These DECLARATIONS along with the completed and signed Application, including attachments, and the DIRECTORS and OFFICERS Liability Insurance Policy including Company Reimbursement, shall constitute the contract between the DIRECTORS and OFFICERS, the COMPANY AND GENESIS INSURANCE COMPANY.

Item 9. Underlying Primary Insurer(s):              Policy Number(s):
        National Union Fire Ins. Co. of Pittsburgh, PA    484-74-93
        Lloyd's & Cos.                                   F01227D97
        Lloyd's & Cos.                                   F01230D97

Item 10.Underlying Deductible applicable to each loss: $0/$0/$200,000.

Item 11.Underlying Premium:  $545,000.

Item 12.Retroactive Date: 12/20/91

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date:   06/06/1997          By:   *Michael Zartman*
                                  Company Officer or Authorized Agent         H 3627

CPM No. GIC-7495 (08/93) 505364

# GENESIS   GENESIS INSURANCE COMPANY

## FOLLOW FORM ENDORSEMENT

Policy Number YXB001372

It is understood and agreed that Section VIII - GENERAL CONDITIONS of the Policy is hereby amended as follows:

The following GENERAL CONDITIONS (N) & (O) will be added to the Policy:

(N)   FOLLOW FORM ENDORSEMENT

In the event of LOSS for which the INSURED has coverage under the coverage described in Items 4 and 9 of the Declarations, ("Underlying Policy"), the excess of which would be recoverable hereunder except for terms and conditions of this Policy which are not consistent with the Underlying Policy, then, this Policy shall be amended to follow the terms and conditions of the applicable Underlying Policy in respect of such LOSS.

It is further understood and agreed that:

(1) In the event of the depletion of the Limit of Liability of the Underlying Policy solely as a result of payment of LOSS thereunder, this Policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this Policy, continue to apply for subsequent LOSS as excess insurance over the amount of insurance remaining under such Underlying Policy.   In the event of the exhaustion of all of the Limit of Liability of such Underlying Policy solely as a result of payment of LOSS thereunder, the remaining Limit of Liability available under this Policy shall, subject to the Limit of Liability as set forth in Item 3 of the Declarations and to the other terms of this Policy, continue for subsequent LOSS as primary insurance and any retention specified in the Underlying Policy shall be imposed under this Policy.

(2) The INSURER'S obligations under this Policy shall not be increased, expanded or otherwise changed as a result of the receivership, insolvency, inability or refusal to pay of any Underlying Insurer(s) or the cancellation of the Underlying Policy.

(3) The INSURED agrees that this Policy, except as herein stated, is subject to all terms, conditions, agreements and limitations of the Underlying Policy in all respects as in effect on the date hereof.

(4) A true and accurate copy of the Underlying Policy has been provided to the INSURER. The INSURED shall furnish to the INSURER copies of all proposed renewals, rewrites or changes by endorsement or otherwise to the Underlying Policy prior to such renewals, rewrites or changes.   The INSURED agrees that should any change to the Underlying Policy be made by rewrite, endorsement or otherwise, this Policy shall not be changed without the prior written consent of the INSURER, which consent shall be at the sole discretion of the INSURER and endorsed hereon.   It is further agreed, should any change of this Policy be approved, then the premium hereon may be adjusted accordingly.

(O)   CANCELLATION, NON-RENEWAL OR TERMINATION OF UNDERLYING POLICY

In the event the Underlying Policy of the Underlying Insurer(s) shall be cancelled, non-renewed, or terminated other than by reason of the exhaustion of any aggregate limit, there shall be simultaneous termination, non-renewal or cancellation of this Policy.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date: ___06/06/1997___          By: _Michael Zortman_____
                                     Company Officer or Authorized Agent

H 3628

RM No. GIC-7496 (08/93) 505364

In Witness Whereof, we have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by our authorized representative.

Secretary

President

H 3629

F.   The DISCOVERY PERIOD shall only apply to CLAIMS first made against the DIRECTORS or OFFICERS during said DISCOVERY PERIOD.

G.   In the event of the purchase of the DISCOVERY PERIOD, the entire premium therefore shall be deemed earned at its commencement. If the DISCOVERY PERIOD is terminated before its full term for any reason the INSURER shall not be liable to return any portion of the premium paid for the DISCOVERY PERIOD. Notwithstanding the foregoing, if the DISCOVERY PERIOD is terminated before completion of its full term pursuant to Section III H, the INSURER shall return the pro rate unearned premium to the INSURED.

H.   If the DISCOVERY PERIOD is purchased, it shall terminate immediately on the effective date of any contract of insurance or indemnity which replaces the coverage afforded by this Policy through the DISCOVERY PERIOD either in whole or in part.

## SECTION IV. EXCLUSIONS

The INSURER shall not be liable to make any payment for LOSS in connection with any CLAIM made against the DIRECTORS or OFFICERS:

A.   Alleging, arising out of, based upon or attributable to any attempt, whether successful or unsuccessful, by any person or entity to acquire securities of the COMPANY against the opposition of the Board of Directors of the COMPANY ("BOARD"), or any action whether successful or unsuccessful, by the COMPANY or the BOARD to resist such attempts; however, this exclusion shall not apply if, before taking any such resistive action, the COMPANY or the BOARD has obtained written opinion (1) from independent legal counsel that such resistive action is a lawful exercise of the BOARD'S business judgement and (2) from an independent investment banking firm that the offer for the securities of the COMPANY is inadequate, and that any financial transaction approved by the BOARD which is resistive of such acquisition is fair to the COMPANY and its shareholders;

B.   Based upon or attributable to the DIRECTORS or OFFICERS gaining in fact any profit or advantage to which they were not legally entitled;

-   For return by the DIRECTORS or OFFICERS of any remuneration paid to the DIRECTORS or OFFICERS without the previous approval of the governing bodies of the COMPANY, which payment, without such previous approval, shall be held to be in violation of law;

D.   Brought about or contributed to by the fraudulent, dishonest or criminal acts of the DIRECTORS or OFFICERS;

E.   Which is insured in whole or in part by another valid policy or policies, regardless of whether or not any LOSS in connection with such CLAIM is collectible or recoverable under such other policy or policies, provided, however, this Exclusion E shall not apply with respect to any excess beyond the amount or amounts of coverage under such other policy or policies whether such other policy or policies are stated to be primary, contributory, excess or otherwise, where such CLAIM is otherwise covered by the terms and provisions of this Policy;

F.   Arising out of or in any way involving (1) any WRONGFUL ACT, or any fact, circumstance or situation which has been the subject of any notice given prior to the effective date of this Policy under any insurance policy providing protection for the DIRECTORS or OFFICERS, including any matter in any way related thereto; or (2) any other WRONGFUL ACT which, together with a WRONGFUL ACT which has been subject of such notice described in the preceding clause, would constitute INTERRELATED WRONGFUL ACTS;

G.   Arising out of or in any way involving actual or alleged: (1) bodily injury, sickness, disease, or death of any person, assault, battery, mental anguish, emotional distress, loss of consortium, or ethnic, sexual, racial, religious, disability, age or other discrimination or harassment; or (2) damage to or destruction of any tangible property including loss of use thereof; or (3) invasion of privacy, wrongful entry, eviction, false arrest, false imprisonment, malicious prosecution, defamation or false light, libel or slander;

H.   Arising out of or in any way involving any pension, profit sharing or employee benefit program established in whole or in part for the benefit of any of the DIRECTORS, OFFICERS or employees of the COMPANY, or based upon, arising out of or in any way involving the Employee Retirement Income Security Act of 1974 (or any regulations promulgated thereunder) or similar provisions of any federal, state or local statutory law or common law;

H  3620

I.  For any actual or alleged WRONGFUL ACT in the discharge of their duties as a Director or Officer of any entity other than th COMPANY, even if directed or requested to serve as a Director or Officer of such other entity, except where this Policy has bee: specifically endorsed providing such extension of coverage;

J.  Based upon, arising out of, attributable to or in any way involving, directly or indirectly:

(1)  the actual, alleged or threatened discharge, disposal, migration, dispersal, release or escape of pollutants, or

(2)  any direction, order or request to test for, monitor, remediate, clean up, remove, contain, treat, detoxify or neutralize pollutants or to pay for or contribute to the costs of undertaking such actions including claims alleging damage to the COMPANY or it: shareholders.

Pollutants includes (but is not limited to) any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, organisms or other hazardous substances, and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

K.  By or at the behest of the COMPANY, or any affiliate of the COMPANY or any DIRECTOR or OFFICER, or by any security holder of the COMPANY, whether directly or derivatively, unless such CLAIM is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of, any DIRECTOR or OFFICER or the COMPANY or any affiliate of the COMPANY; provided, however, this exclusion shall not apply to wrongful termination of employment claims brought by a former employee other than a former employee who is or was a DIRECTOR of the COMPANY;

L.  For an accounting of profits in fact made from the purchase and sale or sale and purchase by the DIRECTORS or OFFICERS of securities of the COMPANY within the meaning of Section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any state statutory law or common law;

M.  Arising out of or in any way involving any actual or alleged failure to effect or maintain any policy of insurance;

N.  Of any SUBSIDIARY arising out of or in any way involving, (1) any WRONGFUL ACT occurring prior to the date such entity became a SUBSIDIARY, or (2) any WRONGFUL ACT occurring subsequent to the date such entity became a SUBSIDIARY which, together with a WRONGFUL ACT occurring prior to the date such entity became a SUBSIDIARY, constitute INTERRELATED WRONGFUL ACTS.

NOTE: THE WRONGFUL ACT OF ANY DIRECTOR OR OFFICER SHALL NOT BE IMPUTED TO ANY OTHER DIRECTORS OR OFFICERS FOR THE PURPOSE OF DETERMINING THE APPLICABILITY OF EXCLUSION B, C AND D.

SECTION V. LIMIT OF LIABILITY

A.  The INSURER shall be liable to pay one hundred percent (100%) of LOSS in excess of the applicable Retention amount stated in Item 4 of the Declarations up to the Limit of Liability stated in Item 3 of the Declarations.

B.  CLAIMS based upon or arising out of the same WRONGFUL ACT or fact, circumstance or situation, or any INTERRELATED WRONGFUL ACT, or fact, circumstance or situation, or one or more series of any similar, repeated or continuous WRONGFUL ACTS, of one or more of the DIRECTORS or OFFICERS, shall be considered a single CLAIM and only one Retention and Limit of Liability shall be applicable to such single CLAIM; provided, however, that each such single CLAIM shall be deemed to fall within the POLICY YEAR in which the earliest CLAIM arising out of such WRONGFUL ACT or fact, circumstance or situation, or one or more series of any similar, repeated or continuous WRONGFUL ACTS is first made, or within the POLICY YEAR in which notice pursuant to Section VII A is given, whichever occurs first. In the event that more than one DIRECTOR or OFFICER is included in the same CLAIM, the total amount of such CLAIM and the Retention shall be apportioned pro-rata among the DIRECTORS and OFFICERS in proportion to their respective LOSS unless otherwise mutually agreed upon by the DIRECTORS and OFFICERS and the INSURER.

C.  One Retention amount shall apply to each and every CLAIM. In the event a single CLAIM is covered under more than one Insuring Agreement, the Retention stated in Item 4 of the Declarations shall be applied separately to the part of the CLAIM covered by each Insuring Agreement and the sum of the Retentions so applied shall constitute the Retention for each single CLAIM, provided however, he total Retention as finally determined shall in no event exceed the largest of the applicable Retentions. Notwithstanding the

H 3621

aforementioned, for the purposes of the application of the Retention, any LOSS applicable to the Company Reimbursement, Insurance Agreement Section I B, includes that for which indemnification by the COMPANY is legally permissible whether or not actual indemnification is granted and the COMPANY shall be presumed to have in effect in its By-Laws the broadest possible indemnification provisions permitted under the applicable laws.

D.   COSTS OF DEFENSE shall be part of and not in addition to the Limit of Liability stated in Item 3 of the Declarations, and such COSTS OF DEFENSE shall reduce the Limit of Liability stated in Item 3 of the Declarations and shall also be applied against the Retention.

E.   Subject to the foregoing, the INSURER'S liability for all LOSS including COSTS OF DEFENSE shall be the amount shown in Item 3 of the Declarations, and shall be the maximum aggregate Limit of Liability of the INSURER in the POLICY YEAR for all CLAIM made against the DIRECTORS and OFFICERS, regardless of the time of payment by the INSURER.

## SECTION VI. COSTS OF DEFENSE AND SETTLEMENTS

A.   The DIRECTORS or OFFICERS shall not admit liability for, or settle, any CLAIM or incur COSTS OF DEFENSE, in connection with any CLAIM, without the INSURER'S prior written consent, which consent shall not be unreasonably withheld. The INSURER shall be entitled to full information and all particulars it may request in order to reach a decision as to such consent. Any COSTS OF DEFENSE incurred and/or settlements agreed to prior the INSURER'S consent thereto shall not be covered hereunder. In the event of such consent being given, and subject to all other terms and provisions of this Policy, including but not limited to Section V D of this Policy, the INSURER shall reimburse COSTS OF DEFENSE only upon the final disposition of any CLAIM made against the DIRECTORS or OFFICERS.

B.   Notwithstanding the provisions of Paragraph A hereinabove, the INSURER at its sole option and discretion may advance COSTS OF DEFENSE on behalf of the DIRECTORS and OFFICERS, incurred by the DIRECTORS and OFFICERS in connection with any CLAIM made against them, prior to the final disposition of any such CLAIMS. Any agreement by the INSURER to advance COSTS OF DEFENSE shall be on the condition that:

(1)   The DIRECTORS and OFFICERS provide a written undertaking satisfactory to the INSURER providing that in the event it is finally established that the INSURER has no liability under the Policy to the DIRECTORS and OFFICERS, or any of them, for such CLAIM, such DIRECTORS and OFFICERS agree to repay to the INSURER upon demand all COSTS OF DEFENSE advanced on their behalf by virtue of this provision;

(2)   The DIRECTORS and OFFICERS provide security for such written undertaking satisfactory to the INSURER; and

(3)   Any COSTS OF DEFENSE advanced by the INSURER shall reduce the Limit of Liability for such CLAIM to the extent that they are not in fact repaid to the INSURER in accordance with (1) hereinabove.

C.   It shall be the duty of the DIRECTORS and OFFICERS and not the duty of the INSURER to defend CLAIMS, provided that the DIRECTORS or OFFICERS shall only retain counsel as is mutually agreed upon with the INSURER.

The INSURER shall at all times have the right, but not the duty, to associate with the DIRECTORS or OFFICERS in the investigation, defense or settlement of any CLAIM to which this Policy may apply. The COMPANY and the DIRECTORS and OFFICERS shall provide the INSURER with such information, assistance and cooperation as the INSURER may reasonably request.

## SECTION VII. NOTICE OF CLAIM

A.   The DIRECTORS or OFFICERS shall, as a condition precedent to their rights under this Policy, give the INSURER notice in writing as soon as practicable of any CLAIM first made against the DIRECTORS or OFFICERS during the POLICY PERIOD or DISCOVERY PERIOD, but in no event later than thirty (30) days after such CLAIM is made, and shall give the INSURER such information and cooperation as the INSURER may reasonably require.

B.   If prior to the effective date of the cancellation of this Policy in the event of its cancellation by the INSURER pursuant to the provisions of Section VIII (A) (2), or if prior to the expiration date of this Policy stated in Item 2 of the Declarations in the event of its non renewal by the INSURER pursuant to the provisions of Section VIII (A) (4) and prior to the inception of the DISCOVERY PERIOD, the DIRECTORS or OFFICERS of the COMPANY first become aware of any circumstances which may subsequently give rise to

H 3622

CLAIM being made against the INSURED, and the DIRECTORS or OFFICERS as soon as practicable, but in no event later than thir (30) days from the date of such first awareness, give written and specific notice to the INSURER of the circumstances and the reason for anticipating a CLAIM, then any CLAIM subsequently made against the DIRECTORS or OFFICERS arising directly out of suc circumstances as specifically noticed shall be deemed for the purposes of this Policy to have been made during the POLICY YEA in which such notice was given; provided, however, that as a condition precedent for any coverage to arise hereunder:

(1)  Such notice must be received by the INSURER prior to the effective date of the cancellation of the Policy, or in the case of non renewal by the INSURER, prior to the expiration date of this Policy stated in Item 2 of the Declarations; and

(2)  Such notice must be specific and contain full particulars as to the circumstances potentially giving rise to the CLAIM, includin a narrative setting forth dates, names of the potential plaintiffs and affected DIRECTORS or OFFICERS, names of other person involved, the nature and scope of the anticipated CLAIM, and all reasons why such a CLAIM is reasonably to be anticipated

C.  In addition to furnishing the notice as provided in Section VII A and VII B, the DIRECTORS or OFFICERS shall, as soon a practicable, furnish the INSURER with copies of reports, investigations, pleadings and all information requested by the INSURER i connection therewith.

D.  The INSURER shall have the right but not the obligation to make any investigation it deems expedient and with the consent of th INSURED against whom the CLAIM has been made or the COMPANY on behalf of the INSURED, make settlement within th available Limit of Liability (whether above or below the applicable Retention). If the INSURED, or the COMPANY on behalf of th INSURED, shall refuse to consent to any settlement recommended by the INSURER and shall act to contest or continue any action or proceedings in connection with such CLAIM, then, subject to the available Limit of Liability and the applicable Retention, th INSURER'S liability for all LOSS in connection with such CLAIM shall not exceed the amount for which the CLAIM could have been settled, plus the reasonable COST OF DEFENSE incurred with the INSURER'S consent up to the date of refusal to consent by th INSURED and/or the COMPANY.

E.  Notice to the INSURER as provided in Section VII A and VII B, and any information furnished to the INSURER as provided in Section VII C shall be given to GENESIS INSURANCE COMPANY, CLAIMS DEPARTMENT, 25550 CHAGRIN BLVD. SUITE 300 BEACHWOOD, OHIO 44122.

## SECTION VIII. GENERAL CONDITIONS

### A. CANCELLATION OR NON-RENEWAL

(1)  By acceptance of this Policy, the COMPANY and the DIRECTORS and OFFICERS hereby confer the exclusive power and authority to cancel this Policy on their behalf to the entity named in Item 1 of the DECLARATIONS. Such entity may cance this Policy by surrender thereof to the INSURER, or by mailing to the INSURER written notice stating when thereafter suc cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the POLICY PERIOD. Delivery of such written notice shall be equivalent to mailing.

(2)  This Policy may be canceled by the INSURER by mailing to the entity named in Item 1 of the DECLARATIONS written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the POLICY PERIOD. Delivery of such written notice by the INSURER shall be equivalent to mailing.

(3)  If this Policy shall be cancelled by the entity named in Item 1 of the DECLARATIONS, the INSURER shall retain the customary short rate portion of the premium. If this Policy shall be cancelled by or on behalf of the INSURER, the INSURER shall retain the pro-rata portion of the premium. Payment or tender of any unearned premium by the INSURER shall not be a condition precedent to the effectiveness of cancellations, but such payment shall be made as soon as practicable.

(4)  If the INSURER elects not to renew this Policy, the INSURER shall provide the entity named in Item 1 of the DECLARATIONS with no less than thirty (30) days advance notice thereof.

(5)  If the period of limitation relating to the giving of notice as provided for in Section VIII A (2) or VIII A (4) is prohibited or made void by any law controlling the construction thereof, such period shall be amended so as to be equal to the minimum period of limitation permitted by such law.

H 3623

## B. TERMINATION

This Policy shall be deemed terminated immediately upon the happening of any of the following events:

(1) The acquisition of the entity named in Item 1 of the Declarations by another entity, or the merger of the entity named in Item of the Declarations into another entity such that the entity named in Item 1 of the Declarations is not the surviving entity, or t consolidation of the entity named in Item 1 of the Declarations with another entity, or the acquisition of substantially all of t assets of the entity named in Item 1 of the Declarations by another entity, or

(2) The appointment of a receiver, conservator, trustee, liquidator, or rehabilitator, or any similar official for or with respect to t entity named in Item 1 of the Declarations.

If this Policy shall be terminated, the INSURER shall retain the pro rata portion of the premium.  Payment or tender of any unearn premium by the INSURER shall not be a condition precedent to the effectiveness of terminations, but such payment shall be made as so as practicable.

## C. WARRANTY

It is agreed and warranted that the particulars and statements contained in the application for this Policy or contained in any Application f any Policy issued by the INSURER of which this Policy is a renewal thereof (any such Applications collectively referred to as t "APPLICATION"), a copy of which is attached hereto, and any material submitted therewith (which shall be on file with the INSURE and be deemed attached hereto, as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated in and constituting a part of this Policy.

By acceptance of this Policy the DIRECTORS and OFFICERS and the COMPANY agree:

(1) That the statements in the Application or in any materials submitted therewith are their representations, that they shall be deeme material to the acceptance of the risk or hazard assumed by the INSURER under this Policy, and that this Policy is issued i reliance upon the truth of such representations;

(2) That in the event that the Application, including materials submitted therewith, contains misrepresentations made with the actu intent to deceive, or contain misrepresentations which materially affect either the acceptance of the risk or the hazard assume by the INSURER under this Policy, this Policy in its entirety shall be void and of no effect whatsoever; and provided, howeve that except for material facts or circumstances known to the person(s) who signed the Application, any misstatement or omissio in such Application or materials submitted therewith in respect of a specific WRONGFUL ACT by a particular DIRECTOR c OFFICER or his cognizance of any matter which he has reason to suppose might afford grounds for a future claim against hir shall not be imputed to any other DIRECTOR or OFFICER for purposes of determining the validity of this Policy as to such othe DIRECTOR or OFFICER; and

(3) That this Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individu contracts of insurance with each of the DIRECTORS and OFFICERS.

## D. ACTION AGAINST THE INSURER

(1) No action shall be taken against the INSURER unless, as a condition precedent thereto, there shall have been full compliance wit all the terms of this Policy, and until the DIRECTORS' or OFFICERS' obligation to pay shall have been finally determined, eithe by an adjudication against the DIRECTORS or OFFICERS or by written agreement of the DIRECTORS or OFFICERS, claimar and the INSURER.

(2) No person or organization shall have any right under this Policy to join the INSURER as a party to any CLAIM against th DIRECTORS or OFFICERS nor shall the INSURER be impleaded by the DIRECTORS or OFFICERS or their leg representative in any such CLAIM.

7

H 3624

## E. ACQUISITIONS, MERGERS AND SUBSIDIARIES

(1) In the event the COMPANY acquires another entity or acquires substantially all of the assets of another entity, or merges with another entity such that said COMPANY is the surviving entity, or creates or acquires a SUBSIDIARY, after the inception of this Policy, no coverage shall be afforded under this Policy for any LOSS in any way involving the assets or entity acquired or the assets, liabilities, Directors, Officers or employees of the entity acquired or merged with, or such SUBSIDIARY unless and until:

   (a) The entity named in Item 1 of the Declarations provides written notice of such transaction or event to the INSURER thirty (30) days prior to the effective date of such transaction or event;

   (b) The entity named in Item 1 of the Declarations provides the INSURER with such information in connection therewith as the INSURER may deem necessary;

   (c) The entity named in Item 1 of the Declarations accepts any special terms, conditions, exclusions or additional premium charge required by the INSURER; and

   (d) The INSURER, at its sole discretion, specifically agrees in writing to provide such coverage.

(2) In the event that all of the conditions stated in Paragraph (1) hereinabove are met, such coverage as may be afforded under this Policy for an LOSS in any way involving the assets or entity acquired or the assets, liabilities, Directors or Officers of the entity merged with or of such SUBSIDIARY shall not apply to any CLAIM based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving:

   (a) Any WRONGFUL ACT or any fact, circumstance or situation committed or allegedly committed prior to the effective date of such acquisition, merger or creation; or

   (b) Any other WRONGFUL ACT which, together with a WRONGFUL ACT committed or allegedly committed prior to the effective date of such acquisition, merger or creation, constitute INTERRELATED WRONGFUL ACTS.

(3) In the event of sale or dissolution of any SUBSIDIARY after the inception date of this Policy or of any Policy issued the INSURER of which this Policy is a renewal thereof, this Policy, subject to its terms, shall continue to apply to all persons who were DIRECTORS or OFFICERS of such SUBSIDIARY with respect to CLAIMS first made during the POLICY PERIOD or the DISCOVERY PERIOD against such DIRECTORS or OFFICERS for WRONGFUL ACTS committed or allegedly committed prior to the time of sale or dissolution.   In the event of sale, there shall be no coverage for CLAIMS made against the DIRECTORS or OFFICERS of such SUBSIDIARY based on WRONGFUL ACTS committed or allegedly committed subsequent to the sale.

## F. SUBROGATION

In the event of any payment under this Policy, the INSURER shall be subrogated to all of the DIRECTORS' or OFFICERS' and the COMPANY'S rights to recovery thereof, and the DIRECTORS or OFFICERS and the COMPANY shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the INSURER to effectively bring suit in the name of any DIRECTOR or OFFICER or the COMPANY.

## G. ASSIGNMENT

Assignment of interest under this Policy shall not bind the INSURER until its consent is endorsed hereon.

## H. CONFORMITY TO STATUTE

Any terms of this Policy which are in conflict with the terms of any applicable laws construing this Policy, are hereby amended to conform to such laws.

8

H 3625

## I. ENTIRE AGREEMENT

By acceptance of this Policy, the DIRECTORS, OFFICERS and the INSURER agree that this Policy (including the Application and any materials submitted therewith) and any written endorsements attached thereto constitute the entire agreement between the parties.

## J. AUTHORIZATION

By acceptance of this Policy, the entity named in Item 1 of the Declarations shall act on behalf of the COMPANY and all the DIRECTORS and OFFICERS for all purposes including, but not limited to, giving and receiving of all notices and correspondence, the cancellation or non-renewal of this Policy, the payment of premiums, and the receipt of any return premiums that may be due under this Policy.

## K. CHANGES

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the INSURER shall not effect a waiver or a change in any part of this Policy or stop the INSURER from asserting any right under the terms of this Policy, nor shall the terms of this Policy be waived or changed, except by written endorsement or rider issued to form a part of this Policy.

## L. CONSTRUCTION OF POLICY

The terms of this Policy are to be construed in an evenhanded fashion as between the DIRECTORS, OFFICERS or COMPANY and the INSURER in accordance with the laws of the jurisdiction in which the situation forming the basis for this controversy arose. Where the language of this Policy is deemed to be ambiguous or otherwise unclear, the issue shall be resolved in a manner most consistent with the relevant terms of the Policy without regard to authorship of the language and without any presumption or arbitrary interpretation or construction in favor of either the DIRECTORS, OFFICERS or COMPANY or the INSURER.

## M. FINANCIAL REPORTING

It is hereby understood and agreed that the COMPANY shall submit to Genesis Insurance Company, 25550 Chagrin Blvd, Suite 300, Beachwood, Ohio 44122 as such becomes available, copies of each Annual Report, Form 10-K, Interim Financial Report or any press release which the COMPANY issues, along with any proxy material or other information that may be requested by the INSURER depicting either the financial condition, the organizational structure or the management of the COMPANY.

FORM GIC-7418 (8/93)                                          GENESIS INSURANCE COMPANY

H 3626

9

# GENESIS   GENESIS INSURANCE COMPANY

## DECLARATIONS PAGE FOR FOLLOW FORM ENDORSEMENT

Policy Number YXB001372

It is understood and agreed that Item 1-12 of the Declarations is hereby amended to read as follows:

DECLARATIONS:

Item 1. Name of Insured (herein Insured):   Molten Metal Technology, Inc.

Principal Address:   400-2 Totten Pond Road, Waltham, MA   02154--

Item 2. Policy Period from 12:01 a.m. on 01/19/1997 (inception date) to 12:01 a.m. on 01/19/1998 (expiration date), standard time at the Principal Address as to each of said dates.

IMPORTANT:   THIS POLICY DEFINITELY EXPIRES ON THE DATE STATED ABOVE WITHOUT FURTHER NOTICE BY OR ON BEHALF OF THE UNDERWRITERS.

Item 3. Aggregate Limit of Liability: $ 5,000,000.

Item 4. Underlying Primary Limit(s):   $15,000,000.

Item 5. Premium: $65,000 1 year prepaid premium

Item 6. Premium for DISCOVERY PERIOD:

75% of the Premium in Item 5 above, as provided in Section III, to be paid only if the eligibility requirements are met and the DISCOVERY PERIOD option is properly exercised.

Item 7. Endorsements:

This Policy is subject to the terms of the following endorsements attached hereto and incorporated herein by reference at the effective date of this Policy and to all other endorsements attached hereto after the effective date of this Policy:

Item 8. Notices:

All Notices required to be given to the INSURER under this Policy shall be addressed to Genesis D&O Insurance Company, 25550 Chagrin Boulevard, Suite 300, Beachwood, Ohio 44122.

These DECLARATIONS along with the completed and signed Application, including attachments, and the DIRECTORS and OFFICERS Liability Insurance Policy including Company Reimbursement, shall constitute the contract between the DIRECTORS and OFFICERS, the COMPANY AND GENESIS INSURANCE COMPANY.

Item 9. Underlying Primary Insurer(s):          Policy Number(s):
National Union Fire Ins. Co. of Pittsburgh, PA    484-74-93
Lloyd's & Cos.                                    F01227D97
Lloyd's & Cos.                                    F01230D97

Item 10. Underlying Deductible applicable to each loss: $0/$0/$200,000.

Item 11. Underlying Premium:  $545,000.

Item 12. Retroactive Date: 12/20/91

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date: _____06/06/1997_____          By: _____Michael Zartman_____
                                        Company Officer or Authorized Agent     H 3627

# GENESIS   GENESIS INSURANCE COMPANY

## FOLLOW FORM ENDORSEMENT

Policy Number YXB001372

It is understood and agreed that Section VIII - GENERAL CONDITIONS of the Policy is hereby amended as follows:

The following GENERAL CONDITIONS (N) & (O) will be added to the Policy:

(N)     FOLLOW FORM ENDORSEMENT

In the event of LOSS for which the INSURED has coverage under the coverage described in Items 4 and 9 of the Declarations, ("Underlying Policy"), the excess of which would be recoverable hereunder except for terms and conditions of this Policy which are not consistent with the Underlying Policy, then, this Policy shall be amended to follow the terms and conditions of the applicable Underlying Policy in respect of such LOSS.

It is further understood and agreed that:

(1)     In the event of the depletion of the Limit of Liability of the Underlying Policy solely as a result of payment of LOSS thereunder, this Policy shall, subject to the Limit of Liability set forth in Item 3 of the Declarations and to the other terms of this Policy, continue to apply for subsequent LOSS as excess insurance over the amount of insurance remaining under such Underlying Policy.  In the event of the exhaustion of all of the Limit of Liability of such Underlying Policy solely as a result of payment of LOSS thereunder, the remaining Limit of Liability available under this Policy shall, subject to the Limit of Liability as set forth in Item 3 of the Declarations and to the other terms of this Policy, continue for subsequent LOSS as primary insurance and any retention specified in the Underlying Policy shall be imposed under this Policy.

(2)     The INSURER'S obligations under this Policy shall not be increased, expanded or otherwise changed as a result of the receivership, insolvency, inability or refusal to pay of any Underlying Insurer(s) or the cancellation of the Underlying Policy.

(3)     The INSURED agrees that this Policy, except as herein stated, is subject to all terms, conditions, agreements and limitations of the Underlying Policy in all respects as in effect on the date hereof.

(4)     A true and accurate copy of the Underlying Policy has been provided to the INSURER. The INSURED shall furnish to the INSURER copies of all proposed renewals, rewrites or changes by endorsement or otherwise to the Underlying Policy prior to such renewals, rewrites or changes.  The INSURED agrees that should any change to the Underlying Policy be made by rewrite, endorsement or otherwise, this Policy shall not be changed without the prior written consent of the INSURER, which consent shall be at the sole discretion of the INSURER and endorsed hereon.  It is further agreed, should any change of this Policy be approved, then the premium hereon may be adjusted accordingly.

(O)     CANCELLATION, NON-RENEWAL OR TERMINATION OF UNDERLYING POLICY

In the event the Underlying Policy of the Underlying Insurer(s) shall be cancelled, non-renewed, or terminated other than by reason of the exhaustion of any aggregate limit, there shall be simultaneous termination, non-renewal or cancellation of this Policy.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy other than as above stated.

Date:    06/06/1997               By:   *Michael Zartman*
                                        Company Officer or Authorized Agent

RM No. GIC-7496 (08/93) 505364                                    H 3628

In Witness Whereof, we have caused this policy to be executed and attested, but this p
unless countersigned by our authorized representative.

Secretary                                    President



# Lloyd's Policy

**We, Underwriting Members** of the Syndicates whose definitive numbers and proportions are shown in the Table attached hereto (hereinafter referred to as 'the Underwriters'), hereby agree, in consideration of the payment to Us by or on behalf of the Assured of the Premium specified in the Schedule, to insure against loss, including but not limited to associated expenses specified herein, if any, to the extent and in the manner provided in this Policy.

**The Underwriters** hereby bind themselves severally and not jointly, each for his own part and not one for another, and therefore each of the Underwriters (and his Executors and Administrators) shall be liable only for his own share of his Syndicate's proportion of any such Loss and of any such Expenses. The identity of each of the Underwriters and the amount of his share may be ascertained by the Assured or the Assured's representative on application to Lloyd's Policy Signing Office, quoting the Lloyd's Policy Signing Office number and date shown in the Table.

If the Assured shall make any claim knowing the same to be false or fraudulent, as regards amount or otherwise, this Policy shall become void and all claim hereunder shall be forfeited.

**In Witness** whereof the General Manager of Lloyd's Policy Signing Office has signed this Policy on behalf of each of Us.



LLOYD'S POLICY SIGNING OFFICE
General Manager

FOR EMBOSSMENT BY
LLOYD'S POLICY SIGNING OFFICE

H 3550

J(A)  NMA2421 (3/1/95) Printed by the Corporation of Lloyd's

Schedule

| | | | |
|---|---|---|---|
| Policy or Certificate No. | 542 / F01230D97 | Contract No. (if any) | |

The name and address of the Assured

> MOLTEN METAL TECHNOLOGY, INC.
> 51 Sawyer Road
> Waltham
> Massachusetts 02154

The risk, interest, location and sum insured hereunder

### EXCESS DIRECTORS AND OFFICERS AND COMPANY REIMBURSEMENT INDEMNITY

This Policy being for 40.000%, Underwriters hereon accept their pro-rata proportion of:

(a)  any loss, whether total or partial;
(b)  associated expenses, if any, and
(c)  the premium;

all as more fully specified in the wording attached hereto which is hereby incorporated in and forms part of this Policy.

The percentages signed in the Table are percentages of 100% of the amount(s) of insurance stated herein.

(542 NCC 00238)

The Premium    USD90,000.00

* at 12.01 a.m. local standard time at the principal address

| | | |
|---|---|---|
| The period of insurance from    19th January 1997    to    19th January 1998 both days inclusive, and for such further period or periods as may be mutually agreed upon | | |
| Dated in   LONDON | the    16th April 1997 | |

J or J(A) (Schedule) NMA 2422 for attachment to NMA 2420, NMA 2421, NMA 2461 or NMA 2462

H 3551

**EXCESS**
**DIRECTORS AND OFFICERS AND COMPANY**
**REIMBURSEMENT INDEMNITY POLICY**

DOXS 89 09/95 LSW 882

01230D97 PD1

DECLARATIONS

EXCESS DIRECTORS AND OFFICERS AND
COMPANY REIMBURSEMENT POLICY

NOTICE:  THIS POLICY SUBJECT TO ITS TERMS APPLIES ONLY TO ANY CLAIM MADE AGAINST THE DIRECTORS AND
OFFICERS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL
BE REDUCED AND MAY BE EXHAUSTED BY AMOUNTS INCURRED AS REASONABLE AND NECESSARY LEGAL FEES AND
EXPENSES IN DEFENDING THE DIRECTORS AND OFFICERS.  THIS POLICY DOES NOT PROVIDE FOR ANY DUTY BY
UNDERWRITERS TO DEFEND THOSE INSURED HEREUNDER.

These Declarations along with the completed and signed Application, and the Policy with Endorsements shall
constitute the contract between those insured hereunder and Underwriters.

Policy No:       542/F01230D97

Item A.       Named Insured:            MOLTEN METAL TECHNOLOGY, INC.

              Principal Address:        51 Sawyer Road
                                        Waltham
                                        Massachusetts 02154

Item B.       Policy Period:

              From 19th January 1997  to 19th January 1998 both days at 12.01 a.m. standard Time at the
              Principal Address stated in Item A.

Item C.       Limit of Liability:       USD5.000.000 in the aggregate for the Policy Period.

Item D.       Premium:                  USD90.000

Item E.       Notification to Underwriters pursuant to Clause V. shall be given to:
                                        Hanson & Peters
                                        Attention: Keith Hanson
                                        311 South Wacker Drive
                                        Chicago
                                        Illinois 60606.

              Item F.   Primary Policy:

              Primary Insurer:          National Union Fire Insurance Company of Pittsburgh, PA.
              Policy No.:               484-74-93
              Limits of Liability:      USD5.000.000
              Retentions/Deductibles:   USDNil/USDNil/USD200.000
              Participation/Co-Insurance: Nil
              Policy Period:
              ` om:                     19th January 1997
              To:                       19th January 1998

Item G.       Underlying Excess Policies:

              First Underlying Insurer: Lloyd's & Companies
              Policy No.`               F01227D97
              Limits of Liability:      USD5.000.000
              Retentions/Deductibles:   As per Primary Policy
              Participation/Co-Insurance: Nil
              Policy Period:
              From:                     19th January 1997
              To:                       19th January 1998

01230D97 PD1                                                    Page 2

                                                                H 3553

Second Underlying Excess Insurer: None
Policy No.:
Limits of Liability:
Retentions/Deductibles:
Participation/Co-Insurance:
Policy Period:
From:
To:

Third Underlying Excess Insurer:
Policy No.:
Limits of Liability:
Retentions/Deductibles:
Participation/Co-Insurance:
Policy Period:
From:
To:

Fourth Underlying Excess Insurer:
Policy No.:
Limits of Liability:
Retentions/Deductibles:
Participation/Co-Insurance:
Policy Period:
From:
To:

Item H.  Service of process in any suit pursuant to Clause VII. shall be made upon:
Mendes and Mount
750 Seventh Avenue
New York
New York 10019-6829

Item I.  Form numbers of endorsements attached at issuance:

Endorsement No. 1    Nuclear Incident Exclusion Clause - Liability - Direct (Broad) - NMA 1256.

Endorsement No. 2    Radioactive Contamination Exclusion Clause - Liability - Direct - NMA 1477.

Endorsement No. 3    Manuscript Rider A.

J.B.

## EXCESS DIRECTORS AND OFFICERS AND
## COMPANY REIMBURSEMENT INDEMNITY POLICY

In consideration of the payment of the premium, in reliance upon the statements in the Application attached hereto and made a part hereof, subject to the Declarations made a part hereof and subject to all of the terms of this Policy, Underwriters agree as follows:

I.    CONFORMANCE WITH PRIMARY POLICY

Except as regards:

    1)    the premium, and

    2)    the amounts and Limit of Liability, and

    3)    the subject matter of Clauses II, III, IV, V, VI, and VII, and

    4)    as otherwise may be provided hereon,

this Policy is subject to the same insuring clauses, definitions, terms, conditions, exclusions and other provisions as those set forth in the Primary Policy as described in the materials submitted to Underwriters in connection with the application for this Policy. No changes to the Primary Policy as so described shall be binding upon Underwriters under this Policy unless specifically endorsed hereon.

II.    DEFINITIONS

The following terms whenever used in this Policy shall have the meanings indicated.

A.    "Primary Policy" shall mean the policy identified in Item F. of the Declarations.

B.    "Underlying Policy" shall mean the policies identified in Items F. and G. of the Declarations.

C.    "Underlying Limit of Liability" shall mean the combined limits of liability of the Underlying Policies as set forth in Items F. and G. of the Declarations, less any reduction or exhaustion of said limits of liability due to payment of loss under said policies.

III.    MAINTENANCE OF UNDERLYING POLICIES

This Policy provides excess coverage only. It is a condition precedent to the coverage afforded under this Policy that those insured hereunder maintain the Underlying Policies with retentions/deductibles, and limits of liability (subject to reduction or exhaustion as a result of loss payments), as set forth in Items F. and G. of the Declarations. This Policy does not provide coverage for any loss not covered by the Underlying Policies except and to the extent that such loss is not paid under the Underlying Policies solely by reason of the reduction or exhaustion of the Underlying Limits of Liability through payments of loss thereunder. In the event the insurer under one or more of the Underlying Policies fails to pay loss in connection with any claim as a result of the insolvency, bankruptcy or liquidation of said insurer, then those insured hereunder shall be deemed self-insured for the amount of the limit of liability of said insurer which is not paid as a result of such insolvency, bankruptcy or liquidation.

IV.    LIMIT OF LIABILITY

A.    Subject to Clause IV.B., Underwriters shall be liable to pay loss which is in excess of:

    1)    the Underlying Limit of Liability plus

    2)    the applicable retention or deductible under the Primary Policy

up to the Limit of Liability as shown under Item C. of the Declarations resulting from each claim made against the directors and officers.

B.    The amount shown in Item C. of the Declarations shall be the maximum aggregate Limit of Liability of Underwriters for all loss resulting from all claims made against the directors and officers during the Policy Period, together with all claims made against the directors and officers which, in accordance with Clause IV.E. or Clause V.B., shall be deemed to have been made during the Policy Period.

C.    Underwriters shall be liable only after the insurers under each of the Underlying Policies have paid or have been held liable to pay the full amount of the Underlying Limit of Liability.

D.  Subject to Clause IV.B., in the event of the reduction or exhaustion of the Underlying Limit of Liability by reason of payment of loss, this Policy shall:

    1)  in the event of reduction, pay excess of the reduced limits, and

    2)  in the event of exhaustion, continue in force as primary insurance; provided, however that in the case of exhaustion this Policy shall only pay excess of the retention or deductible applicable to the Primary Policy as set forth in item F. of the Declarations, which shall be applied to any subsequent loss in the same manner as specified in the Primary Policy.

E.  More than one claim involving the same wrongful act or related wrongful acts of one or more directors and officers shall be deemed to constitute a single claim and such single claim shall be deemed to have been made at the earliest of the following times:

    1)  the time the earliest claim involving the same wrongful act or related wrongful acts is first made, or

    2)  the time the claim involving the same wrongful act or related wrongful acts shall be deemed to have been made pursuant to Clause V.B., if applicable.

## V.  NOTIFICATION

A.  If during the Policy Period or any optional extension period, if applicable, any claim is made against any director or officer, those insured hereunder shall, as a condition precedent to their right to be reimbursed under this Policy, give to Underwriters notice in writing as soon as practicable of any such claim, but in no event later than sixty (60) days after such claim is first made.

B.  If during the Policy Period or any optional extension period, if applicable, those insured hereunder first become aware of a specific wrongful act, and if those insured hereunder shall, during such period, give written notice to Underwriters as soon as practicable of:

    1)  the specific wrongful act, and

    2)  the consequences which have or may result therefrom, and

    3)  the circumstances by which those insured hereunder first became aware thereof,

then any claim not otherwise excluded by the terms of this Policy subsequently made against the directors and officers arising out of such wrongful act or any related wrongful act shall be deemed for the purposes of this Policy to have been made at the time such notice was first given.

C.  Notice to Underwriters provided for in this Clause V. shall be given to the firm shown under Item E. of the Declarations.

## VI.  WARRANTY CLAUSE

It is warranted that the particulars and statements contained in the Application for this Policy or contained in any application for any policy issued by Underwriters of which this Policy is a renewal thereof, a copy of which is attached hereto, and any material submitted therewith (which shall be retained on file by Underwriters and be deemed attached hereto, as if physically attached hereto), are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy. This Policy shall be deemed to be a single unitary contract and not a severable contract of insurance or a series of individual contracts of insurance with each of the persons or entities insured hereunder.

## VII.  SERVICE OF SUIT

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of any person or entity insured hereunder, will submit to the jurisdiction of a Court of competent jurisdiction within the United States. Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States. It is further agreed that service of process in such suit may be made upon the firm shown under Item H. of the Declarations, and that in any suit instituted

01230D97 PD1

against any one of them upon this contract. Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The firm shown under Item H. of the Declarations are authorised and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of any person or entity insured hereunder to give a written undertaking to such person or entity that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to the statute of any state, territory or district of the United States which makes provision therefore, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of any person or entity insured hereunder or any beneficiary hereunder arising out of this Policy, and hereby designate the firm shown under Item H. of the Declarations as the firm to whom the said officer is authorised to mail such process or a true copy thereof.

01230D97 PD1

ENDORSEMENT NUMBER 1

Attaching to and forming part of Policy No. 542/F01230D97.

In favour of: MOLTEN METAL TECHNOLOGY, INC.

U.S.A.

**NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD)**
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:-

Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability).

not being insurances of the classification to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy*

does not apply:-

I.     Under any Liability Coverage, to injury, sickness, disease, death or destruction

(a)    with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b)    resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.    Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.   Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a)    the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

01230D97 PD1

H  3558

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or byproduct material; "source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means

(a)    any nuclear reactor,

(b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c)    any equipment or devise used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

*NOTE:-    As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.

17/3/60

N.M.A 1256

All other terms, conditions and limitations remain unaltered.

<u>ENDORSEMENT NUMBER 2</u>

Attaching to and forming part of Policy No. 542/F01230D97.

In favour of: MOLTEN METAL TECHNOLOGY, INC.

<u>U.S.A.</u>

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT
(Approved by Lloyd's Underwriters' Non-Marine Association)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

**13/2/64**
N.M.A. 1477

All other terms, conditions and limitations remain unaltered.

<u>ENDORSEMENT NUMBER 3</u>

Attaching to and forming part of Policy No. 542/F01230D97.

In favour of: MOLTEN METAL TECHNOLOGY, INC.

In consideration of the premium charged, it is hereby understood and agreed that the No Claims Bonus referred to in Primary Policy Endorsement No. 11 and First Excess Policy Endorsement No. 3 shall not apply to this Policy.

Manuscript Rider A.

All other terms, conditions and limitations remain unaltered.

(THIS IS AN APPLICATION FOR A CLAIMS MADE POLICY)

RENEWAL APPLICATION
FOR
DIRECTORS' AND OFFICERS' AND COMPANY
REIMBURSEMENT INDEMNITY POLICY
(COMMERCIAL)

NOTICE: THE POLICY FOR WHICH APPLICATION IS MADE, SUBJECT TO ITS TERMS, APPLIES ONLY TO ANY "CLAIM" (AS DEFINED IN THE POLICY FOR WHICH APPLICATION IS MADE) MADE AGAINST THE DIRECTORS AND OFFICERS DURING THE POLICY PERIOD. THE LIMIT OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENTS SHALL BE REDUCED AND MAY BE EXHAUSTED BY AMOUNTS INCURRED AS "COSTS, CHARGES AND EXPENSES" (AS DEFINED IN THE POLICY FOR WHICH APPLICATION IS MADE) AND "COSTS, CHARGES AND EXPENSES" SHALL BE APPLIED TO THE RETENTIONS. THE POLICY DOES NOT PROVIDE FOR ANY DUTY BY UNDERWRITERS TO DEFEND THOSE INSURED UNDER THE POLICY.

---

GENERAL INSTRUCTIONS FOR COMPLETING THIS APPLICATION:

1. Please type or print in ink.

2. Please read carefully and answer all questions. If a question is not applicable, so state. If space is insufficient to answer any question fully, attach a separate sheet.

3. The original Renewal Application must be submitted.

4. The Chairman of the Board or the President must sign and date this Renewal Application.

5. This Renewal Application and all exhibits shall be held in confidence.

6. Please read the Policy for which application is made (the "Policy") prior to completing this Renewal Application.

7. The terms as used herein shall have the meanings stated in Paragraph II., DEFINITIONS, of the Policy.

H 3562

1.   Name of Parent Company_____Molten Metal Technology, Inc._____

     Address   400-2 Totten Pond Road
               (Number)      (Street)
               Waltham, MA  02154
     (City)                    (State)              (Zip Code)

2.   The Parent Company has continuously been in business since ___11___ / _1989_
                                                              (Month)     (Year)

3.   Parent Company has continually paid cash dividends since what date on its:

          (a)   Common Stock _n/a_    (b)   Preferred Stock _n/a_

4.   Complete the following in respect of all classes of shares issued by the Parent
     Company:

| Class of shares | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| | common | | | |
| Number of shares outstanding | 23,573,215 as of 2/1/97 | | | |
| Number of shares owned by Directors (directly and/or beneficially) | 7,319,298* | | | |
| Number of shares owned by Officers who are not Directors (directly and/or beneficially) | 260,719*+ | | | |

     *Does not include shares issuable upon excercise of stock options.
     +Does not include shares held by non-Executive Officers.

5.   (a)   Total number of wholly owned Subsidiaries at the inception date of the Policy:

                    Domestic __3__   Foreign _____

          List all such Subsidiaries for which coverage is requested and the date created
          or acquired:  MMT Federal Holdings, Inc. - August 1994

                    MMT International HOldings, Inc. - February 1996

                    MMT of Tennessee Inc. - November 1996

     (b)   Total number of controlled Subsidiaries (more than 50% but less than 100%
           owned) at the inception date of the Policy:  1

           List all such Subsidiaries for which coverage is requested and the date created
           or acquired: _____

                    MMT de Mexico, S.A de C V - February 1996

                                                                 H 3563

6.     (a)     Does any person or entity (other than the Company) own 10% or more of any entity described in 5.b. above?

         Yes _____     No  <u>X</u>_____

         If yes, give details: _____

         _____

         _____

       (b)     Does any person or entity own 10% or more of any class of shares issued by the Parent Company?

         Yes  <u>x</u>_____     No _____

         If yes, give details:  <u>William M. Haney, III, the Parent Company's</u>

         <u>President and CEO, owns approximately 20% of the outstanding common</u>

         <u>stock.</u>_____

7.     (a)     Complete the following for each of the Parent Company's last four fiscal years (use consolidated figures)

| Year | 19\_\_ | 19\_\_ | 19\_\_ | 19\_\_ |
|---|---|---|---|---|
| Total Consolidated Assets | <u>See pages 5 and 6</u> of the Financial Statements in the Annual Report | | | |
| Current Assets | | | | |
| Current Liabilities | | | | |
| Shareholders Equity | | | | |
| Net Income | | | | |
| Net Income per Share | | | | |
| Dividends per Share | | | | |
| Sales/Revenues | | | | |
| Long Term Debt | | | | |
| Short Term Debt | | | | |

       (b)     Has the Company at any time over the last five years been in breach of any of its debt covenants or loan agreements?

         Yes _____     No  <u>x</u>_____

         H 3564

8.    Has the Company at any time over the last five years been involved in any policy dispute with any of its insurers (on any class of business)?

Yes _____    No ___X___

If yes, give details: _____

_____

_____

9.    Give details of the Company's current directors' and officers' insurance:

Insurer :    National Union/Lloyds of London

Limit:    $5,000,000/$5,000,000 excess

Period:    one year/one year

Retention:    $200,000/0

Premium:    $285,000/$170,000 plus SLT

10.    (a)    Has the Company under consideration at the present time or does it contemplate any acquisitions, tender offers or mergers?

Yes _____    No ___X___

If yes, give details: _____

_____

_____

(b)    Complete the following for all acquisitions made over the last five years which have increased the total assets of the Company by 5% or more:

| Entity Acquired | Date Acquired | Asset Value at Date Acquired | Purchase Price | Method of Payment |
|---|---|---|---|---|
| Certain assets of Scientific Ecology Group, Inc. | 12/10/96 | $31 Million | $31 Million | cash |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

H 3565

11.   Has the Company ever repurchased its own shares at a price in excess of the market value at the time?

Yes _____     No ___X___

If yes, give details: _____

_____

_____

12.   Has the Company at any time over the last five years changed its accountants or external general counsel?

Yes ___x___     No _____

If yes, give details including reasons for changes: ___In 1992, the Company changed

accountants from Ernst & Young to Price Waterhouse for quality of service.

External general counsel was changed for same reason.___

13.   Has the Company:

(a)   filed within the past 18 months or contemplated filing within the next 12 months any registration statement with the Securities and Exchange Commission for a public offering of securities?

Yes ___x___     No _____

If yes, furnish copy of prospectus.

(b)   issued within the past 18 months or contemplated issuing within the next 12 months any shares (common or otherwise)?

Yes ___x___     No _____

If yes, give details: ___See Attachment 5_____

_____

_____

14.   The following officer of the Parent Company is designated to receive any and all notices from Underwriters or their authorized representative(s) concerning this insurance:

___Ethan E. Jacks, Vice President and General Counsel___

H 3566

15. List the date of the end of each of the last eight calendar quarters and the corresponding closing price for shares of the Parent Company's common stock:

| DATE | PRICE |
|------|-------|
| 12/31/96 | $11.75 |
| 9/30/96 | 32.00 |
| 6/30/96 | 29.50 |
| 3/31/96 | 33.50 |
| 12/31/95 | 32.625 |
| 9/30/95 | 32.375 |
| 6/30/96 | 23.25 |
| 3/31/95 | 16.75 |

16. Have any filings been made concerning the Company pursuant to Section 13(d) of the Securities Exchange Act of 1934 during the last two years?

Yes _____     No ___X___

If yes, attach a copy of each such filing.

17. Has the Company made any filing pursuant to Section 13(d) of the Securities Exchange Act of 1934 during the last two years?

Yes _____     No ___X___

If yes, attach a copy of each such filing.

18. What percentage of the Parent Company's common stock was sold and purchased during the last 12 months? ___approximately 100%___

19. The Company has not been involved in or had any knowledge of any pending anti-trust, price-fixing, tax, copyright, patent litigation or governmental regulatory or administrative proceedings, except as follows (if answer is none, so state): _____

___See Attachment B___

H 3567

20. It is agreed that this Renewal Application is supplemental to Application(s) for all policies of which the Policy would be a renewal, and that such Application(s), together with the Renewal Application and any materials submitted herewith (which shall be retained on file by Underwriters and shall be deemed attached hereto, as if physically attached hereto) constitute the complete Application which shall be the basis of the Policy and will be attached to and become part of the Policy.

21. It is agreed that in the event there is any material change in the answers to the questions contained herein prior to the effective date of the Policy, the applicant will notify Underwriters and, at the sole discretion of Underwriters, any outstanding quotations may be modified or withdrawn.

22. Attached and made a part of this Renewal Application by reference are the following materials regarding the Parent Company: (a) two copies of the last Annual Report to Stockholders; (b) two certified copies of the provisions of the Charter or By-Laws covering Indemnification of Directors and Officers, and (c) two copies of the Notice to Stockholders and the Proxy Statement for either the last or the next annual meeting. Underwriters are hereby authorised to make any investigation and inquiry in connection with this Renewal Application as they may deem necessary.

23. The undersigned declares that to the best of his/her knowledge the statements herein are true. Signing of the Renewal Application does not bind the undersigned to complete the insurance, but it is agreed that this Renewal Application, shall be the basis of the contract should a Policy be issued, and this Renewal Application will be attached to and become part of such Policy, if issued. Underwriters are hereby authorised to make any investigation and inquiry in connection with this Renewal Application as they may deem necessary.

Signed: _____

Must Be Signed By:
Chairman of the Board or President
of Parent Company

Capacity: William M. Haney, III President and CEO

Company: Molten Metal Technology, Inc.

Date: February 20, 1997
(Day)        (Month)            (Year)

Submitted by: _____
(Agent)

Date: _____
(Day)        (Month)            (Year)

13666

H 3568

Attachment A

Please see discussion of Stock Options and Stock Award Plan on pages 16 and 17 of the financial statements included in the Company's Annual Report and pages 13-17 of the Company's Proxy Statement. Please see discussions of option issued to Fluor Daniel Environmental Services, Inc. on page 20 of the financial statements included in the Company's Annual Report. With respect to contemplated issuances of securities, the Company from time to time evaluates its capital needs and market conditions and may undertake an offering of securities within the next 12 months, although the Company has no current intention to do so.

MMT CONFIDENTIAL

H 3569

Attachment B

1.    The Company has previously noticed the insurer regarding litigation in the matter
of <u>Sain et al. v. Nagel, Bach, Molten Metal Technology and Preston</u>, Case Number 95C2247.
Said litigation is still pending.

2.    Securities class action lawsuit entitled <u>Axler et al. v. Molten Metal Technology,
Inc., Haney, Nagel, Downs, Gatto, Yates, Preston and Strong</u>, Case Number 97-10325PBS, filed
on February 12, 1997.  A notice of said action is being filed with the insurer.

3.    Securities class action lawsuit entitled <u>Friedland et al. v. Molten Metal
Technology, Inc., Haney, Nagel, Preston and Strong</u>, Case Number 97-CV-10346-PBS, filed on
February 13, 1997.  A notice of said action is being filed with the insurer.

MMT CONFIDENTIAL

H 3570

Secretary's Certificate

The undersigned hereby certifies that he is the duly elected and acting Secretary of

Molten Metal Technology, Inc., a Delaware corporation (the "Company"), and further certifies

that attached hereto as Exhibit A is a true and correct copy of the Company's Amended and

Restated Certificate of Incorporation, as amended to date, and attached hereto as Exhibit B is a

true and correct copy of the Company's Amended and Restated By-Laws, as amended to date.

IN WITNESS WHEREOF, the undersigned has executed this certificate this 20th day of

February, 1997.

Ethan E. Jacks,
Secretary

H 3571

The Table of Syndicates referred to on the face of this Policy follows

## SEVERAL LIABILITY NOTICE

The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions. The subscribing insurers are not responsible for the subscription of any co-insuring insurer who for any reason does not satisfy all or part of its obligations.

LSW 1001 (Insurance)

| LPSO USE ONLY UXO1 2104 | | 0542 | REFERENCES 61453 18|04|97 |
|---|---|---|---|
| AMOUNT, PERCENTAGE OR PROPORTION | SYNDICATE | | UNDERWRITER'S REFERENCE |
| PERCENT | | | 1 |
| 30.000 | | 839 | CAO1863AS000 |
| 6.789 | | 376 | HABE46384FUN |
| 3.211 | | 2376 | HABE46384FUN |

THE LIST OF UNDERWRITING MEMBERS
OF LLOYDS IS IN RESPECT OF 1997
YEAR OF ACCOUNT

| TOTAL LINE 40.000 | NO. OF SYNDS 3 | FOR LPSO USE ONLY USL1 3591 |
|---|---|---|

J:\OFFICE\GENERAL\SCB\J6252.DOC

H 3572

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SESSION

00-5381/BLS

| | |
|---|---|
| MMT RECOVERY LLC,<br>RESTART PARTNERS I, L.P.,<br>RESTART PARTNERS II, L.P.,<br>RESTART PARTNERS III, L.P.,<br>RESTART PARTNERS IV, L.P.,<br>RESTART PARTNERS V, L.P.,<br>ENDOWMENT RESTART, LLC,<br>MORGENS WATERFALL INCOME<br>PARTNERS, and<br>MWV SEPARATE ACCOUNT ALPHA, LLC, | ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| WILLIAM M. HANEY, III, CHRISTOPHER<br>J. NAGEL, PETER A. LEWIS, CHARLES W.<br>SHAVER, MARIE J. LANGLOIS, JOHN T.<br>PRESTON, KATHERINE GUNDERSON,<br>ANNE W. GILSON HANEY, GAIL E.<br>PRESTON, ETHAN JACKS, EUGENE<br>BERMAN, DAVID HOEY, R.W. BECK,<br>INC., and DEVELOPMENT SPECIALISTS,<br>INC., | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. _____

Jury Trial Demanded

## COMPLAINT

MMT Recovery LLC, a Delaware limited liability company ("MMT Recovery"),

Restart Partners I, L.P., Restart Partners II, L.P., Restart Partners III, L.P., Restart Partners

IV, L.P., Restart Partners V, L.P., each a Delaware limited partnership, Endowment Restart,

LLC and MWV Separate Account Alpha, LLC, each Delaware limited liability companies,

and Morgens Waterfall Income Partners, a New York limited partnership (collectively the

"Plaintiffs"), by their undersigned attorneys, for their complaint for violations of

Massachusetts securities laws, common-law fraud, negligent misrepresentation, unfair and

deceptive trade practices and negligence, allege as follows:

## SUMMARY OF THE ACTION

1.      On December 3, 1997 Molten Metal Technology, Inc., a Delaware corporation

("Molten Metal") and its four principal subsidiaries (together with Molten Metal, the

"Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy

Code.  At the time Molten Metal had its corporate headquarters in Waltham, Massachusetts,

and its principal research and development facility in Fall River, Massachusetts.

2.      The Debtors were in the business of research and development of hazardous-

waste-processing technologies, as well as design, construction, and operation of waste

processing facilities using such technologies.  The principal proprietary technology of the

Debtors was "catalytic extraction processing" ("CEP"), whereby hazardous wastes were placed

in a bath of liquid metal kept at a temperature of several thousand degrees Fahrenheit.  The

Debtors claimed that the CEP process caused the breakdown of many kinds of hazardous waste

into harmless gasses, liquids and solids.

3.      Molten Metal's bankruptcy was precipitated by a severe cash-flow crisis.

During 1997 Molten Metal's cash on hand decreased by over $100 million, principally because

of continued capital expenditures to build and commence commercial operations at two CEP

facilities.  The Debtors claimed that they sought to use the chapter 11 reorganization process

(i) to give them breathing room from their creditors, (ii) to reorganize the capital structure of the Debtors, and (iii) to raise an additional $20 million of capital allegedly needed and sufficient to complete capital improvements to make commercially viable one of those two CEP facilities -- a facility in Oak Ridge, Tennessee for processing low-level radioactive waste (the "Q-CEP Facility").  Completion and profitability of that facility was then to serve as a springboard to completing the other plant and starting other CEP projects.

4.      The Debtors ultimately arranged, by March 20, 1998, to receive the needed $20 million of capital from a group of investment funds advised and managed by Morgens, Waterfall, Vintiadis & Co., Inc. ("Morgens").  Those funds (comprising all of the Plaintiffs except MMT Recovery) are the predecessors-in-interest of the Plaintiff MMT Recovery, and are now the equity members of MMT Recovery, which is an entity also advised by Morgens and whose sole assets are rights relating to the investments in Molten Metal.

5.      In the course of obtaining the investment from the Plaintiffs, Molten Metal and its officers and directors, including Defendant Nagel, made false and misleading statements of material fact, and omitted to state material facts, to Morgens and the Plaintiffs regarding the efficacy of the Debtors' CEP technology.  Specifically, Molten Metal and Defendant Nagel stated that the Q-CEP Facility could reduce the volume of the low-level radioactive waste that it processed by a ratio of more than 30:1, and in many cases by as much as a ratio of 90:1. Molten Metal and Defendant Nagel also stated that CEP was a "dioxin free" waste-processing technology vastly superior to competing technologies.

6.      On information and belief, Defendants Haney, Lewis, Berman, Jacks, Hoey and Shaver aided and abetted the actions of Molten Metal and Defendant Nagel.  Haney, Lewis

and Nagel and the other individual defendants were directors and/or officers of Molten Metal at the time Morgens, as advisor to the Plaintiffs, was solicited for an investment and, under the laws of this Commonwealth governing the sale of securities, are vicariously liable for the misstatements by Molten Metal. Defendant R.W. Beck, Inc. negligently issued a report to Morgens and the Plaintiffs passing on the viability of the Q-CEP process and the commercial viability of the Q-CEP Facility -- a report on which the Plaintiffs relied in deciding to invest in Molten Metal. Defendant Development Specialists, Inc. was at all relevant times working for Molten Metal and the other Debtors in the role of corporate controller (an officer) and producing all of the financial projections used to solicit and maintain the investment by the Plaintiffs.

7.      Neither the claims about volume reduction nor dioxins were true. To the contrary, Defendants Haney and Nagel knew that the Q-CEP Facility did not reduce the volume of radioactive wastes by a ratio of 30:1 as claimed. Indeed, the Q-CEP process actually increased the amount of such waste. Defendants Nagel and Haney also knew, CEP did produce dioxins in quantities comparable to competing technologies, thus giving CEP no competitive advantage.

8.      Not surprisingly, given the reality behind the false and misleading statements, the Debtors' business plan failed. On August 24, 1998, less than five months after the Plaintiffs' commitment to invest $20 million, the bankruptcy court overseeing the Debtors appointed a trustee to take over management of the affairs of Molten Metal and the other Debtors. To maintain the Debtors' business in saleable condition and in an attempt to mitigate losses, MMT Recovery (i) advanced an additional $3.5 million to the chapter 11 trustee to

cover operating losses through December 1998, (ii) permitted the bankruptcy trustee to use at least $1.0 million of additional cash collateral belonging to MMT Recovery and (iii) expended in excess of $1.0 million in legal and other professional fees in protecting MMT Recovery's interest in its investment and defending lawsuits against MMT Recovery filed by third parties.

9.     Despite the fact that the Debtors had stated in their bankruptcy filing that they had assets (excluding intercompany claims) with a value in excess of $110 million, after the collapse of the Debtors' business plan the only operating businesses of the Debtors were sold by the bankruptcy trustee, in December 1998, for a mere $15.6 million, $5.0 million of which was comprised of deferred payments over five years.  Those operating facilities included the Q-CEP Facility, which was sold, to insiders (including Defendant Preston) who knew the true facts about the technology, for only $100,000 in cash plus deferred payments over five years totaling only $4.0 million.  Even those deferred payments have ceased, as the successor operator of the Q-CEP Facility is no longer making its payments; the Q-CEP Facility is demonstrably worthless.  Although some funds have been repaid to MMT Recovery as payments of principal and accrued interest on debt securities, MMT Recovery (or, in the alternative, the other Plaintiffs) have sustained direct losses to date totaling approximately $19.3 million as a consequence of the Defendants' false and misleading statements and tortious conduct.

## THE PARTIES

### *The Plaintiffs*

10.     Each of Restart Partners I, L.P. ("Restart I"), Restart Partners II, L.P. ("Restart II"), Restart Partners III, L.P. ("Restart III"), Restart Partners IV, L.P. ("Restart

IV"), Restart Partners V, L.P. ("Restart V"), is a Delaware limited partnership advised and managed, directly or indirectly, by Morgens. Each of Endowment Restart, LLC ("Endowment Restart") and MWV Separate Account Alpha, LLC ("MWV Alpha") is a Delaware limited liability company advised and managed, directly or indirectly, by Morgens. Morgens Waterfall Income Partners ("MWIP") is a New York limited partnership advised and managed, directly or indirectly, by Morgens. Restart I, Restart II, Restart II, Restart IV, Restart V, Endowment Restart and MWIP are referred to herein collectively as the "Short-Term Investors"). The Short-Term Investors and MWV Alpha are referred to herein collectively as the "Medium-Term Investors". These funds are investment pools into which various charitable endowments, pension plans and others place their funds for investment by Morgens.

11.    MMT Recovery is the successor-in-interest to the Medium-Term Investors.

12.    To raise the $20 million of capital, the Debtors, through a financial advisor, approached Morgens, which advises various funds and accounts (including the Medium-Term Investors) in investing in distressed securities and bankruptcy situations. Morgens ultimately decided that the Short-Term Investors should make an initial investment in the Debtors. The Short-Term Investors purchased notes with a stated principal amount of $7.7 million (the "Short-Term Notes"), issued by the Debtors on or about December 17, 1997.

13.    On March 20, 1998, the Medium-Term Investors entered into a financing transaction with the Debtors. Pursuant to a Post-Petition Financing Agreement dated March 20, 1998 (the "Financing Agreement"), the Medium-Term Investors committed to advance up to $20 million to the Debtors. Those advances were evidenced by notes constituting debt

securities, and the Financing Agreement also provided the Medium-Term Investors equity

securities insofar as the Medium-Term Investors purchased rights to 25% of the equity (during

and upon any reorganization) of the Debtors. The closing of the transactions contemplated by

the Financing Agreement occurred in Boston, Massachusetts.

14.     On March 20, 1998, the Medium-Term Investors provided the first $7.0 million

investment under their commitment to the Debtors, for the purpose of refinancing the Short-

Term Notes. Between March 20, 1998 and August 5, 1998, the Medium-Term Investors

invested another $8.8 million of their $20 million commitment to the Debtors, pursuant to the

terms of the Financing Agreement.

15.     On or about September 23, 1998, the Medium-Term Investors formed MMT

Recovery and capitalized that entity by assigning to MMT Recovery all of the Medium-Term

Investors' rights with respect to the Debtors, including rights under the Financing Agreement

and any related causes of action, including the causes of actions asserted in this Complaint. In

turn, each of the Medium-Term Investors became a member of MMT Recovery, a limited

liability company.

16.     MMT Recovery itself provided an additional $3.5 million to the Debtors'

bankruptcy trustee from September 1998 through December 1998 to fund operating losses

while the principal operating businesses of the Debtors were sold. From December 1998 to

the present MMT Recovery has, out of necessity and to avoid further loss and damage,

permitted the bankruptcy trustee to use in excess of $1.0 million of MMT Recovery's cash

collateral. MMT Recovery has also incurred a significant amount of legal and professional

expenses, exclusive of the costs of this action, in protecting its investment and defending

against lawsuits filed against it by third parties in various bankruptcy contested matters and adversary proceedings.

### *The Defendants*

17.     Defendant Christopher J. Nagel is, on information and belief, a resident of The Commonwealth of Massachusetts, residing in the Town of Wayland in the County of Middlesex. At all relevant times, Nagel was the Chief Technology Officer and Vice President of Molten Metal, responsible for all research, development and engineering activities. Defendant Nagel invented the CEP process. At all relevant times, Defendant Nagel was a director of Molten Metal.

18.     Defendant Katherine Gunderson is, on information and belief, a resident of The Commonwealth of Massachusetts, residing in the Town of Wayland in the County of Middlesex. At all relevant times, Defendant Gunderson was the spouse of Defendant Nagel.

19.     Defendant William M. Haney, III ("Haney") is, on information and belief, a resident of The Commonwealth of Massachusetts, residing in the Town of Wayland in the County of Middlesex. From the company's founding until November 1997 (one month prior to its bankruptcy), Haney was the Chief Executive Officer and Chairman of the Board of Directors of Molten Metal. After his resignation as CEO and Chairman in November 1997, Haney remained a member of the Board of Directors of Molten Metal at all times relevant to the misconduct described herein.

20.     Defendant Anne W. Gilson Haney is, on information and belief, a resident of The Commonwealth of Massachusetts, residing in the Town of Wayland in the County of

Middlesex. At all relevant times, Defendant Anne Haney was the spouse of Defendant William Haney.

21.    Defendant Peter Lewis is, on information and belief, a resident of the State of New York. At all relevant times, Defendant Lewis was a director of Molten Metal. Lewis was a member of the audit committee of Molten Metal's board of directors. Lewis also was a member of a special investigation committee formed by the board of directors in or about April 1997. Finally, Lewis also was a managing director of Lazard Freres & Co., an investment banking firm that provided services to Molten Metal. In those capacities, Lewis received detailed reports regarding many sensitive internal matters of Molten Metal, such as the integrity of management and the accuracy of Molten Metal's scientific claims, and as a member of the audit and special investigative committees reported back to the full board of directors.

22.    Defendant John T. Preston is, on information and belief, a resident of The Commonwealth of Massachusetts, residing in the Town of Hingham in the County of Plymouth. At all relevant times, Defendant Preston was a director of Molten Metal.

23.    Defendant Gail G. Preston is, on information and belief, a resident of The Commonwealth of Massachusetts, residing in the Town of Hingham in the County of Plymouth. At all relevant times Defendant Gail Preston was the spouse of Defendant Preston.

24.    Defendant Charles Shaver is, on information and belief, a resident of The Commonwealth of Massachusetts. At all relevant times Defendant Shaver was an officer, as President and Chief Operating Officer, and director of Molten Metal.

25.     Defendant Eugene Berman is, on information and belief, a resident of the State of Maryland.  At all relevant times Defendant Berman was an officer of Molten Metal, as Vice President of Regulatory Affairs.

26.     Defendant David Hoey is, on information and belief, a resident of The Commonwealth of Massachusetts, residing in the Town of Wayland in the County of Middlesex.  At all relevant times Defendant Hoey was an officer of Molten Metal, as Vice President of Business Development.

27.     Defendant Ethan Jacks is, on information and belief, a resident of The Commonwealth of Massachusetts, in the Town of Weston in the County of Middlesex.  At all relevant times Defendant Jacks was an officer of and senior in-house counsel at Molten Metal and the other Debtors.

28.     Defendant Marie J. Langlois is, on information and belief, a resident of the State of Rhode Island.  At all relevant times Defendant Langlois was a director of Molten Metal.

29.     Defendant R.W. Beck, Inc. ("Beck") is an engineering consulting firm with a usual place of business in this Commonwealth, in the City of Framingham in the County of Middlesex.  In 1997 certain of the Debtors hired Beck to produce an "independent engineer's report" validating the technology at the Q-CEP Facility, which report would be used to aid in soliciting investments in the Debtors.  That report was dated October 2, 1997 (the "1997 Q-CEP Facility Report"), although the proposed $20 million financing for which it was used was aborted prior to the bankruptcy filing.  After the bankruptcy filing, when the Debtors again sought a $20 million investment, Beck was hired by the Medium-Term Investors to review the

Debtors' plan for capital improvements to the Q-CEP Facility, to be funded primarily with funds to be advanced by the Medium-Term Investors. Beck produced a report (the "1998 Capex Report") regarding such improvements for the Medium-Term Investors, prior to the closing of the Financing Agreement. The 1998 Capex Report incorporated by reference the 1997 Q-CEP Facility Report.

30.    Defendant Development Specialists, Inc. ("DSI") is a corporation with a usual place of business at 2 Oliver Street, Boston, Massachusetts, in the County of Suffolk. Prior to and at all relevant times during the Debtors' bankruptcy case, DSI acted as controller for Molten Metal, thereby serving as an officer of Molten Metal or as a person occupying a similar status or performing similar functions. DSI personnel, for example, (i) reviewed Molten Metal's overall business plan and, on information and belief, suggested changes that were made to such plan, (ii) reviewed specific business lines of the Debtors and made recommendations regarding them, (iii) prepared all financial projections used in the solicitation of the investment by Morgens and the Medium-Term Investors and (iv) conducted a detailed review of the affairs of Molten Metal and the other Debtors as part of preparing the Debtors' bankruptcy schedules and statements.

## JURISDICTION

31.    The amount in controversy in this action well exceeds $25,000.

32.    A substantial portion of the acts complained of herein occurred in this Commonwealth, and the closing of the relevant transactions occurred in this Commonwealth.

MHODMA.Active;8412565;6

## THE DEBTORS SOLICIT MORGENS FOR FINANCING

33.     In late November 1997, shortly before the Debtors' chapter 11 filing, a financial advisor to Molten Metal contacted Stuart Brown, a senior employee of Morgens. Mr. Brown had investment discretion with respect to various Morgens-advised funds and accounts.  That financial advisor conveyed to Morgens the Debtors' proposal that Morgens (through its advised affiliates) invest in the Debtors during the Debtors' bankruptcy case, the filing of which was imminent.

34.     The Debtors filed for bankruptcy protection on December 3, 1997.  The Debtors then invited Morgens to attend a face-to-face meeting at which the Debtors could make a presentation as to their business and reorganization plan, as well as the terms of a proposed financing.

35.     Mr. Brown asked an analyst at Morgens, Victor Simonte, to assist him in evaluating a potential investment in the Debtors.  Although Mr. Brown retained final authority to approve any investment, Mr. Simonte principally performed the analysis of the Debtors' business and the proposed financing terms, bringing such analyses to Mr. Brown for review. Mr. Simonte was a main point of contact between Morgens and the Debtors.

36.     Morgens accepted the invitation for a face-to-face meeting, and Mr. Simonte traveled to Massachusetts on December 10, 1997 to attend such a meeting.  The meeting took place in the board room at the Debtors' corporate headquarters in Waltham, Massachusetts.  In addition to Mr. Simonte, the attendees at that meeting included Defendant Nagel, Gordon Bitter (the new Chief Executive Officer of the Debtors), Defendant David Hoey (the Debtors'

Vice President for Business Development) and Defendant Eugene Berman (the Debtors' Vice President of Governmental, Legal and External Affairs).

*False Statements Regarding CEP's Volume Reduction of Hazardous Wastes*

37.    At the December 10 meeting with Simonte, Defendant Nagel stated that CEP could be used to process for disposal ion exchange resins ("IERs").  IERs are the filtering element in filters used in the secondary cooling loops of nuclear power plants.  Those resins must be changed periodically and, as filters, pick up low levels of radioactive waste particles. Accordingly, the spent IERs must be disposed of as low-level radioactive waste.  Disposal costs for such waste are high.  The principal disposal site for such low level radioactive waste is located in Barnwell, South Carolina, and that site charges for burial of such waste according to the volume and weight of the waste to be buried.

38.    As of December 1997 the Debtors had constructed the Q-CEP Facility in Oak Ridge, Tennessee for the precise purpose of processing IERs using a variant of CEP technology, so-called quantum catalytic extraction processing ("Q-CEP" or "Quantum CEP"). The business plan for the Q-CEP Facility was to take spent IERs and process them using the CEP process.  Although Q-CEP could not remove the radioactivity from the waste, the business plan for the Q-CEP process was that it supposedly would cause many component elements of the IERs to disassociate and to be released as non-hazardous chemicals, leaving a smaller amount (by both volume and weight) of low-level radioactive waste for burial.  This volume and weight reduction would then, in turn, reduce the cost to bury the waste.  The Debtors represented to the Plaintiffs that the Debtors planned to take IERs from nuclear power plants at a cost slightly less than the costs of direct burial at the Barnwell site, and then pay

MHODMA.Active:8412565:6                    13

Barnwell significantly less to bury the low-level radioactive waste after being processed through the Q-CEP Facility.

39.    At the time of Molten Metal's bankruptcy filing, the Q-CEP Facility was the facility of the Debtors that was allegedly nearest to being a viable commercial operation. The Debtors' business plan in the bankruptcy was to focus efforts and funds (principally the investment from the Medium-Term Investors) to develop the Q-CEP Facility to a stage where it allegedly would be commercially viable. The ability of the Q-CEP Facility to process spent IERs and reduce the volume and weight of low-level radioactive wastes was critical to the realization of the Debtors' business plan as presented and represented by the Debtors and the Defendants who were their directors and officers.

40.    At the December 10, 1997 meeting with Simonte, Defendant Nagel, on behalf of Molten Metal, stated that Q-CEP could reduce the volume of low-level radioactive waste from spent IERs by a ratio of at least 30:1, and in many cases by more than a ratio of 90:1. The other company officers participating in the meeting adopted and confirmed, and none contradicted, Nagel's representations.

41.    In addition to statements at that meeting, the Debtors also provided Simonte with written materials regarding the volume-reduction capabilities of Q-CEP. On behalf of the Debtors, Defendant Ethan Jacks, in-house general counsel to the Debtors, provided Simonte with an offering memorandum that the Debtors had written in October 1997 (the "October 1997 Offering Book" or the "OM"). The October 1997 Offering Book had been written for an attempted (but ultimately unsuccessful) bond offering to finance one of the Debtors' facilities in Oak Ridge, Tennessee. That offering had sought to raise $20 million of debt financing to

complete the Q-CEP Facility -- the same purpose as the $20 million financing ultimately

obtained from the Medium-Term Investors during the Debtors' bankruptcy case.  That bond

offering was not consummated, but Molten Metal and the other Debtors used the same offering

materials to solicit the investment by the Medium-Term Investors.

      42.    The October 1997 Offering Book, given to Morgens to evaluate a proposed

investment, included the following statements regarding volume and weight reduction by Q-

CEP and the Q-CEP Facility:

- The [Q-CEP] Facility offers customers volume reduction of IER of approximately 30:1 and IER weight reduction of approximately 7:1, based on the volume and weight of IER shipped to the [Q-CEP] Facility and the radioactive final form shipped to a licensed landfill for disposal. OM at 8.

- The Company's services are designed primarily to process customers' LLRW [i.e., low level radioactive waste] into a form suitable for long-term storage or disposal and also, in most cases, to substantially reduce the volume and weight of such LLRW.  By virtue of its LLRW processing capabilities, the Company believes its services can provide attractive cost savings to its customers as compared to existing alternatives and can reduce their need for storage of LLRW on their sites. OM at 7.

- MMT has developed Quantum-CEP™ (or Q-CEP™) to process radioactive wastes and "mixed wastes" (containing both radioactive and hazardous constituents). Quantum-CEP breaks down hazardous and toxic materials, while separating and containing radioactive elements in a stable, self-shielding form suitable for storage or final disposal. This can result in a substantial reduction in the volume of radioactive materials requiring storage or disposal. OM Appendix A, at 1.

- With respect to Quantum-CEP, MMT believes that the primary factors that create demand include customers' regulatory compliance concerns and the ability of Quantum-CEP to reduce the volume of radioactive materials. OM, Appendix A, at 2.

- The Q-CEP process reduces the volume of spent IER by greater than 30:1 and the weight by greater than 7:1. OM, Appendix B (incorporating an independent engineer's report), at B-2.

A copy of the October 1997 Offering Book can be found at Tab A of the Exhibits In Support

of Plaintiff's Complaint.  Morgens and the Medium-Term Investors relied on the October 1997

Offering Book in deciding to invest in Molten Metal and the other Debtors, and would not

have invested except for the statements made regarding volume reduction.

*The Debtors and Nagel Make the Same False Statements Regarding Q-CEP
to the Bankruptcy Creditors' Committee, and then Repeat the Misstatements to Morgens*

43.   Because the Financing Agreement between the Debtors and the Plaintiffs was a

transaction to be effected in bankruptcy, it required bankruptcy-court approval.  To obtain

such approval, at the same time Molten Metal was soliciting the investment from Morgens,

Molten Metal was seeking to convince the Debtors' creditors that the Debtors' business plan of

continued technology development was a viable strategy.

44.   As in most chapter 11 bankruptcy cases, an official committee of unsecured

creditors was formed in the Debtors' cases.  Shortly after formation of that committee, the

Debtors made a face-to-face presentation to that committee to convince it of the viability of the

Debtors' CEP technology and business plan.  That meeting occurred on or about January 9,

1998, and included written materials (the "Committee Presentation").  Defendant Nagel

participated in the meeting with the committee and authored, or had significant editorial

control over, the portions of the Committee Presentation concerning the Debtors' technology.

45.   Because the Committee Presentation was designed to convince the creditors'

committee of the viability of the Debtors' business and financing plans, and Molten Metal was

likewise trying to convince Morgens and the Medium-Term Investors on the same points.

Morgens and Simonte received a copy of the Committee Presentation for use in Morgens'

MHODMA Active:8412565;6                              16

evaluation of the proposed investment.  A copy of the Committee Presentation can be found at

Tab B of the Exhibits In Support of Plaintiff's Complaint.  The Committee Presentation

repeatedly represented the achievement of volume-reduction at the Q-CEP Facility:

- "Volume Reduction > 30:1" (tab 2, p.18)

- "Q-CEP Final Form . . . Volume Reduction > 30:1" (tab 3, p.7)

- "Q-CEP Resin Plant - 1997 Performance . . . Highlights: . . . Achieving
  Volume Reduction goal of 30/1"  (tab 3, p.9)

- "Q-CEP Volume Reductions Compare Favorably with Processing and
  Stabilization Technologies . . . Quantum Q-CEP > 30:1" (tab 4, p.9)

- "Q-CEP's Competitive Advantages in Resin Processing . . . High volume
  reduction" (tab 4, p.10)

- "Radwaste Market Opportunities . . . High Volume Reduction" (tab 4, p.26)

Alleged volume reduction by the Q-CEP process was thus a focus of the Committee

Presentation and an intended part of the solicitation of Morgens and the Medium-Term

Investors to make their investment.  Morgens and the Medium-Term Investors relied on the

Committee Presentation in deciding to invest in Molten Metal and the other Debtors, and

would not have invested except for the statements made regarding volume reduction.

### The Truth About Q-CEP and Volume Reduction

46.    The truth about volume reduction was, however, quite to the contrary.

Information produced internally at the Debtors between March and July of 1997 showed no

reduction in the volume of waste took place at all, let alone by more than a 30:1 ratio as was

falsely represented.  The Q-CEP process actually increased the amount of waste to be buried.

This increase was due to the fact that in addition to the molten metal bath becoming

17

contaminated with radioactive waste (as planned), so did the soot/dust, hydrogen sulfide, and gasses emitted from the process itself (not as planned). Furthermore, because both the molten metal bath and the products had radioactive contamination, many parts of the machinery and ductwork at the Q-CEP Facility that handled such products also became contaminated, and those tainted materials too would have to be disposed of.

47.     As a result, the true facts were that the Q-CEP process did not produce any volume reduction in low-level radioactive wastes from spent IERs, much less the 30:1 reduction repeatedly and falsely represented to Simonte.

48.     On information and belief, these true facts were known to the Defendants who were directors and officers of Molten Metal. An email sent on or about March 31, 1997 from B.J. Garner (an employee of the Debtors) to, *inter alia*, Defendants Haney and Nagel, reported to senior management of Molten Metal that Q-CEP was not providing any volume reduction. Furthermore, in sworn testimony in another civil action, a former senior executive of Molten Metal, G. Earl McConchie, testified that in June and July of 1997, he inquired of Molten Metal's superintendent of the Q-CEP Facility, Myron Kaszmarsky, as to the actual volume reduction at that facility. Kaszmarsky provided McConchie with operating data for the Q-CEP Facility that showed that the amount of waste coming out of the process exceeded the amount of feed going in. The fact that there was no volume reduction was therefore known to Molten Metal and the other Defendants only a few months prior to the making of false representations in the October 1997 Offering Book, the December 10 meeting and the solicitation of Morgens' investment.

*False Statements Regarding Dioxins*

49.    Nagel made other false materially statements and omissions concerning the CEP

technology.    At the December 10 face-to-face meeting with company officers and Simonte,

Defendant Nagel gave an extensive presentation to Simonte regarding the science and

technology of the Debtors' CEP process.  Nagel stated that the CEP process did not produce

dioxins.   Dioxins are highly carcinogenic chlorine compounds that are the by-products of

high-temperature waste processing technologies such as incineration.  Because CEP also used

high temperatures to process waste, the issue of dioxin formation was an obvious one, and a

focus of the Debtors' marketing and fundraising literature since as early as 1995.   Thus, as

represented to the Plaintiffs, not only did CEP not have the chemical pathways in which

dioxins form, but CEP could actually render safe many hazardous materials that contained

dioxins.

50.    For example, Defendant Nagel stated at the December 10 meeting that the

dioxin-free nature of CEP provided CEP a significant advantage over competing technologies.

The Debtors and Nagel claimed repeatedly and, as it turned out, falsely, that CEP operated at

such high temperatures and with a metal bath that together actually "blew apart" dioxin

molecules.  To emphasize this "fact", at one point during the meeting Defendant Nagel held up

a glass jar containing ash generated in incinerators, stated that if the jar were opened it would

kill everyone in the room even with the minuscule amount of dioxins in the dust, and then

stated that CEP would not produce such a byproduct and, indeed, that CEP could process such

dioxin-laden ash to make it non-hazardous.

51.    The December 10 meeting also included a discussion of the purported long-term

potential for the Debtors' business.  The alleged fact that CEP did not produce dioxins was,

and was portrayed by the Debtors as, a critical competitive advantage for the Debtors.

Furthermore, CEP's purported ability to actually process dioxin-laden hazardous waste such as

incinerator fly-ash (the dust used in the glass-jar demonstration to Simonte) was stated as a

major area of business prospects for the Debtors.

52.    On information and belief, no company officer in the room at that meeting,

including Defendants Berman and Hoey, contradicted Nagel or corrected Nagel.

53.    In addition to the December 10 meeting, the Defendant Jacks, on behalf of the

Debtors, also supplied Simonte with written materials that discussed the dioxin-free nature of

the CEP process.  The October 1997 Offering Book delivered to Simonte stated that the CEP

process did not generate dioxins, and that this fact gave CEP a competitive advantage in the

waste-processing industry:

> In connection with a July 1995 equivalency determination for chlorinated
> organic wastes, the EPA noted that dioxin, a toxic and harmful substance, was
> not detected at EPA-promulgated regulatory levels in CEP demonstrations.  The
> Company believes that the EPA's BDAT equivalency determinations confirmed
> that CEP is fundamentally different from incineration, and further confirms that
> the use of CEP supports the EPA's efforts to minimize cross-media
> contamination (transfer of contaminants to air and water from solid wastes) and
> to reduce the quantity of residuals for land disposal.

OM Appendix A, at 15.  Morgens and the Medium-Term Investors relied on the October 1997

Offering Book in deciding to invest in Molten Metal and the other Debtors, and would not

have invested except for the statements made regarding dioxins.

*The Debtors and Nagel Make the Same False Statements Regarding Dioxins
to the Bankruptcy Creditors' Committee, and then Repeat the Misstatements to Morgens*

54.     The Committee Presentation authored by Nagel and other of the Defendants,

and delivered to Simonte, also specifically discussed the allegedly dioxin-free nature of CEP:

> Over a wide range of heterogeneous feeds . . . results consistently demonstrated: . . .
> Dioxins/furans nondetectable to targeted regulatory standard of 0.1 ng/Nm³ TEQ (tab
> 2, p.15)

Morgens and the Medium-Term Investors likewise relied on the Committee Presentation in

deciding to invest in Molten Metal and the other Debtors, and would not have invested except

for the statements made regarding dioxins.

*The Truth About CEP and Dioxin*

55.     The truth about CEP and dioxin was, however, far different than as represented.

In 1996 and early 1997 Dow Chemical was exploring forming a joint venture with Molten

Metal.  As part of its due diligence, Dow insisted that CEP products be independently tested

for the presence of dioxins.  The results of that independent testing, contained in a Dow

Chemical report dated June 30, 1997, concluded that dioxins were found in CEP products.

Indeed, that report showed that CEP products contained dioxins in amounts only slightly less

than for incinerator ash (the very type of ash that Defendant Nagel would use for dramatic

effect only a few months later, at the December 10 meeting with Morgens).

56.     Those test results were, in fact, no surprise to Nagel or the other director and

officer Defendants.  As early as mid-1996, Dow had given a preliminary oral report of its

dioxin testing to Defendant Nagel.  Nagel discussed those preliminary results (the finding of

dioxins in CEP products) with one of the other senior executives of the Debtor, Earl

MHODMA.Active:8412565:6                            21

McConchie, in October 1996. There is no such thing as a dioxin problem that is not serious, because of the tremendous additional disposal costs if a waste-processing technology produces dioxins. Dioxin formation was a problem both at the Q-CEP Facility and for the other prospective CEP facilities that were part of the Molten Metal business plan into which the Plaintiffs invested.

57. Defendants Haney and Lewis were members of the Molten Metal board of directors during the period when Molten Metal and the other Debtors solicited Morgens for an investment and when the Medium-Term Investors advanced funds to the Debtors, and knew that the representations being made to the Plaintiffs were not true. In their capacities as directors, Defendants Haney, Lewis, Preston, Langlois and Shaver authorized the Debtors' to seek such financing and ultimately voted in favor of the Debtors entering into the Financing Agreement.

### R.W. BECK, INC. VERIFIES THE DEBTORS' TECHNOLOGICAL CLAIMS

58. By the time of the proposed Morgens investment in late 1997 and early 1998, Defendant Beck had been connected with Molten Metal for some time. In or about October 1997, some of the Debtors hired Beck to produce the 1997 Q-CEP Facility Report, which was an "independent engineer's report" that validated the technology used at the Q-CEP Facility. Molten Metal and one of its subsidiaries then used that report to solicit a $20 million investment, via a tax-exempt bond financing. That proposed financing was aborted because of a lack of interest among potential buyers of the bonds.

59.    The 1997 Q-CEP Facility Report contained the following statements by

Defendant Beck:

- The Q-CEP process reduces the volume of spent IER by greater than 30 to 1 and the weight by greater than 7 to 1. 1997 Q-CEP Facility Report at B-2.

- The Company's services are designed primarily to process customers' LLRW into a form suitable for long-term storage or disposal and, in most cases, to substantially reduce the volume and weight of such LLRW. By virtue of its LLRW processing capabilities, the Company believes its services can provide attractive cost savings to its customers as compared to existing alternatives and can reduce their need for storage of LLRW on their sites. 1997 Q-CEP Facility Report at B-4.

- The Q-CEP technology currently in use at the Q-CEP facility is a sound and proven method of volume and weight reduction of spent IER. 1997 Q-CEP Facility Report at B-64.

60.    When Molten Metal sought, after its bankruptcy filing, to again raise $20

million of financing, it used the October 1997 Q-CEP Facility Report. It provided a copy of

that report to Morgens. Moreover, Morgens and the Medium-Term Investors themselves hired

Defendant Beck to validate the Debtors' proposed business plan in the bankruptcy case. Thus,

Defendant Beck produced a new report, the 1998 Capex Report, specifically for Morgens.

The 1998 Capex Report incorporated by reference the October 1997 Q-CEP Facility Report,

and Beck knew and intended that Morgens and the Medium-Term Investors rely on the

October 1997 Q-CEP Facility Report.

61.    In preparing both the 1997 Q-CEP Facility Report and the Capex Report,

Defendant Beck's personnel personally visited the Q-CEP Facility. Defendant Beck's

personnel also interviewed employees of Molten Metal and the other Debtors, and reviewed

documents regarding the Q-CEP process, the Q-CEP Facility and the commercial market in which the Q-CEP Facility competed.

62.   The Medium-Term Investors relied on statements in the October 1997 Q-CEP Facility Report and the 1998 Capex Report, and Defendant Beck's expert analysis in determining to invest in Molten Metal and the other Debtors.

## COUNT I

### Violation of G.L. c.110A, § 410 (Blue-Sky)

63.   Plaintiffs repeat and reallege the contents of paragraphs 1-62 as if set forth in full herein.

64.   On or about December 17, 2000 and March 20, 1998, the Debtors sold debt and equity securities to the Short-Term Investors and the Medium-Term Investors, in the form of the Notes and the equity rights under the Financing Agreement.

65.   The sale of securities was by means of untrue statements by Molten Metal of material facts regarding volume reduction and dioxins, and omissions by Molten Metal to state materials facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  The Short-Term Investors and the Medium-Term Investors relied on such statements in making their investments, and would not have made the investments but for those statements.

66.   At that time, Defendants Nagel, Haney, Lewis, Preston, Shaver and Langlois were directors of Molten Metal.  Defendants Nagel, Shaver, Berman, Hoey and Jacks were officers of Molten Metal.

MHODMA.Active:8412565;6                          24

67.    At that time Defendant DSI was an officer, or a person occupying a similar status or performing similar functions, for Molten Metal and the other Debtors. DSI was intimately involved in fashioning the Debtors' business plan and formulating projections that were used to solicit the investment by the Plaintiffs.

68.    Plaintiffs have incurred losses in an aggregate amount of not less than $19.3 million.

69.    This Court should find each of Defendants Nagel, Haney, Lewis, Preston, Shaver, Langlois, Berman, Hoey, Jacks and DSI liable to the Plaintiffs in the amount of Plaintiffs' losses.

## COUNT II

### Common-Law Fraud

70.    Plaintiffs repeat and reallege the contents of paragraphs 1-69 as if set forth in full herein.

71.    The Debtors', Nagel's and Jacks' statements and omissions regarding the dioxin-free nature of CEP and volume-reducing capabilities of Q-CEP were false.

72.    At the time such oral and written statements were made, the Debtors, Nagel and Jacks knew them to be false or were reckless in avoiding the truth or falsity of such statements.

73.    The Short-Term Investors and the Medium-Term Investors relied on such statements in deciding to, respectively, purchase the Short-Term Notes and enter into the Financing Agreement, and would not have purchased the Short-Term Notes or entered into the

Financing Agreement had they known the true facts regarding CEP and dioxin and that Q-CEP was not effective in reducing the volume of low-level radioactive wastes.

74.    Defendants Nagel and Jacks aided and abetted the fraud perpetrated by the Debtors, by knowingly and wilfully making and publishing statements that supported the Debtors' fraudulent statements and knowingly and wilfully failing to correct errors and omissions in the Debtors' fraudulent statements, which statements Nagel and Jacks each knew to be false and misleading.

75.    Defendants Nagel, Jacks, Haney, Lewis and Preston aided and abetted the fraud perpetrated by the Debtors and Defendants Nagel and Jacks, by knowingly and wilfully encouraging and approving the financing activities of the Debtors and knowingly and wilfully failing to correct or stop false and misleading statements and omissions that they knew were being made in connection with such financing activities, when they knew that the Debtors' and officers and directors speaking on behalf of the Debtors were making statements regarding the efficacy and nature of CEP that were false and misleading.  Defendants Berman and Hoey aided and abetted the fraud when they attended the December 10, 1997 meeting with Simonte, made presentations to Simonte at that meeting for the purpose of soliciting an investment by Morgens, and failed to correct statements that they knew were false, or as to which they recklessly avoiding knowing the truth.

76.    MMT Recovery and/or the Medium-Term Investors have incurred losses in an aggregate amount of not less than $19.3 million.

77.    This Court should find each of Defendants Nagel, Haney, Lewis, Preston, Berman, Hoey and Jacks liable to Plaintiffs in the amount of their losses.

## COUNT III

### Negligent Misrepresentation

78.     Plaintiffs repeat and reallege the contents of paragraphs 1-77 as if set forth in full herein.

79.     The Debtors', Nagel's and Jacks' statements, and omissions regarding the dioxin-free nature of CEP and volume-reducing capabilities of Q-CEP were false.

80.     At the time such oral and written statements were made, the Debtors, Nagel and Jacks were negligent in determining whether those statements were true, because, *inter alia*, they ignored internal analyses that demonstrated that their statements were false and misleading, as well as testing performed by outside experts such as Dow Chemical that demonstrated the true facts.

81.     The Medium-Term Investors reasonably relied on the materially false and misleading statements by the Debtors, Nagel and Jacks.  Defendants Haney, Lewis, Preston, Berman and Hoey materially aided and abetted the making of such statements.

82.     The Short-Term Investors and the Medium-Term Investors relied on such statements in deciding, respectively, to purchase the Short-Term Notes and to enter into the Financing Agreement, and would not have purchased the Short-Term Notes or entered into the Financing Agreement had they known the true facts regarding CEP and dioxin and that Q-CEP was not effective in reducing the volume of low-level radioactive wastes.

83.     Plaintiffs have incurred losses in an aggregate amount of not less than $19.3 million.

MHODMA Active:8412565;6                    27

84.   This Court should find Defendants Nagel, Jacks, Haney, Lewis, Preston, Berman and Hoey liable to the Plaintiffs in the amount of Plaintiffs' losses.

## COUNT IV

### Violation of G.L. c.93A

85.   Plaintiff repeats and realleges the contents of paragraphs 1-84 as if set forth in full herein.

86.   At all relevant times Defendants Nagel, Haney, Lewis and Jacks were engaged in trade or commence within the meaning of G.L. c.93A, § 1(b).

87.   The conduct of Defendants Nagel, Haney, Lewis and Jacks constituted a violation of the Massachusetts Consumer Protection Act, G.L. c.93A, §§ 9 and/or 11, causing Plaintiffs substantial loss and injury in the approximate amount of $19.3 million.

88.   The conduct of Defendants Nagel, Haney, Lewis and Jacks complained of herein occurred primarily and substantially in The Commonwealth of Massachusetts.

89.   At all relevant times, Plaintiffs were engaged in the conduct of trade or commerce within the meaning of G.L. c.93A, § 1(b).

90.   Defendants Nagel, Haney, Lewis and Jacks' violations of the Massachusetts Consumer Protection Act were wilful and/or knowing violations of said statute.

91.   This Court should find each of Defendants Nagel, Haney, Lewis and Jacks liable to the Plaintiffs in the amount of Plaintiffs' losses, and for treble such damages, plus Plaintiffs' attorney's fees in this action.

## COUNT V

### Fraudulent Transfers to Katherine Gunderson

92.     Plaintiffs repeat and reallege the contents of paragraphs 1-91 as if set forth in full herein.

93.     Shortly after the appointment of a bankruptcy trustee for the Debtors, Defendant Nagel, on or about November 3, 1998, transferred all of his interest in his personal residence located at 28 Highland Circle in the Town of Wayland, Massachusetts (the "Nagel House"), to Defendant Gunderson.  The transfer was made for the stated consideration of $10.00, although the Nagel House was purchased in 1992 for the stated consideration of $560,000.  At the time of such transfer Gunderson was Nagel's wife.

94.     On information and belief, on or about November 3, 1998 Defendant Nagel transferred other property of his to Defendant Gunderson.

95.     The transfer of the Nagel House, and, on information and belief, other property of Nagel, were made with an actual intent to defeat, delay, hinder and defraud present and future creditors of Nagel, including the Plaintiffs.

96.     At the time of such transfers, Plaintiffs were present and future creditors of Nagel.

97.     On information and belief, at the time of such transfers, Nagel was engaged or about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction, or Nagel intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

29

98.    At the time of the transfer of the Nagel House and the other property of Nagel, Nagel was insolvent or was rendered insolvent as a result of such transfer.

99.    The transfers of the Nagel House, and on information and belief the other Nagel property, was made for less than reasonably equivalent value.

100.    This Court should order (a) Defendant Gunderson to pay to the Plaintiffs the lesser of (i) the value of the interest in the Nagel House and other property of Nagel so transferred and (ii) the amount of damages incurred by Plaintiffs, or (b) that such transfers be voided to the extent necessary to satisfy Plaintiffs' claims.

101.    This Court should impose an injunction against Defendants Nagel and Gunderson against further disposition by them of the assets of Nagel and the assets transferred to Gunderson.

## COUNT VI

### Recovery of Fraudulent Transfers to Anne Haney

102.    Plaintiffs repeat and reallege the contents of paragraphs 1-101 as if set forth in full herein.

103.    Shortly after the Medium-Term Investors invested in Molten Metal, Defendant Haney, on or about May 16, 1997, transferred all of his interest in his personal residence located at 61 Lincoln Road in the Town of Wayland, Massachusetts (the "Haney House"), to Defendant Anne Haney.  The transfer was made for the stated consideration of $10.00, although the Haney House was purchased in 1992 for stated consideration of $900,000.  At the time of such transfer Anne Haney was Haney's wife.

104. On such information and belief, on or about May 16, 1997, or thereafter, Defendant Haney transferred other property of his to Defendant Anne Haney.

105. The transfer of the Haney House, and on information and belief other property of Haney, was made with an actual intent to defeat, delay, hinder and defraud present and future creditors of Haney, including the Plaintiffs.

106. At the time of such transfers, Plaintiffs were present and future creditors of Nagel.

107. On information and belief, at the time of such transfers, Haney was engaged or about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction, or Haney intended to incur, or believed or reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

108. At the time of the transfer of the Haney House and the other property of Haney, Haney was insolvent or was rendered insolvent as a result of such transfer.

109. The transfers of the Haney House, and, on information and belief, the other Haney property, were made for less than reasonably equivalent value.

110. This Court should order (a) Defendant Anne Haney to pay to the Plaintiffs the lesser of (i) the value of the interest in the Haney House and other property of Haney so transferred and (ii) the amount of damages incurred by Plaintiffs, or (b) that such transfers be voided to the extent necessary to satisfy Plaintiffs' claims.

111.   This Court should impose an injunction against Defendants Haney and Anne Haney against further disposition by them of the assets of Haney and the assets transferred to Anne Haney.

## COUNT VII

### Recovery of Fraudulent Transfers to Gail G. Preston

112.   Plaintiffs repeat and reallege the contents of paragraphs 1-111 as if set forth in full herein.

113.   Shortly after the appointment of a bankruptcy trustee for the Debtors, Defendant Preston, on or about December 1, 1998, transferred all of his interest in his personal residence located at 9 Martin's Cove Lane in the Town of Hingham, Massachusetts (the "Preston House"), to Defendant Gail Preston. At the time of such transfer Gail Preston was Preston's wife.

114.   On such information and belief, on or about December 1, 1998 Defendant Preston transferred other property of his to Defendant Gail Preston.

115.   The transfer of the Preston House, and on information and belief other property of Preston, was made with an intent to defeat, delay, hinder and defraud present and future creditors of Preston, including the Plaintiffs.

116.   At the time of such transfers, Plaintiffs were present and future creditors of Preston.

117.   On information and belief, at the time of such transfers, Preston was engaged or about to engage in a business or transaction for which his remaining assets were unreasonably small in relation to the business or transaction, or Preston intended to incur, or believed or

reasonably should have believed that he would incur debts beyond his ability to pay as they became due.

118.   At the time of the transfer of the Preston House and the other property of Preston, Preston was insolvent or was rendered insolvent as a result of such transfer.

119.   The transfers of the Preston House, and, on information and belief, the other Preston property, were made for less than reasonably equivalent value.

120.   This Court should order (a) Defendant Gail Preston to pay to the Plaintiffs the lesser of (i) the value of the interest in the Preston House and other property of Preston so transferred and (ii) the amount of damages incurred by Plaintiffs, or (b) that such transfers be voided to the extent necessary to satisfy Plaintiffs' claims.

121.   This Court should impose an injunction against Defendants Preston and Gail Preston against further disposition by them of the assets of Preston and the assets transferred to Gail Preston.

## COUNT VIII

### Negligence and Negligent Misrepresentations by R.W. Beck, Inc.

122.   Plaintiffs repeat and reallege the contents of paragraphs 1-121 as if set forth in full herein.

123.   The Medium-Term Investors and Morgens, as their advisor, hired Defendant Beck to perform an expert engineering analysis of Molten Metal's planned capital expenditures for Q-CEP, and also to confirm that Molten Metal's technology was viable. Accordingly, Defendant Beck provided Morgens and the Medium-Term Investors with oral reports and both the Capex Report and the 1997 Q-CEP Facility Report.

MHODMA.Active;8412565;6                    33

124.   As an expert and under its contract with Morgens and the Medium-Term Investors, Defendant Beck had a duty to exercise reasonable care in performing its analysis and making its reports regarding the Q-CEP Facility.

125.   Defendant Beck, on the one hand, and Morgens and the Medium-Term Investors, on the other hand, were in privity or quasi-privity as a result of the contract under which Defendant Beck was to provide Morgens and the Medium-Term Investors with reports, and by Defendant Beck's consent to Morgens' and the Medium-Term Investors use of the 1997 Q-CEP Facility Report.

126.   The Capex Report and the 1997 Q-CEP Facility Report failed to identify serious deficiencies in the Debtors' technology that could have, with the exercise of reasonable care, been discovered by Defendant Beck.

127.   The Medium-Term Investors relied on Defendant Beck in making their investment in the Debtors.  The negligence of Defendant Beck in performing work for the Medium-Term Investors was a proximate causes of the losses suffered by the Medium-Term Investors and their successor in interest, MMT Recovery.

128.   As a result, Plaintiffs have incurred losses in an aggregate amount of not less than $19.3 million.

129.   This Court should find Defendant Beck liable to the Plaintiffs in the amount of Plaintiffs' losses.

<u>PRAYER FOR RELIEF</u>

NOW THEREFORE, the Plaintiffs demand trial by jury and pray that this Court grant it the damages requested herein, plus interest, costs and attorneys fees, enter the injunctions requested herein, and grant such other relief as is just and proper under the circumstances.

                                                MMT RECOVERY LLC,
                                                RESTART PARTNERS I, L.P.,
                                                RESTART PARTNERS II, L.P.,
                                                RESTART PARTNERS III, L.P.,
                                                RESTART PARTNERS IV, L.P.,
                                                RESTART PARTNERS V, L.P.,
                                                ENDOWMENT RESTART, LLC,
                                                MORGENS WATERFALL INCOME PARTNERS, and
                                                MWV SEPARATE ACCOUNT ALPHA, LLC,

                                                By their attorneys




                                                Randall W. Bodner (BBO#549160)
                                                Steven T. Hoort (BBO#239380)
                                                D. Ross Martin (BBO#628853)
                                                Amy E. Serino (BBO#643664)
                                                ROPES & GRAY
                                                One International Place
                                                Boston, Massachusetts 02110
                                                Telephone:    617-951-7000
                                                Telecopier:   617-951-7050